**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARCOS GONZALEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>INTELLIA THERAPEUTICS, INC., JOHN LEONARD, LAURA SEPP-LORENZINO, DAVID LEBWOHL, and EDWARD J. DULAC,<br><br>                    Defendants. | Case No. 1:25-cv-10353-DJC<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

## <u>TABLE OF CONTENTS</u>

I.      NATURE OF THE ACTION ..................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................................. 6

III.    THE PARTIES ........................................................................................................... 6

IV.     FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS ............. 8

V.      SUBSTANTIVE ALLEGATIONS ............................................................................ 10

        A.      Intellia and Its Development of Therapeutics Using Gene Editing Technology. . 10

        B.      Intellia's Pipeline Expansion to Gene Insertion with NTLA-3001. ..................... 12

        C.      Undisclosed Pre-Clinical Testing Showing No Indication of Efficacy Coupled
                with a Depleting Landscape for Expensive and Inefficient Viral-Based Editing
                Methods Stalled Internal Pursuit of NTLA-3001. ................................................. 17

        D.      Defendants Misled Investors with Public Declarations of 2024 Strategic Priorities
                to Include NTLA-3001 and Target Execution of Near-Term Clinical Prospects. 23

        E.      Intellia's "At-the-Market" Offerings on Strategic Priorities and Cash Runway. . 27

        F.      The Truth Emerges. .............................................................................................. 30

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....... 33

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 63

        A.      Corroborating Former Employee Accounts Confirm Individual Defendants'
                Knowledge of and/or Access to Material Adverse Information. .......................... 63

        B.      The Individual Defendants Held Themselves Out as Knowledgeable. ................ 65

        C.      The NTLA-3001 Program was Integral to Intellia's Access to Capital ............... 71

VIII.   LOSS CAUSATION ................................................................................................. 71

IX.     CLASS ACTION ALLEGATIONS ........................................................................... 73

X.      PRAYER FOR RELIEF ........................................................................................... 80

XI.     DEMAND FOR TRIAL BY JURY ......................................................................... 80

i

**GLOSSARY**

| Term or Acronym | Definition |
|---|---|
| A1AT or AAT | Alpha-1 Antitrypsin. A protein produced by the liver and secreted into the bloodstream. AAT is a protease inhibitor meaning it helps regulate the activity of certain enzymes in the body. AAT helps protect the lungs from neutrophil elastases, an enzyme that can damage lung tissue. |
| AATD | Alpha-1 Antitrypsin Deficiency. A rare genetic disorder that can lead to lung and liver disease occurring when the patient has mutations in the *SERPINA1* gene, causing the body to produce insufficient levels or dysfunctional alpha-1 antitrypsin protein. |
| AAV | Adeno-Associated Virus is a versatile viral vector technology that can be engineered to deliver DNA to target cells. |
| ATTR | Transthyretin amyloidosis. A progressive disease caused by the buildup of abnormal transthyretin protein deposits in various organs, impacting their function. |
| CRISPR/Cas 9 | Clustered Regularly Interspaced Short Palindromic Repeats. A technology that enables the precise editing of DNA in living organisms. The CRISPR system consists of two main components: a Cas enzyme and a guide RNA (gRNA). The gRNA is designed to match the specific DNA sequence of the targeted gene to edit. The Cas enzyme, like Cas9, acts like a pair of molecular scissors, cutting the DNA at the location specified by the gRNA. |
| CTA | Clinical Trial Application. A regulatory submission made to the competent national regulatory authority(ies) for authorization to conduct a clinical trial in a specific country. |
| DNA | Deoxyribonucleic acid. The molecule that carries the genetic instructions for all living organisms. |
| *ex vivo* | Refers to medical treatments, experiments, or procedures performed on living tissue, cells, or organs that have been removed from the organism and are studied or treated outside of the body, before returning them. |
| FDA | United States Food and Drug Administration. The regulatory agency run by the Department of Health and Human Services responsible for protecting public health by ensuring the safety, efficacy, and security of various products, including food, drugs, and medical devices in the U.S. |
| FlexiVent | A sophisticated benchtop laboratory device used to measure lung function in preclinical research to assess respiratory mechanics. According to the manufacturer, it can not only measure airway resistance and compliance mechanics of pulmonary ventilation but also captures details about the mechanical properties of conducting airways, terminal airways and parenchyma. |
| HAE | Hereditary Angioedema. A genetic condition causing recurrent, painful swelling (angioedema) due to a deficiency or dysfunction of the C1- |

| Term or Acronym | Definition |
| --- | --- |
|  | inhibitor protein, most commonly occurring due to mutations in the *SERPING1* gene. |
| *in vivo* | Refers to medical treatments, experiments, or procedures performed on living organisms. In gene therapy, *in vivo* refers to delivery of therapeutic genes directly into the patient's body, rather than modifying cells outside the body and then returning them. |
| IND | Investigational New Drug application. A request for authorization from the FDA to administer an investigational drug or biological product to humans in a clinical setting. |
| LNP | Lipid Nanoparticle. A type of nanoscale delivery vehicle, composed of lipids, that are used to encapsulate and transport therapeutic agents to targeted cells or tissues. |
| MEDSAFE | New Zealand Medicines and Medical Devices Safety Authority. The regulatory body run by the New Zealand Ministry of Health responsible for the regulation of therapeutic products in New Zealand. |
| MHRA | United Kingdom Medicines and Healthcare products Regulatory Agency. The regulatory body responsible for the regulation of medicines, medical devices and blood components for transfusion in the United Kingdom. |
| NHP | Non-Human Primates. NHPs are used in research for various reasons, primarily due to their close genetic and physiological similarity to humans, making them valuable models for studying human diseases and developing treatments. |
| Pharmacological activity | Refers to the beneficial or adverse effects a drug or chemical compound has on living organisms, particularly in the context of disease prevention, treatment, or diagnosis. It encompasses the compound's ability to interact with biological systems and alter their function or structure. |
| RNA | Ribonucleic acid. A molecule essential for various biological roles, including protein synthesis and gene expression. |
| *SERPINA1* | A gene that provides instructions for making the alpha-1 antitrypsin protein. Mutations in the *SERPINA1* gene can lead to AATD, leading to reduced levels or dysfunctional AAT protein. |
| TTR | Transthyretin. A protein that is produced mainly in the liver that transports vitamin A and the thyroid hormone thyroxine throughout the body. Mutation in the TTR gene can lead to ATTR. |

Court-appointed Lead Plaintiffs John D. Albaugh, James Scott Ewert, Yiu Chung Lee, and Ronnie Evans (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this amended complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*, (a) review and analysis of relevant public filings made by Intellia Therapeutics, Inc., ("Intellia" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Intellia's public documents, conference calls, press releases, presentations, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews with former employees and/or contractors of Intellia; (e) industry reports and relevant guidance; and (f) other information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most evidence supporting the allegations contained herein is known only to Defendants or is exclusively within their control.

## I.    NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities other than Defendants (defined below) who purchased Intellia common stock between January 4, 2024 to January 8, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Intellia's and certain of its executive officers' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

2.      Intellia describes itself as a clinical-stage gene editing company. At issue in this case is Intellia's former leading drug candidate, NTLA-3001, and Defendants' materially false and misleading public statements about their near-term strategic priorities and the clinical development of that program. Externally, Intellia and its leading executive officers provided investors and analysts with effusive statements about their commitment to and execution on progressing NTLA-3001 to its first-in-human Phase 1/2 clinical trial, necessary for market approval of the drug but also serving as a proof-of-concept trial for the expanded therapeutic potential of CRISPR-based technologies moving beyond knockouts in the liver. Internally, the truth was quite different. After disappointing preclinical studies showed no indication of efficacy in mice or nonhuman primates, Intellia had all but abandoned the development of NTLA-3001 in favor of its other development candidates, NTLA-2001 and NTLA-2002, which were much less expensive to test and manufacture, and used a simpler gene editing delivery system making the drugs easier to administer and validate. Defendants kept investors in the dark about Intellia's true business strategy and its starving of NTLA-3001 of resources necessary for clinical development just long enough to raise over $175 million through public "at-the-market" stock sales. Investors who bought Intellia stock on the hype of NTLA-3001 were left holding the bag once Defendants admitted to the discontinuation of the program before ever dosing a single human patient. This action seeks to recover the losses sustained by these investors for Defendants' duplicity concerning Intellia and its true intentions about NTLA-3001's development.

3.      NTLA-3001 was Intellia's first and wholly owned *in vivo* targeted gene insertion program for the treatment of alpha-1 antitrypsin deficiency ("AATD")-associated lung disease. Defendants referred to NTLA-3001 as a leading development candidate.

4.      NTLA-3001 used a hybrid delivery system to replace sick (or mutated) liver genes with healthy ones that could properly produce AAT proteins after just a single dose. Intellia described the process as combining the Company's proprietary non-viral lipid nanoparticles ("LNP") encapsulating the CRISPR/Cas9 targeting component, with an adeno-associated virus ("AAV") vector carrying the new healthy gene, to enable the precise target of the mutated *SERPINA1* gene in the liver and insertion of a healthy copy of the *SERPINA1* gene which encodes the AAT protein, with the potential to permanently restore expression of functional AAT protein to therapeutic levels after a single dose.

5.      On January 4, 2024 (the first day of the Class Period), Intellia announced its near-term "strategic priorities" and cash runway through 2026 and outlined key development milestones in 2024. In particular, Intellia announced its earlier-than-expected submission of a Clinical Trial Application ("CTA") to the United Kingdom's Medicines and Healthcare products Regulatory Agency ("MHRA") to initiate a first-in-human Phase 1/2 study of NTLA-3001 for the treatment of AATD-associated lung disease, declaring its near-term "strategic priorities" to include the launch of this innovative clinical trial "validating CRISPR-based *in vivo* targeted gene insertion," and setting its related milestone of first patient dosed by year-end.

6.      Investors and analysts praised the Company's inclusion of the AATD program in its near-term strategic priorities, and were enthused by its potential for growth through the clinical development of its first-in-human Phase 1/2 trial of NTLA-3001, a proof-of-concept trial for *in vivo* targeted gene insertion. For example, on this news, one analyst following the Company noted "[w]ith two late-stage assets with clinical POC [proof-of-concept] and a 3rd asset entering Ph1 in AATD, we continue to see significant upside for NTLA in the near, mid- and longer term, driven by its *in vivo* knockout & insertion, base editing and *ex vivo* platforms." Another analyst

highlighted the early submission of the CTA as "keeping 2024 PH1 initiation on track," noting "[w]hile we are conservative on ATTR-CM and HAE prospects, we believe AATD is a more suitable indication for gene-editing, given severity and unmet need."

7.     Throughout the Class Period, Intellia and those who ran it—particularly the Individual Defendants (defined below)—repeatedly touted the CTA submission and subsequent authorization to initiate the first-in-human Phase 1/2 study of NTLA-3001 for the treatment of AATD-associated lung disease, reinforcing that the program was a strategic priority in 2024 and touting ongoing execution of clinical advancement with statements like, "[w]e're continuing to advance novel gene editing and delivery technologies for both *in vivo* and *ex vivo* therapeutic applications;" "[o]ur clinical development of the *in vivo* pipeline is rapidly accelerating;" and "[w]e now have active research programs in 5 different tissues outside the liver … this includes the … lung;" and repeated assurances that Intellia was "[o]n track to dose the first patient in the Phase 1 study of NTLA-3001 … in 2024;" and "it is possible that we'll have data, reasonable to think we have data in 2025."

8.     Unbeknownst to investors, however, Intellia had secretly shifted its business strategy. It no longer considered NTLA-3001 a priority and was already taking steps to wind down the AATD program. By 2024, market demand for AAV-based editing therapies (like NTLA-3001) was rapidly dwindling due to their low yield delivery presenting both exorbitantly higher production costs and technical constraints. In addition to being cost prohibitive and inefficient, the use of AAV vectors in NTLA-3001's dual delivery system made the treatment harder to carry out and more difficult to validate. Worse yet, undisclosed preclinical testing of NTLA-3001, completed in 2023, showed no indication of efficacy in mice or non-human primates making it exceptionally unlikely that the Company would be able to show any therapeutic impact in human

clinical trials. As a result, by the start of the Class Period, Intellia had already begun to quietly wind down NTLA-3001, ceasing all preclinical research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services, and allowing critical licenses to expire, all necessary for the clinical advancement of NTLA-3001.

9.    Consequently, Defendants' public representations created the materially false and/or misleading impression that Intellia remained committed to the AATD program, that it was proceeding with its development as described to investors, and that its then-known pre-clinical testing supported efficacy. None of this was true. Defendants' statements also concealed Intellia's change in strategy and material risks associated with known efficacy problems and the design of NTLA-3001. Defendants' Class Period misrepresentations and omissions of these material facts caused Plaintiffs and other shareholders to purchase Intellia securities at artificially inflated prices.

10.    The truth emerged on January 9, 2025, when Intellia published a press release announcing the discontinuation of *all* NTLA-3001 related research and development, including the abandonment of the first-in-human Phase 1/2 trial prior to any patients dosed, and a related reduction in workforce by 27%, shifting all its resources to later-stage clinical programs.

11.    On this news, the price of Intellia securities declined dramatically from a closing price of $12.02 per share on January 8, 2025, to $10.20 per share on January 10, 2025 (*i.e.*, the next trading session due to markets being closed on January 9, 2025 in observance of the passing of former President Jimmy Carter), a decline of about 15% in the span of a single trading day.

12.    Plaintiffs bring this action seeking to recover the tens of millions of dollars of investment losses caused by Defendants' violations of the federal securities laws.

## II.    <u>JURISDICTION AND VENUE</u>

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as Defendant Intellia is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and other members of the Class, took place within this District.

16.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    <u>THE PARTIES</u>

17.    Plaintiff John D. Albaugh purchased Intellia securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Albaugh's certification evidencing his transaction(s) in Intellia is incorporated herein by reference. *See* ECF No. 11-1.

18.    Plaintiff James Scott Ewert purchased Intellia securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Ewert's certification evidencing his transaction(s) in Intellia is incorporated herein by reference. *See* ECF No. 14-3.

19. Plaintiff Yiu Chung Lee purchased Intellia securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Lee's certification evidencing his transaction(s) in Intellia is incorporated herein by reference. *See id.*

20. Plaintiff Ronnie Evans purchased Intellia securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Mr. Evans' certification evidencing his transaction(s) in Intellia is incorporated herein by reference. *See id.*

21. Intellia Therapeutics, Inc. is a Delaware corporation with its principal executive offices located at 40 Erie Street, Suite 130, Cambridge, Massachusetts 02139. During the Class Period, the Company's common stock traded on the National Association of Securities Dealers Automated Quotations (the "NASDAQ") under the symbol "NTLA."

22. Defendant John Leonard ("Leonard") has served as Intellia's President and Chief Executive Officer ("CEO") since January 2018, and as a member of the Company's board of directors since July 2014, and at all relevant times thereafter.

23. Defendant Laura Sepp-Lorenzino ("Sepp-Lorenzino") served as the Company's Executive Vice President ("EVP"), Chief Scientific Officer ("CSO") from May 2019 until her transition to Special Advisor to the CEO announced January 9, 2025, effective January 13, 2025, prior to retirement effective December 31, 2025.

24. Defendant David Lebwohl ("Lebwohl") has served as Intellia's EVP, Chief Medical Officer ("CMO") since April 2020 and at all relevant times thereafter.

25. Defendant Edward J. Dulac ("Dulac") has served as Intellia's EVP, Chief Financial Officer ("CFO") and Treasurer since July 22, 2024, and at all relevant times thereafter.

26.     Defendants Leonard**,** Sepp-Lorenzino, Lebwohl, and Dulac are collectively referred to herein as the "Individual Defendants." Intellia together with the Individual Defendants are referred to herein as the "Defendants."

27.     The Individual Defendants, because of their day-to-day responsibilities at Intellia and the executive authority they wielded, possessed the power and authority to control the contents of Intellia's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

28.     Intellia is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

29.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Intellia under *respondeat superior* and agency principles.

## IV.     FORMER EMPLOYEES CORROBORATING FACTUAL ALLEGATIONS

30.     Confidential Witness #1 ("CW1") was employed by Intellia between June 2018 and June 2024. During their tenure with the Company, CW1 served as Senior Associate Scientist from

October 2021 to June 2024, and a Research Associate from June 2018 to October 2021, with a focus on early-stage laboratory research.

31.     Confidential Witness #2 ("CW2") was employed by Intellia between January 2023 and January 2025. During their tenure with the Company, CW2 served as a Computational Biologist focused on processing sequencing data and developing therapeutic insights. In this role, CW2 supported the Company's *ex vivo* efforts, specifically cell therapy development, known as CAR T-cell therapy.

32.     Confidential Witness #3 ("CW3") was employed by Intellia between April 2023 and January 2025. During their tenure with the Company, CW3 served as a Senior Research Associate with a focus on disease biology. In this role, CW3 conducted research on Intellia's discovery programs, including assay development, and contributed to its IND-enabling activities with the preparation of data for preclinical packages. CW3 reported to Sean Burns, Intellia's Vice President of Disease Biology, who, in turn, reported to Defendant Sepp-Lorenzino.

33.     Confidential Witness #4 ("CW4") was employed as a Scientist at Intellia between March 2023 and January 2025. In this role, CW4 and their team created molecular assays and cell-potency assays to test whether a drug was safe and potent. These tests were meant to show that a therapy or development program met regulatory standards before being administered to humans.

34.     Confidential Witness #5 ("CW5") served as the Director of the Protein Production and Assay Group at Intellia between August 2022 and January 2025, when they were laid off. CW5 served in similar roles going back to 2015. As Director of the Protein Production and Assay Group, CW5 led a team of up to eight scientists responsible for producing proteins and developing assays, including the CRISPR/Cas9 variants and engineered enzymes at the Company. CW5 and

their team also supported Intellia's *in vivo* and *ex vivo* programs by assisting with the LNP delivery efforts. CW5 reported directly to Defendant Sepp-Lorenzino.

35.    Confidential Witness #6 ("CW6") was employed by Intellia between March 2022 and January 2025. During their tenure with the Company, CW6 served as an *in vivo* Study Support Technician. In this role, CW6 performed pre-clinical studies involving animal testing. Throughout 2023, CW6's work focused primarily on the pre-clinical testing of NTLA-3001 to determine whether the therapeutic molecules accurately targeted the lungs and whether there were changes in lung histology. CW6 was responsible for administering Lipid Nanoparticles ("LNPs") to the lungs of mice and measuring lung mechanics using a FlexiVent machine. CW6 was the point person for using the FlexiVent at Intellia. CW6 reported to Cindy Shaw, former Director of Preclinical Pharmacology at Intellia, who, in turn, reported to Jonathan Phillips, Head of Toxicology and Pharmacology, who, in turn, reported directly to its chief executive officers.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Intellia and Its Development of Therapeutics Using Gene Editing Technology.

36.    Intellia is a gene editing company focused on development and commercialization of novel, potentially curative therapeutics leveraging CRISPR/Cas9-based technologies.

37.    The CRISPR/Cas9 system is a technology developed for genome editing, the process of altering selected sequences of genomic deoxyribonucleic acid ("DNA") – *i.e.*, the instructions for how the body should function. This system can be used to make three general types of edits: knockouts, repairs, and insertions.

38.    According to Intellia, CRISPR/Cas9 genome editing has the potential to make permanent, precisely targeted changes in a patient's chromosomes and repair the underlying

10

genetic mutation, whereas more traditional gene therapy typically involves introducing a non-permanent copy of a gene into a patient's cells.

39.    Recognizing the potential for treating—and possibly curing—a broad range of severe diseases with gene editing approaches, the Company's stated strategy is to develop and commercialize its product candidates and further its gene editing technology to develop new product candidates, expanding the application of gene editing medicine.

40.    Intellia continues to add new capabilities to expand its existing solutions including its proprietary base editor and DNA writing technology, its proprietary LNPs and modular adeno-associated virus ("AAV") vector delivery systems, as well as novel CRISPR enzymes, which provides it with the capabilities to achieve multiple editing strategies.

41.    According to Intellia, it leverages its modular CRISPR/Cas9-based gene editing platform to advance both *in vivo* and *ex vivo* therapies for diseases with high unmet needs. The Company's *in vivo* programs use intravenously administered CRISPR/Cas9-based technologies as the therapy, in which proprietary delivery technology (like LNPs and/or AAV) enables highly precise editing of disease-causing genes directly within specific target tissues. Intellia's *ex vivo* programs apply CRISPR outside the body to create a therapy by using engineered human cells to treat immuno-oncology and autoimmune diseases.

42.    To maximize opportunity to rapidly develop clinically successful products, Intellia claims to utilize a risk-mitigated approach to selecting indications with significant unmet medical needs based on four primary criteria:

- the type of edit: knockout, repair or insertion;

- the delivery modality for *in vivo* and *ex vivo* applications;

- the existence of efficient regulatory pathways to approval; and

11

- the potential for the CRISPR/Cas9 system to provide improved therapeutic benefits over existing therapeutic options.

43.     At all relevant times, the Company made claims of continued advancements in its platform's modular solutions and research efforts on genome editing technologies as well as delivery and cell engineering capabilities to generate additional development candidates, building a diversified pipeline such that Intellia was not reliant on any single delivery technology or editing approach, increasing the probabilities for success.

**B.     Intellia's Pipeline Expansion to Gene Insertion with NTLA-3001.**

44.     The Company first pursued the clinical development of two *in vivo* CRISPR/Cas9-based therapy candidates, NTLA-2001 (or "nex-z") for the treatment of transthyretin amyloidosis ("ATTR") and NTLA-2002 for the treatment of hereditary angioedema ("HAE"), each utilizing a gene knockout strategy to target defective genes in the liver.

45.     Intellia completed its transition from a pre-clinical to a clinical-stage company in the fourth quarter of 2020 when, in November, it dosed the first patient in its first-in-human Phase I study evaluating NTLA-2001, designed to inactivate the transthyretin ("TTR") gene in liver cells.

46.     Purportedly leveraging insights gained from the development of NTLA-2001, in June 2021, Intellia announced that it had submitted its first Clinical Trial Application ("CTA") to the New Zealand Medicines and Medical Devices Safety Authority ("MEDSAFE") for NTLA-2002 to initiate a first-in-human study.

47.     In October 2021, Intellia announced the authorization of its CTA by MEDSAFE to initiate a Phase 1/2 study evaluating NTLA-2002, and the following month announced that a second CTA had been subsequently authorized by the United Kingdom's ("U.K.") Medicines and

Healthcare products Regulatory Agency ("MHRA") for the first-in-human study of NTLA-2002, with plans to (and did) dose the first patient by year-end.

48.     With the Company's first two *in vivo* programs advancing in clinical development, on November 4, 2021, Intellia announced its first and wholly owned CRISPR/Cas9-mediated *in vivo* targeted **gene insertion** development candidate, NTLA-3001, for treatment of Alpha-1 Antitrypsin Deficiency (AATD)-associated lung disease.

49.     AATD is a rare genetic disorder that can lead to lung and liver disease, occurring when the patient has two mutated copies of the *SERPINA1* gene, causing the body to produce insufficient levels of the alpha-1 antitrypsin ("A1AT" or "AAT") protein. A wild-type (*i.e.*, standard, non-mutated) *SERPINA1* gene encodes the AAT protein produced in the liver that is then secreted to protect the lungs from inflammation and irritating substances introduced into the lungs when breathing. With insufficient levels of the AAT protein, patients are more susceptible to lung damage from smoking, pollution, or even dust from the environment. This can lead to a serious condition known as chronic obstructive pulmonary disease (or COPD). AATD may also cause a liver disease known as cirrhosis. Intellia estimates that there are more than 60,000 severe AATD patients in the United States and roughly 250,000 globally.

50.     According to Intellia, NTLA-3001 is designed to precisely insert a healthy copy of the *SERPINA1* gene, which encodes the AAT protein, with the potential to permanently restore expression of functional AAT protein to therapeutic levels after a single dose. As a potential therapeutic cure, NTLA-3001 was to eliminate the need for weekly intravenous infusions of AAT augmentation therapy or transplant in severe cases.

51.     The Company's CRISPR-based *in vivo* targeted gene insertion platform for the treatment of AATD-associated lung disease (*i.e.*, NTLA-3001) used a hybrid delivery system

13

combining Intellia's proprietary LNPs, encapsulating the CRISPR/Cas9 targeting component, with an AAV vector carrying a donor DNA template, or the new healthy *SERPINA1* gene, to enable therapeutic AAT protein production to normal human levels.

52.     Intellia's announcement of NTLA-3001 as a clinical development candidate followed its October 19, 2021 presentation of data at the 29th Annual Congress of the European Society of Gene & Cell Therapy (ESGCT), purportedly showing that insertion of a healthy form of the *SERPINA1* gene led to normal human AAT levels in non-human primates (NHPs) which were durable after 52 weeks.

53.     The advancement of its first gene insertion platform sparked new interest in Intellia and was seen as an important catalyst to delivering on its promise of expanding the application of gene editing medicine. For example, analysts at Chardan Capital Markets issued a report noting the Company's advancement of *in vivo* insertion development candidates "signal the platform may be ready for prime time."

54.     Similarly, analyst Michael G. King of H.C. Wainwright & Co. issued a report following the Company's announced advancement of NTLA-3001, among other things, noting the "announcement reinforces our enthusiasm for the stock and we see these announcements as positive signals on Intellia's efforts to deliver on the promise of its groundbreaking genome editing technology platform." It went on to state, in pertinent part:

> **NTLA-3001 has been advanced into IND enabling studies as the company's first gene insertion development candidate**. NTLA-3001 is aimed at Alpha-1 Antitrypsin Deficiency (AATD), a genetic disorder defined by the inheritance of two severe deficiency alleles at the A1AT locus. The disease primarily leads to lung dysfunction (90% of AATD patients) resulting in chronic obstructive pulmonary disease. A possible treatment strategy for patients with the lung manifestation of the disease would be to insert a healthy copy of a healthy *SERPINA1* gene to produce functional A1AT protein in the lung. This strategy uses the company's modular LNP CRISPR/Cas9 strategy in combination with a healthy copy of the SERPINA1 gene delivered using AAV. Unlike episomal expression of genes by

14

AAV, in this case the virus is used as a delivery vehicle for the DNA that gets inserted at the endogenous albumin locus of target cells. Preclinical data presented in October at the European Society for Gene and Cell Therapy Congress (ESGCT) by Intellia, demonstrated that in non-human primates (NHP) therapeutic levels of human A1AT expression can be achieved and maintained for one year… Although these are preliminary preclinical results traditionally NHPs have been remarkably good predictors of potential clinical outcomes in human studies as we have seen previously with TTR amyloidosis.

55.    In tandem with its announcement of NTLA-3001, on February 24, 2022, Intellia announced another wholly owned *in vivo* knockout development candidate, NTLA-2003, for treatment of AATD-associated liver disease. According to Intellia, NTLA-2003 would address a small subset of patients, approximately 10% to 15%, particularly adolescent patients, who experience live dysfunction due to accumulation of mutant AAT protein. Like NTLA-2001 and NTLA-2002, utilizing the gene knockout strategy, NTLA-2003 was designed to inactivate the *SERPINA1* gene responsible for the production of the abnormal AAT protein in the liver. Thus, while related to NTLA-3001 in that they both target the same gene, Intellia emphasized that the two programs were distinct from each other based on their gene editing approach and potential therapeutic impact.

56.    Throughout 2022 and 2023, Intellia repeatedly told investors that it was advancing its pipeline of *in vivo* programs towards clinical development, conducting Investigational New Drug ("IND")-enabling activities for NTLA-3001 and NTLA-2003, highlighting NTLA-3001, specifically, by touting plans to file an IND application or equivalent before year-end 2023. Intellia did not provide the same guidance for NTLA-2003, signaling to investors it was a lower priority.

57.    Then, on November 9, 2023, when announcing its financial results for the third quarter of 2023 ("3Q23"), Intellia informed investors of its decision to halt further IND-enabling activities for NTLA-2003 to "prioritize a research program for Alpha 1 utilizing our DNA writing technology" (*i.e.*, NTLA-3001). Concurrently, Intellia provided a definitive regulatory approval

pathway for NTLA-3001, announcing its plans to submit a Clinical Trial Application (CTA) to the U.K.'s MHRA in the first quarter of 2024.

58.     During the Company's conference call to discuss its 3Q23 financial results, then-CFO Glenn Goddard explained the decision to prioritize NTLA-3001 over NTLA-2003 stating that, "[a]s we move forward in the current capital market environment we will continue to be selective with how we deploy capital and will continue to make important portfolio prioritization decisions to support our continued growth."

59.     Defendant Leonard echoed Mr. Goddard's statements when responding to inquiries about contributing factors to halting IND-enabling activities for NTLA-2003:

> Salveen Jaswal Richter, Goldman Sachs Group, Inc.: With regard to the AAT program 2003, can you just walk us through what you saw pre-clinically to discontinue this program? And just your thoughts about why gene writing is the technology to move forward with here?
>
> John M. Leonard: As we looked at the strict liver manifestations of Alpha 1 antitrypsin deficiency, which is what 2003 would address, we see that as what is, a pretty small subset of all patients, it's estimated 10% up to 15%, [that] actually experienced that. And so as we balance that opportunity, versus the progress we're making with the [ CI ] writing approach. We thought that the better deployment of our resources was to the CI writing, which again is making good progress in the preclinical setting. We will have more opportunity to talk about that as time goes on. But one of the things that we're very excited about is deploying that technology even more broadly in other conditions.

60.     Defendant Leonard is also quoted in the Company's 3Q23 announcement reiterating Intellia's commitment to NTLA-3001 and the value the program brings to its future growth stating, in pertinent part, "[l]ooking ahead, we expect to achieve several notable milestones in the coming weeks and months, including … submitting a regulatory filing to begin clinical development for NTLA-3001, our *in vivo* gene insertion program for people living with alpha-1 antitrypsin deficiency. We look forward to advancing our pipeline and platform as we move closer to realizing the potential of CRISPR-based medicines."

C.    **Undisclosed Pre-Clinical Testing Showing No Indication of Efficacy Coupled with a Depleting Landscape for Expensive and Inefficient Viral-Based Editing Methods Stalled Internal Pursuit of NTLA-3001.**

61.    Ordinarily, clinical testing progresses along a regimented schedule beginning with Phase 1 testing focused primarily on determining the safety, side effects, and best dosage in a limited pool of patients; progressing to Phase 2 testing, once safety and dosage are established, to determine if the new treatment has sufficiently promising efficacy to warrant further investigation as well as to further assess safety at selected dosage through an expanded patient population; before finishing out with Phase 3 testing to confirm efficacy and safety at selected dosage in an even larger patient pool, providing sufficient data to support market approval for widespread public use.

62.    A Phase 1/2 clinical trial is a combined study that integrates elements of both Phase 1 and Phase 2 trials. The aim is to expedite the development of new treatments by gathering information on both safety and efficacy simultaneously, rather than conducting these phases separately.  In addition to determining the safety, side effects, and best dosage of a new treatment, a Phase 1/2 trial also tests how well a certain disease responds to the new treatment (*i.e.*, efficacy).

63.    During a new drug's early preclinical development, the primary goal is to determine if the product is reasonably safe for initial use in humans in limited, early-stage clinical studies, and if the compound exhibits pharmacological activity that justifies commercial development.

64.    According to CW6, it was widely understood within the Pre-clinical Pharmacology team at Intellia that NTLA-3001 did not show efficacy in the animal studies conducted in 2023. There was no efficacy at all, CW6 said, adding that Intellia could not prove efficacy even in mice.

65.    CW6 said they ran several pilot studies in 2023 with the Company's FlexiVent machine [1] specifically designed to gauge the efficacy of NTLA-3001, and none of them

---

[1] A FlexiVent machine is a sophisticated benchtop laboratory device used to measure lung function

demonstrated any efficacy. According to CW6, the FlexiVent machine was critically important for the NTLA-3001 program because it was the only way to demonstrate whether the program was properly targeting the lungs and having a therapeutic impact. CW6 said the FlexiVent machine was purchased in the summer of 2023 specifically for this purpose. CW6 explained that for a program like NTLA-3001, which was designed to treat pulmonary conditions, it was essential to prove in animal studies that the therapy actually reached the lungs and changed lung function.

66.     According to CW6, if successful, the FlexiVent study would have shown whether the molecules delivered via lipid nanoparticles (LNPs) were reaching the lungs and if they stayed there. CW6 explained one would know if there was any change to the lung histology from delivery. According to CW6, those early pilot studies of NTLA-3001, conducted in 2023, showed no changes in either the cell populations or the histology of the lungs. If the Company could not prove the program could do it in mice, there is no way it could prove that in humans, CW6 said.

67.     CW6 said the problems with the 2023 FlexiVent studies, and the lack of efficacy for NTLA-3001, were widely understood among their colleagues at Intellia. CW6 added their superior, former Director of Preclinical Pharmacology at Intellia, Cindy Shaw, was also aware.

68.     CW6 said that by the beginning of 2024, the Company stopped doing any FlexiVent studies with NTLA-3001. CW6 reiterated that the FlexiVent machine was central to proving the program's lung targeting capabilities and the fact that it sat unused was significant. CW6 said they knew Intellia had given up on or de-prioritized NTLA-3001 because the FlexiVent sat unused for all of 2024. In addition, CW6 said the Company did not have all the proper certifications to comprehensively conduct testing of NTLA-3001. According to CW6, Intellia let its necessary

---

in preclinical research to assess respiratory mechanics. According to the manufacturer, it can not only measure airway resistance and compliance mechanics of pulmonary ventilation but also captures details about the mechanical properties of conducting airways, terminal airways and parenchyma. *See http://www.scireq.com/flexivent.*

Drug Enforcement Administration ("DEA") license expire at the end of 2023. Based on their observations, CW6 said the Company effectively abandoned trying to prove that NTLA-3001 was reaching the lungs in 2023.

69.     According to CW6, in addition to the pre-clinical testing conducted at Intellia, the Company outsourced additional nonhuman primate studies for NTLA-3001 in 2023. CW6 said these nonhuman primate studies similarly showed no indication of efficacy. CW6 recalled that the results of these studies were discussed amongst CW6 and their team during small group meetings (held on Fridays) around April 2024. According to CW6, Ms. Shaw definitively told CW6 during this meeting that these studies showed there was no editing in the nonhuman primates and that they were not finding what they were looking for.

70.     According to CW1, CW2, and CW4, the hybrid delivery system utilized for NTLA-3001 made the program more complicated, costly, and uncertain in comparison to the other *in vivo* programs at Intellia. CW2 said it was well known and widely accepted within the Company that NTLA-3001 was a difficult program and much harder to deliver. As CW1 and CW4 explained, the Company's earlier programs (like NTLA -2001 and -2002) only needed to cut a section of DNA. Once the cut was made, the targeted gene would be knocked out, and that was the end of the process. But NTLA-3001 used a different method. After the DNA was cut, the program also had to insert a new DNA sequence into the genome. That extra step made the treatment harder to carry out and more uncertain. According to CW1 and CW4, the scientific complexity of the program increased the risk that did would not succeed.

71.     CW4 added that the AAV vector component used in NTLA-3001 also made the program much more expensive and inefficient to produce than those using LNPs only. CW4 explained that AAV vector production has very low yield – approximately 20% or 30%. Because

the yield is so low, the Company had to spend a lot of money to produce a very small amount as it often requires multiple production cycles for a single dose, presenting both cost and technical constraints. According to CW4, this is especially true for *in vivo* therapies where the vector needs to reach the entire body (like NTLA-3001). For context, CW4 said all the gene therapies released in the last fifteen years that used AAV vectors all cost between $1 and $3 million for one dose. According to CW4 and CW5, many companies in the gene editing and delivery space were already starting to move away from AAV vectors as a delivery method in 2024 because of these constraints.

72.     CW6 said there was no excitement about NTLA-3001 inside Intellia. According to CW6 other programs, like NTLA-2002, were treated very differently. For those programs, Intellia would hand out t-shirts and other swag at Company town hall meetings (attended and led by senior executives, including the Individual Defendants, as detailed in Section VII.A, *infra*). But for NTLA-3001, there were no t-shirts or swag.

73.     According to CW3, beginning in July 2024, the general sentiment at Intellia was concern about potential layoffs. CW3 recalled that, in July 2024, Intellia's Vice President of Disease Biology, Sean Burns, sent an email to the Company's Disease Biology department (including CW3) informing them that the department was being moved to "high-priority projects." According to CW3, the email went on to say that, at that time, Mr. Burns had no information about a layoff but expressed that, in his opinion, it was in the department's best interest to make sure that everyone on the team is indispensable. CW3 said Mr. Burns sent the same email in November 2024 to make sure everyone in the department was working on high-priority things only.

74.     According to CW5, in addition to the workforce reduction announced in January 2024, Intellia continued efforts to trim the business, deprioritizing programs during the second and

third quarter of 2024. CW5 recalled having direct conversations with Defendant Sepp-Lorenzino in or around October 2024 about more layoffs.

75.    CW2 recalled that they first learned of NTLA-3001's discontinuation on December 12, 2024, during the Company's year-end town hall meeting held *via* Zoom. Referring to their notes taken during the meeting, CW2 recalled the slide show presentation shown included a slide admitting that NTLA-3001 "did not meet our goals."

76.    Intellia's reported research and development ("R&D") expenses further support the corroborating accounts of these former employees that the Company was no longer focused on the clinical development of the AATD program and had already begun to quietly wind down NTLA-3001 from the beginning of 2024 by diverting necessary resources to other programs. Indeed, while Intellia's total R&D expenses consistently increased quarter-over-quarter ("q/q") and year-over-year ("y/y") during the fiscal year ended December 31, 2024, the Company's allocation of funds to NTLA-3001 rapidly declined.

77.    For example, for 2024 Intellia's reported external costs related to NTLA-3001 totaled $8.7 million as compared to $17.3 million in 2023, and as compared to $11.5 million in 2022. This represents a 50% decline y/y at a time when the Company was publicly touting the initiation of its first-in-human Phase 1/2 trial of NTLA-3001. For context, Intellia's external R&D expenses for its other two *in vivo* programs also touted as advancing in clinical development and designated "strategic priorities" in 2024—*i.e.*, NTLA-2001 (or nex-z) and NTLA-2002— increased by 28% and 72% y/y, respectively.

78.    The following chart summarizes Intellia's external R&D expenses by program, together with the changes in those items in dollars and the respective percentages of change, leading up to and throughout the Class Period:

| | Three Months Ended March 31, | | Period-to-Period Change | Percent Change |
|---|---|---|---|---|
| | 2023 | 2022 | | |
| NTLA-2001 | $9,730 | $8,572 | $1,158 | 14% |
| NTLA-2002 | $4,154 | $1,700 | $2,454 | 144% |
| NTLA-3001 | $3,937 | $1,574 | $2,363 | 150% |
| | Three Months Ended June 30, | | Period-to-Period Change | Percent Change |
| | 2023 | 2022 | | |
| NTLA-2001 | $13,389 | $9,017 | $4,372 | 48% |
| NTLA-2002 | $7,456 | $3,357 | $4,099 | 122% |
| NTLA-3001 | $4,224 | $4,103 | $121 | 3% |
| | Three Months Ended September 30, | | Period-to-Period Change | Percent Change |
| | 2023 | 2022 | | |
| NTLA-2001 | $16,404 | $10,249 | $6,155 | 60% |
| NTLA-2002 | $4,798 | $2,808 | $1,990 | 71% |
| NTLA-3001 | $8,563 | $2,325 | $6,238 | 268% |
| | Year Ended December 31, | | Period-to-Period Change | Percent Change |
| | 2023 | 2022 | | |
| NTLA-2001 | $54,454 | $37,849 | $16,605 | 44% |
| NTLA-2002 | $24,560 | $11,611 | $12,949 | 112% |
| NTLA-3001 | $17,312 | $11,506 | $5,806 | 50% |
| | Three Months Ended March 31, | | Period-to-Period Change | Percent Change |
| | 2024 | 2023 | | |
| NTLA-2001 | $13,658 | $9,730 | $3,928 | 40% |
| NTLA-2002 | $8,793 | $4,154 | $4,639 | 112% |
| NTLA-3001 | $3,637 | $3,937 | ($300) | -8% |
| | Three Months Ended June 30, | | Period-to-Period Change | Percent Change |
| | 2024 | 2023 | | |
| NTLA-2001 | $14,706 | $13,389 | $1,317 | 10% |
| NTLA-2002 | $10,676 | $7,456 | $3,220 | 43% |
| NTLA-3001 | $1,602 | $4,224 | ($2,622) | -62% |
| | Three Months Ended September 30, | | Period-to-Period Change | Percent Change |
| | 2024 | 2023 | | |
| NTLA-2001 | $22,842 | $16,404 | $6,438 | 39% |
| NTLA-2002 | $11,656 | $4,798 | $6,858 | 143% |
| NTLA-3001 | $1,766 | $8,563 | ($6,797) | -79% |
| | Year Ended December 31, | | Period-to-Period Change | Percent Change |
| | 2024 | 2023 | | |
| NTLA-2001 | $69,793 | $54,454 | $15,339 | 28% |
| NTLA-2002 | $42,173 | $24,560 | $17,613 | 72% |
| NTLA-3001 | $8,709 | $17,312 | ($8,603) | -50% |

**D.      Defendants Misled Investors with Public Declarations of 2024 Strategic Priorities to Include NTLA-3001 and Target Execution of Near-Term Clinical Prospects.**

79.      On January 4, 2024, the first day of the Class Period, Intellia issued a press release highlighting its "Three-Year Strategic Priorities and Anticipated 2024 Key Milestones" that "support the company's mission to transform the lives of patients and bring forth a new era in medicine." In pertinent part, Intellia provided "Recent Pipeline Advancement and Corporate Updates" including that it "[s]ubmitted a clinical trial application to initiate a first-in-human Phase 1 study of NTLA-3001 ahead of previous Q1 2024 expectation" in December 2023 supporting the Company's "[a]nticipated 2024 [m]ilestone[]," of "[d]ose first patient in Phase 1 study of NTLA-3001 in 2024."

80.      Analysts and investors alike treated this news as the achievement that management claimed it to be, valuing Intellia on this basis. For example, that same day, Gena Wang of Barclays published a report detailing the Company's "outlined 2024 milestones and 2024-2026 strategic priorities, with a focus on moving forward 3 existing clinical assets in ATTR, HAE and AATD…." The report went on to note that, "[w]ith two late-stage assets with clinical POC and a 3rd asset entering Ph1 in AATD, we continue to see significant upside for NTLA in the near, mid- and longer term, driven by its *in vivo* knockout & insertion, base editing and *ex vivo* platforms," highlighting, in relevant part, that "[f]or NTLA-3001 (*in vivo* insertion for AATD-associated lung disease), NTLA reported CTA submission ahead of prior guidance of 1Q24, with plans to initiate Ph1 first-in-human trial in 2024."

81.      Likewise, analyst David Lebowitz of Citigroup Global Markets Inc. issued a report highlighting, "Intellia's first insertion candidate, NTLA-3001 for AATD-associated lung disease," noting that "CTA submission is complete, keeping 2024 PH1 initiation on track. While we are

conservative on ATTR-CM and HAE prospects, we believe AATD is a more suitable indication for gene-editing, given severity and unmet need."

82.     On January 7, 2024, analysts at RBC Capital Markets published a report stating, in pertinent part, "we remain buyers, as we fundamentally believe that NTLA is best positioned for *in vivo* gene editing (the future for this field)." The report made note that in communications with Intellia's management, management emphasized that an announced reduction in workforce had "no impact on efforts to reach tissue beyond liver [*i.e.*, the development of NTLA-3001 as a pulmonary treatment], as that remains an important priority." It went on to note that the rest of Intellia's pipeline was on track highlighting, "[o]n [NTLA-3001], the first patients are expected to be dosed in 2024 and NTLA remains excited about an approach that can tackle both lung and liver (recall that siRNA can tackle only liver and next-gen augmentation therapy only lung)."

83.     On January 9, 2024, Intellia presented at the J.P. Morgan 42nd Annual Healthcare Conference during which Defendant Leonard further discussed Intellia's "strategic priorities" in the near-term including launching the next wave of *in vivo* clinical programs, claiming the Company has "moved beyond knockouts to the liver to knock-ins of the liver," highlighting, *inter alia*, recent CTA submission for NTLA-3001, its clinical program designed as a "proof-of-concept for [gene] insertion" to treat AATD-associated lung disease, utilizing Intellia's "DNA writing technology." He went on to detail "key milestones for the upcoming year by program" providing, in relevant part, "we anticipate beginning dosing for the gene insertion program for AATD."

84.     The following day, analyst Brian Cheng of J.P. Morgan issued a report noting key takeaways from the conference including, *inter alia*, "AATD Lung's Phase 1 CTA is Submitted; Awaiting Timing for Early Data: The CTA for AATD-lung program [ ] is already submitted ahead of guidance. Enrollment for the Ph 1 is likely to begin in New Zealand."

24

85.     With the release of Intellia's fourth quarter and full-year 2023 financial results on February 22, 2024, Defendants again noted the Company's CTA submission for NTLA-3001 as a "[r]ecent [o]perational [h]ighlight[]," reiterating its prioritization of the program and related 2024 milestone of first patient dosed before year-end. For example, during the Company's conference call to discuss these financial results, Defendant Sepp-Lorenzino provided an update on their execution of Intellia's "strategic priorities" stating, in pertinent part:

> We're continuing to advance novel gene editing and delivery technologies for both *in vivo* and *ex vivo* therapeutic applications. Building on the success of our *in vivo* gene inactivation programs, we're leading the development of CRISPR targeted gene insertion. …

> …[W]e [] expect to begin this year the Phase I study of our wholly owned program, [NT]LA-3[00]1 for alpha-1 antitrypsin efficiency. Based on our preclinical data, [NT]LA-30[0]1 could potentially achieve normal human levels of the alpha-1 protein after a single dose. Further, the potential human proof of concept of our modular gene insertion platform would open a whole new category of diseases that require restoring in leasing or effective protein. These maintain decisions that are not addressable by either base editing or DNA biting…

86.     On May 9, 2024, with the Company's announcement of its financial results for the first quarter of 2024, Defendant Leonard is quoted as saying, in pertinent part:

> Intellia continues to make outstanding progress across our pipeline of *in vivo* and *ex vivo* single-dose CRISPR-based therapies. … Building on our success with *in vivo* gene inactivation, we are excited to initiate the first-in-human study of NTLA-3001 for AATD this year, positioning us to be the first to clinically validate CRISPR-based gene insertion. We look forward to continuing our strong execution, with many notable milestones to mark the progress against our strategic priorities.

87.     Then, on July 30, 2024, Intellia announced its receipt of authorization of the CTA for its first-in-human Phase 1/2 study of NTLA-3001 for the treatment of AATD-associated lung disease. The Company provided detailed information regarding the study design and declared that "[b]eyond its first application in the United Kingdom, Intellia is submitting additional regulatory applications in other countries as part of its ongoing, multi-national development strategy for NTLA-3001." Defendant Leonard called NTLA-3001 "a groundbreaking *in vivo* CRISPR-based

gene insertion candidate" and expressed "[w]e are excited to receive regulatory authorization to begin this important first-in-human study of NTLA-3001 for people living with AATD."

88.    Investors and analysts accepted these statements as confirmation of Intellia's ongoing and successful execution of the clinical advancement of NTLA-3001. For example, that same day, analysts at Truist Securities issued a report entitled, "NTLA-3001 Advances In Crowded AATD But '3001 Could Be An Interesting POC. Reit BUY."

89.    Similarly, analysts from Wells Fargo Securities, LLC issued a report entitled, "NTLA-3001 AATD-Lung Disease Study Initiated; First Patient Dosing Expected in 2H24" noting that "NTLA's program has the potential strength of achieving high levels of AAT expression by utilization of the albumin locus. We look to elucidation of relative differentiation for NTLA's approach and other approaches in the clinic." The report went on to highlight the program's next steps, emphasizing management's claim that, "NTLA is on track to dose the first patient in the Ph1/2 study in 2H24, and is submitting additional regulatory applications in other countries beyond the UK as part of an ongoing, multi-national development strategy." It also reiterated the Company's touted prioritization of NTLA-3001, highlighting that "NTLA notes that the study also serves to validate the company's modular gene insertion platform, which may be leveraged to address numerous other diseases caused by missing or defective protein."

90.    As with the touted CTA submission, in July 2024 and throughout the remainder of the Class Period, Defendants repeatedly stressed the CTA authorization "to initiate a first-in-human study of NTLA-3001," reinforcing that research and development of the AATD program was their strategic priority in 2024. To that end, Defendants repeated assurances that they were on track "to dose the first patient in the Phase 1/2 study of NTLA-3001 in the second half of 2024."

91.     Following such statements made in connection with the Company's announcement of its financial results for the second quarter of 2024, on August 8, 2024, analysts at William Blair issued a report entitled, "Second-Quarter Earnings: NTLA-2002 Phase II Meets All Endpoints With Data in Fourth Quarter; '3001 Dosing Near Term," recapping Intellia's quarterly updates, emphasizing management's claims that it "remains on track to begin dosing patients with alpha-1 antitrypsin deficiency (A1ATD; lung manifestations) in the second half of 2024 after receiving authorization of its clinical trial by the U.K.'s MHRA," and reiterating its "Outperform" rating noting, "Intellia is continuing to execute… Dosing of NTLA-3001 in A1ATD patient by year-end also expands the platform into gene insertion applications, and we will be following this data not only to better understand the asset's competitive positioning in the crowded indication but also as potential read-through to other indications where the technology could be applied."

92.     Even as late as November 7, 2024, Defendants maintained that they were "[o]n track to dose the first patient by year-end in the Phase 1/2 study of NTLA-3001." Additionally, that same day, when analyst William Pickering of Sanford C. Bernstein & Co., LLC. asked "is it a reasonable base case that we would see data in 2025?" Defendant Lebwohl responded that "it is possible that we'll have data, reasonable to think we have data in 2025."

**E.     Intellia's "At-the-Market" Offerings on Strategic Priorities and Cash Runway.**

93.     With no approved product candidates, Intellia has funded its operations through proceeds from the Company's initial public offering ("IPO") and additional capital raises including private placements, follow-on public offerings, at-the-market offerings and the sale of convertible preferred stock.[2]

---

[2] At-the-market offerings are agreements by an issuer to sell at its discretion a certain number or dollar amount of shares each day to a sales firm at a slight discount to market price. The sales firm then resells the shares into the market. At-the-market offerings allow the issuer to "quickly raise

94.     Cash flow is considered by many investors and analysts to be the ultimate measure of a clinical-stage biotechnology company's performance and more reliable than any reported earnings. As such, the success of a clinical-stage biotech company is often measured by its cash runway. As CW5 explained, such companies typically need to show they have at least two years of cash on hand. But having two years of runway means companies must constantly raise new money, CW5 said. These companies must keep raising money to keep having two years.

95.     Intellia took advantage of the positive receipt of its outline 2024 milestones and declared 2024-2026 strategic priorities to access capital necessary to maintain its touted cash runway through 2026. While it was internally grappling with lackluster pre-clinical results showing no indication of efficacy for NTLA-3001, coupled with the changing landscape for viral-based editing drugs and higher costs associated with the development of such therapies, it concealed these problems from investors. Instead, to sell hundreds of millions of dollars of shares to public investors through at-the-market offerings, Intellia and the Individual Defendants made both affirmative misrepresentations and omissions concerning the Company's research and development of its first gene insertion program, NTLA-3001, with the potential near-term read-through to other indications where the technology could be applied.

96.     Intellia previously entered into an agreement, dated March 4, 2022 (the "Sales Agreement") with Jefferies LLC ("Jefferies") with respect to an at-the-market offering program. Under this agreement, the Company had the ability to offer and sell, from time to time at its sole discretion, shares of its common stock having an aggregate offering price of up to $400,000,000.

---

capital by selling newly issued shares into the natural trading flow of the market, without having to market … the offering." *See* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2020/06/wtd--atm-offerings.pdf.

97.     Through December 31, 2023, Intellia issued 7,518,163 shares of our common stock at an average price of $42.70 per share in accordance with the 2022 Sale Agreement for aggregate net proceeds of $310.9 million.

98.     On February 23, 2024, the Company and Jefferies amended the Sales Agreement to increase the size of the at-the-market offering program from $400,000,000 to $750,000,000 (the "Amended Sales Agreement"). As of that day, Intellia had sold approximately $374,272,833 of shares of common stock under the Sales Agreement. Under the Amended Sales Agreement, the Company had the ability to offer and sell, from time to time at its sole discretion, shares of common stock up to an additional $350,000,000 aggregate offering price, on top of the approximately $25,727,167 remaining under the original Sales Agreement.

99.     During the year ended December 31, 2024, Intellia issued 7,004,370 shares of its common stock, in a series of sales, at an average price of $25.68 per share, in accordance with the Amended Sales Agreement, for aggregate net proceeds of $174.9 million. In particular, in the six months ended June 30, 2024, the Company issued 3,802,761 shares of its common stock, at an average price of $25.58 per share, for aggregate net proceeds of $94.4 million; and in the nine months ended September 30, 2024, the Company issued 7,004,370 shares of its common stock, at an average price of $25.68 per share, for aggregate net proceeds of $174.9 million.

100.    At no point during these at-the-market offerings did Defendants disclose Intellia's de-prioritization of NTLA-3001 and its increased risks associated with known efficacy problems, high production costs, and technical inefficiencies presented by its utilization of the increasingly unpopular AAV vectors for the program's dual delivery system, or the Company's related change in strategy to no longer dose the first patient in the proof-of-concept Phase 1/2 trial of NTLA-3001 for the treatment of AATD-associated lung disease by year-end 2024.

101.    Due to the Company's at-the-market offerings, Intellia raised enough cash to sustain its touted cash runway into late 2026. Without these aggressive capital raises, Intellia would not have been able to sustain due to the exorbitant amount of cash used to fund its operations.

**F.    The Truth Emerges.**

102.    On January 9, 2025, while the markets were closed in observance of the passing of former President Jimmy Carter, Defendants issued a press release entitled, "Intellia Therapeutics Announces Anticipated 2025 Milestones and Strategic Reorganization to Prioritize the Advancement of its Late-Stage Programs, NTLA-2002 and Nexiguran Ziclumeran (nex-z)" (the "January 2025 Announcement"), providing, in relevant part, that "Pipeline priorities result in NTLA-3001 discontinuation and select, research-focused investment."

103.    It went on to state that "[t]he pipeline prioritization is intended to focus resources on high value programs - NTLA-2002 and nex-z - to ensure efficient execution, achieve near-term clinical milestones, and prepare Intellia for commercial launch. As part of this prioritization, the Company discontinued development of NTLA-3001 for the treatment of alpha-1 antitrypsin deficiency-associated lung disease and select research-stage programs. Over the course of 2025, the strategic reorganization will result in a net workforce reduction of approximately 27%."

104.    In the January 2025 Announcement, Defendant Leonard is quoted as stating:

'We have made significant progress and built strong momentum in 2024 with three actively enrolling, Phase 3, pivotal studies. Our early clinical data for both NTLA-2002 and nex-z support novel, highly differentiated product profiles that directly address the significant unmet needs of patients and prescribers in HAE and ATTR[.]' [ ] 'We understand the significant potential of our late-stage programs, and within a challenging market environment, have made a difficult decision to focus our resources predominantly on NTLA-2002 and nex-z where we have the greatest opportunity to create significant, near-term value.'

105.    Consequently, after a year of repeated claims that Intellia was executing "strategic priorities to realize the full potential of CRISPR-based gene editing" including the first CRISPR-

based targeted gene insertion program, NTLA-3001, and a mere two months after Defendants'

final assurances of being "[o]n track to dose the first patient by year-end in the Phase 1/2 study of

NTLA-3001," Intellia admitted that it had not dosed any patients in 2024, nor would it ever. In

fact, Intellia admitted that it had abandoned the research and development of the AATD program

entirely. This admission was both a disclosure that prior statements about the Company's clinical

development strategy for NTLA-3001, first human dosing, and its strategic priorities were false

when made, and also served as a materialization of the concealed risks concerning NTLA-3001's

known efficacy problems, high production costs, and technical inefficiencies presented by its

utilization of the increasingly unpopular AAV vectors for the program's dual delivery system.

106.    Investors and analysts reacted immediately to Intellia's revelation. The price of

Intellia securities declined dramatically from a closing price of $12.02 per share on January 8,

2025, to a closing price of $10.20 per share on January 10, 2025, a highly statistically-significant

decline of about 15% in the span of just one trading day.

107.    A number of well-known analysts following Intellia lowered their price targets in

response to the Company's revelation. For example, Wedbush issued a report reducing its 12-

month price target for Intellia from $14.00 to $10.00 and reiterating a "Neutral" rating for the

Company following the January 2025 Announcement. In pertinent part, Wedbush stated:

> NTLA updated its guidance to include a 2H26 BLA submission for its *in vivo* gene
> editing candidate NTLA-2002 in HAE, and discontinued NTLA-3001 for AATD
> (a positive, in our view, for competitor BEAM, Nierengarten, Outperform). The
> company also is reducing headcount by 27%, in order to keep its cash runway
> through H1:27. Unfortunately, in our view, NTLA-2002 and nex-z have limited
> commercial prospects, and we believe eliminating earlier programs restricts future
> growth opportunities.

108.    Oppenheimer & Co Inc. also lowered its 12-to-18-month price target for Intellia to "remove NTLA-3001 and additional early-stage programs" from its model noting, in pertinent part:

> Management provided a corporate update and highlighted its strategic priorities for 2025. Notably, NTLA decided to discontinue NTLA-3001 plus select early R&D programs along with a workforce reduction of ~27% to extend the financial runway into 1H27 (vs. prior guidance of late-2026 with ~$862M cash as of year-end 2024). This sharpened focus aims to support late-stage development and commercialization of nex-z and NTLA-2002. …
>
> We recognize the need for cost-reduction but are somewhat surprised by the decision to discontinue NTLA-3001, considering the differentiated approach, supportive NHP data and that the CTA was already cleared. Management noted the planned first patient dosing by year-end 2024 was held back and the decision was not based on clinical data. We suspect NTLA-3001 may still be an interesting program from a partnering standpoint.

109.    Likewise, Jones Research issued a report providing a reduced price target for the Company contributing the change to "Intellia has deprioritized NTLA-3001 (for AATD-lung disease), choosing to focus on nex-z and NTLA-2002," noting "[w]e have always viewed AATD as a more suitable indication for gene editing than HAE or ATTR" and "that AATD opportunity could have been key to Intellia's long term growth. Given the discontinuation, we have reduced our terminal growth rate projection from 2% to 0%."

110.    Similarly, Wells Fargo Securities, LLC lowered its price target for Intellia following the announced discontinuation of NTLA-3001 and related reduction in workforce highlighting the "changing landscape (e.g. non-viral base editing)."

111.    These reactions to Intellia's admitted de-prioritization of NTLA-3001 and abandoned clinical development of its first CRISPR-based targeted gene insertion program confirms that public investors placed significant weight on Defendants' false and misleading statements made during the Class Period concerning the Company's "strategic priorities" including their repeated claim that it was executing on the research and development of the AATD program and was on track to dose the first human patient in its proof-of-concept Phase 1/2 trial of NTLA-

3001 in 2024. The frequent, in-depth discussion of such matters confirms that Defendants'
misrepresentations and/or omissions during the Class Period were material.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

112.    Throughout the Class Period, Defendants made materially false and misleading
statements and failed to disclose material adverse facts about Intellia's AATD program and its lead
CRISPR-based targeted gene insertion development candidate, NTLA-3001, that were necessary
to make the statements made not misleading. As alleged herein, Defendants misrepresented the
Company's near-term strategic priorities including its commitment to the AATD program and
created the materially false impression that it was proceeding with the clinical development of
NTLA-3001 as planned, with on track target of first patient dosed by year-end 2024. They also
concealed poor pre-clinical results showing no indication of efficacy even in small animals making
it exceptionally unlikely that they would be able to do so in human clinical trials, and known
problems and associated risks relating to a changing landscape for viral-based editing drugs (like
NTLA-3001) with higher production costs and technical difficulty that made the drug
impracticable and undermined its prospects for regulatory approval. Instead, Defendants engaged
in a stealth wind down of the program that directly contradicted their Class Period statements.

### *January 4, 2024*

113.    On January 4, 2024, Intellia issued a press release *via* GlobeNewswire and the
NASDAQ, published on the Company's website, Intelliatx.com, and filed with the SEC as an
exhibit to a current report on Form 8-K signed by Defendant Leonard (the "January 4 Report"),
highlighting its "strategic priorities through 2026 and key anticipated 2024 Milestones that support
the Company's mission to transform the lives of patients and bring forth a new era in medicine."

114.    The January 4 Report listed as a "Recent Pipeline Advancement," "NTLA-3001 for Alpha-1 Antitrypsin Deficiency (AATD)-Associated Lung Disease: Submitted a clinical trial application to initiate a first-in-human Phase 1 study of NTLA-3001 ahead of previous Q1 2024 expectation," and described the Company's "2024 – 2026 Strategic Priorities" as follows:

1.    Complete patient enrollment for pivotal studies of NTLA-2001 and NTLA-2002, including planned biologics license application (BLA) submission for NTLA-2002 in 2026;

2.    ***Launch clinical trials for next wave of in vivo and ex vivo programs, validating CRISPR-based in vivo targeted gene insertion*** and an allogeneic cell engineering solution designed to avoid NK cell-mediated rejection; and

3.    Expand the range of diseases that can be targeted by deploying new editing and delivery innovations, including advancing gene editing in tissues outside the liver and DNA writing technology.[3]

115.    Under "Anticipated 2024 Milestones," the January 4 Report provided, in relevant part, "***NTLA-3001 for AATD-Associated Lung Disease: Dose first patient in Phase 1 study of NTLA-3001 in 2024***."

116.    The statements identified in ¶¶114-15 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being starved of needed resources. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting

---

[3] Unless otherwise indicated, all emphasis in quoted material is added.

resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

<u>*January 9, 2024*</u>

117.    On January 9, 2024, Defendants Lebwohl and Leonard presented on behalf of Intellia, at the J.P. Morgan 42nd Annual Healthcare Conference (the "January 9 Presentation").

118.    In pertinent part, Defendant Leonard discussed Intellia's different capabilities and technologies developed highlighting its expansion to gene insertion stating, "[w]e've also moved beyond knockouts to the liver to knock-ins of the liver. This is the idea of reconstituting genes and then submitted a CTA for NTLA-3001 for alpha-1 antitrypsin deficiency associated with lung disease. ***And as part of that platform of different approaches, we continue to make progress with the various tools that we have***, especially with DNA writing technology."

119.    He went on to recap Intellia's "strategic priorities" including, *inter alia*, "***launching the next wave of in vivo and ex vivo clinical programs as we expand beyond knockouts in the liver***," reiterating "***[s]o key milestones for the upcoming year by program fall into … we anticipate beginning dosing for the gene insertion program for AATD.***"

120.    The statements identified in ¶¶118-19 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being starved of needed resources. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001

due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

*February 22, 2024*

121.    On February 22, 2024, Intellia filed with the SEC the financial results for the fiscal year ended December 31, 2023 on Form 10-K, signed by Defendant Leonard (the "FY23 10-K").

122.    When discussing Intellia's "Strategy," the FY23 10-K provided its "approach to realizing the broad potential of genome editing includes," *inter alia*:

> ***Aggressively Pursuing* In Vivo *Liver Indications to Develop Therapeutics with Our Proprietary Delivery System.*** For our *in vivo* indications, we select well-validated targets in diseases with significant unmet medical needs where there are predictive biomarkers, or measurable indicators of a biological condition or state, with strong disease correlation and where the CRISPR/Cas9 technology and our proprietary delivery tools can be applied towards developing novel therapeutics. Our current *in vivo* pipeline targets diseases of the liver. Our two lead clinical programs in development aim to treat ATTR amyloidosis and HAE. Both programs utilize our proprietary lipid nanoparticle ("LNP") delivery system to knockout a target gene to halt production of an unwanted protein. ***In addition, we are developing therapeutic candidates that leverage our modular gene insertion platform to restore native protein for the treatment of the lung manifestation of alpha-1 antitrypsin deficiency ("AATD"),*** hemophilia A, hemophilia B, and additional disease indications.

> [Second emphasis added].

123.    The statements identified in ¶122 above were materially false and misleading when made because Intellia was, in fact, not "aggressively pursuing" the clinical development of NTLA-3001. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and

increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001. Consequently, these statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion.

124.   The FY23 10-K detailed Intellia's "most advanced programs" in its "Pipeline" including the "Alpha-1 Antitrypsin Deficiency ("AATD") Program" providing, in relevant part:

> NTLA-3001 is our wholly owned, first-in-class CRISPR-mediated *in vivo* targeted gene insertion development candidate for the treatment of AATD-associated lung disease. It is designed to precisely insert a healthy copy of the *SERPINA1* gene, which encodes the A1AT protein, with the potential to restore permanent expression of functional A1AT protein to therapeutic levels after a single dose. Our approach seeks to improve patient outcomes, including eliminating the need for weekly IV infusions of A1AT augmentation therapy or lung transplant in severe cases. In December 2023, we submitted a clinical trial application ("CTA") to initiate a first-in-human, Phase 1 study of NTLA-3001 and **plan to dose the first patient in 2024**.

125.   The statements identified in ¶124 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being starved of needed resources. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV

vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

126.    That same day, Intellia issued a press release via GlobeNewswire and the NASDAQ, published on the Company's website, Intelliatx.com, and filed with the SEC as an exhibit to a current report on Form 8-K signed by Defendant Leonard (the "4Q23 Report").

127.    The 4Q23 Report announced Intellia's fourth quarter and full-year 2023 financial results and highlighted recent Company progress including that, it was "***[o]n track to dose the first patient in the Phase 1 study of NTLA-3001,*** an *in vivo* gene insertion candidate for the treatment of alpha-1 antitrypsin deficiency (AATD)-associated lung disease, ***in 2024***."

128.    It went on to provide "Fourth Quarter 2023 and Recent Operational Highlights" noting under "*In Vivo* Targeted Gene Insertion," in relevant part, "[i]n December 2023, Intellia submitted a Clinical Trial Application (CTA) to initiate a first-in-human, Phase 1 study of NTLA-3001[,]" and reiterating "***[t]he Company plans to dose the first patient in 2024.***"

129.    The statements identified in ¶¶128-29 above were materially false and misleading when made because Intellia was not then "on track" to dose the first NTLA-3001 patient in 2024 as the program was already being starved of needed resources, and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with

efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

130.    On February 22, 2024, Intellia also held its fourth quarter and full year 2023 financial results conference call ("4Q23 Earnings Call").

131.    In Defendant Leonard's prepared remarks, he stated, in pertinent part:

…Having clinically validated our *in vivo* CRISPR gene editing technology by inactivating genetic targets in the liver, **we're now bringing forth the next wave of innovation**.

…

With our wide range of editing and delivering capabilities, we can apply the best tool for each therapeutic application. This allows us to address diseases where there is a meaningful opportunity to improve the standard of care. In some cases, we may even be able to pursue diseases that would otherwise be considered untreatable if not for the power of CRISPR. It is this expansive and modular platform, coupled with our strong balance sheet that will allow us to achieve the 3-year strategic priorities announced earlier this year. **Our focus remains on both near-term clinical execution as well as value creating platform innovation.**

**With this as a backdrop, we expect the following by the end of this year**, 2 *in vivo* knockout programs in active Phase III studies, **2 *in vivo* gene insertion programs in first-in-human studies** and 5 different tissues outside the liver with active research programs. And additionally, we expect to have 6 or more collaborations with at least a dozen potential drug products utilizing our technology in research and development. We're confident in our ability to deliver on these ambitious goals. We have a proven track record of success with regulators in advancing CRISPR-based therapies and clinical trials. We've consistently delivered on our commitments to the scientific, patient and investment communities. And finally, we have a world-class team of drug developers who have pioneered some of the most innovative and commercially successful medicines in history.

132.    The statements identified in ¶131 above were materially false and misleading when made because Intellia's focus, in fact, did not "remain[] on both near-term clinical execution as

well as value creating platform innovation." As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001. Consequently, these statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion.

133.    In Defendant Sepp-Lorenzino's prepared remarks for the 4Q23 Earnings Call, she provided an update on Intellia's execution of its "strategic priorities" stating, in relevant part:

> *We're continuing to advance novel gene editing and delivery technologies for both in vivo and ex vivo therapeutic applications*. Building on the success of our *in vivo* gene inactivation programs, *we're leading the development of CRISPR targeted gene insertion*. Here, we're leveraging the same LNP platform using our Gen OCD programs to deliver the CRISPR machinery along with an AAV to deliver a functional gene. Unlike traditional gene therapy, we expect our approach will permanently restore in leasing or effective protein without a waning of effect over time….
>
> *In parallel, we also expect to begin this year the Phase I study of our wholly owned program, [NT]LA-3[00]1 for alpha-1 antitrypsin efficiency. Based on our preclinical data, [NT]LA-30[0]1 could potentially achieve normal human levels of the alpha-1 protein after a single dose.* Further, the potential human proof of concept of our modular gene insertion platform would open a whole new category of diseases that require restoring in leasing or effective protein. These maintain decisions that are not addressable by either base editing or DNA biting. …

134.    The statements identified in ¶133 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the

AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being starved of needed resources. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy (as evidenced by pre-clinical data, contrary to Sepp-Lorenzino's statements above) and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

135.    Moreover, once Defendant Sepp-Lorenzino chose to speak about purported positive preclinical data supporting the clinical development of NTLA-3001, she had a duty to disclose the negative information that cut against the positive information. As corroborated by CW6, preclinical activities conducted in 2023 showed no indication of efficacy for NTLA-3001 in mice or nonhuman primates, significantly diminishing the likelihood of clinic success, resulting in Intellia effectively abandoning all research and development of the AATD program by the beginning of 2024.

136.    During the Question-and-Answer portion of the call, analyst Benazir Ali Stifel, of Nicolaus & Company, Incorporated inquired about the NTLA-3001 program, posing the following questions: "[g]iven the rapid like clouding of the gene therapy, gene editing approaches in [A]ATD, what is the ideal product profile for NTLA-3001? And can you remind us again [whether] the

*SERPINA1* gene insertion, is it directional? And what are some supportive pieces of evidence or tools that are available to detect the correct insertion of the gene?"

137.    To which Defendant Leonard responded, in relevant part:

We think we've addressed it nicely. Just with respect to the product profile, ***our objective is to get to essentially normal human levels of wild-type protein. Once one does that, which we've accomplished preclinically in nonhuman primates,*** those patients should be essentially the same as patients without the mutation in the first place, at least with respect to their lung disease. ***So, whether or not we'll get to that in humans [i]s the basis of the Phase I trial that we're embarking on now as we speak***. And, of course, we're really excited about getting that information, which we think will address not only what we're doing with 3001, but a whole plethora of other sorts of insertion programs that will be associated with that.

138.    The statements identified in ¶137 above were materially false and misleading when made because they created the materially false impression that Intellia was proceeding with its development of NTLA-3001 as planned, concealing that the program was already being starved of needed resources. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

139.    Moreover, once Defendant Leonard chose to speak about purported positive preclinical data supporting the clinical development of NTLA-3001, he had a duty to disclose the negative information that cut against the positive information. As corroborated by CW6, preclinical activities conducted in 2023 showed no indication of efficacy for NTLA-3001 in mice or nonhuman primates, significantly diminishing the likelihood of clinic success, resulting in

Intellia effectively abandoning all research and development of the AATD program by the beginning of 2024.

*May 9, 2024*

140.    On May 9, 2024, Intellia filed with the SEC the financial results for the quarterly period ended March 31, 2024 on Form 10-Q, signed by Defendant Leonard (the "1Q24 10-Q").

141.    Under "Our Pipeline," the 1Q24 10-Q highlighted the Company's "Alpha-1 Antitrypsin Deficiency ("AATD") Program" providing, in relevant part:

> NTLA-3001 is our wholly owned, first-in-class CRISPR-mediated *in vivo* targeted gene insertion development candidate for the treatment of AATD-associated lung disease. It is designed to precisely insert the wild-type *SERPINA1* gene, which encodes the alpha-1 antitrypsin ("AAT") protein, with the potential to restore permanent expression of fully functional AAT protein to normal levels after a single dose. ***We expect to dose the first patient in a Phase 1 study of NTLA-3001 in 2024.***

142.    The statements identified in ¶141 above were materially false and misleading when made because the target dosing of the first NTLA-3001 patient in 2024 contradicted and concealed that the program was already being quietly wound down, and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

143.    That same day, Intellia issued a press release *via* GlobeNewswire and the NASDAQ, published on the Company's website, Intelliatx.com, and filed with the SEC as an exhibit to a current report on Form 8-K signed by Defendant Leonard (the "1Q24 Report").

144.    The 1Q24 Report announced Intellia's first quarter 2024 financial results and highlighted recent Company progress including that, it was "***[o]n track to dose the first patient in the Phase 1 study of NTLA-3001***, an *in vivo* gene insertion candidate for the treatment of alpha-1 antitrypsin deficiency (AATD), ***in 2024***" and later reiterated that, "***Intellia expects to dose the first patient in a Phase 1 study of NTLA-3001 in 2024***."

145.    The statements identified in ¶144 above were materially false and misleading when made because Intellia was not then "on track" to dose the first NTLA-3001 patient in 2024 as the program was already being quietly wound down, and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

146.    Defendant Leonard is quoted in the 1Q24 Report as saying, in pertinent part:

Intellia continues to make outstanding progress across our pipeline of *in vivo* and *ex vivo* single-dose CRISPR-based therapies. … Building on our success with *in*

*vivo* gene inactivation, we are excited to initiate the first-in-human study of NTLA-3001 for AATD this year, positioning us to be the first to clinically validate CRISPR-based gene insertion. We look forward to continuing our strong execution, with many notable milestones to mark the progress against our strategic priorities.

147.    The statements identified in ¶146 above were materially false and misleading when made because Intellia was not then making "outstanding progress" with NTLA-3001 and the target to "initiate" the first-in-human study of NTLA-3001 in 2024 contradicted and concealed that the program was already being quietly wound down, and the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

148.    On May 9, 2024, the Company also held its first quarter financial results conference call (the "1Q24 Earnings Call").

149.    In his prepared remarks, Defendant Leonard stated, in pertinent part:

…***We're now entering the next stage of growth***, pushing the boundaries of what we can do and ***expanding where we can go with CRISPR*** from gene knockdown ***to gene insertion,*** from liver targets to a broader set of tissues.

Our first wholly owned CRISPR-based gene insertion program, ***NTLA-3001, is expected to enter human clinical development this year***. NTLA-3001 holds the potential to provide normal alpha-1 levels after a single-dose treatment for people with alpha-1 antitrypsin deficiency. We will also have a second clinical program

utilizing our modular gene insertion platform run by Regeneron for hemophilia B expected to start patient dosing later this year.

150.    The statements identified in ¶149 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion and concealing that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

151.    In Defendant Lebwohl's prepared remarks for the 1Q24 Earnings Call, he provided an update on Intellia's clinical programs including, in relevant part:

> Let me now turn to exciting developments with our modular gene insertion platform. Here, we are leveraging the same LNP platform used in our gene knockout program to deliver the CRISPR machinery along with an AAV to deliver a functional gene.
>
> Unlike traditional gene therapy, we expect our approach will permanently restore a missing or defective protein without a waning of effect over time. ***We expect to begin this year a first in-human study of 3001,*** our wholly owned gene insertion program for alpha-1 antitrypsin deficiency.
>
> As a reminder, the main hurdle with treating this disease is getting patients to consistently normal levels of alpha 1. Current standards of care, which involve weekly infusion of augmentation therapy does not achieve this. Other approaches in development have also been unable to yield normal levels of alpha 1 and in some cases, have only been able to produce a modified version of the protein with unknown consequences.

***3001 is the only drug candidate to show AAT levels restored to normal levels after a single dose in nonhuman primates.*** It is designed to precisely insert the wild-type *SERPINA1* gene and permanently restore production and secretion of fully functional alpha-1 protein. Assuming success, 3001 could be life-changing for alpha-1 patients and unlock a whole new category of diseases we can pursue with *in vivo* gene insertion.

Separately, our collaborator Regeneron has achieved clearance from both U.S. and EU authorities for the Factor IX program using our modular gene insertion platform and plan to enroll the first patient later this year. ***Our clinical development of the*** **in vivo** ***pipeline is rapidly accelerating***, and Intellia is well positioned as the leader in this new era of medicine.

152.    The statements identified in ¶151 above were materially false and misleading when made because NTLA-3001 did not "show AAT levels restored to normal levels after a single dose in nonhuman primates," and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its "rapidly accelerating" development, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion, and concealing that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

153.    Moreover, once Defendant Lebwohl chose to speak about purported positive preclinical data supporting the clinical development of NTLA-3001, he had a duty to disclose the negative information that cut against the positive information. As corroborated by CW6,

47

preclinical activities conducted in 2023 showed no indication of efficacy for NTLA-3001 in mice or nonhuman primates, significantly diminishing the likelihood of clinic success, resulting in Intellia effectively abandoning all research and development of the AATD program by the beginning of 2024.

154.    During the Question-and-Answer portion of the call, analyst Troy Frederick Langford of TD Cowen inquired about the AATD program raising the following questions: "[s]o for NTLA-3001, how quickly do you think you can move through development with this asset? So do you think you would try to take this asset into a pivotal study shortly after the Phase I dose work like with NTLA-2001 or do you think we'll have more traditional placebo-controlled Phase II to further refine the dose for a pivotal study like with NTLA-2002."

155.    Defendant Leonard responded:

I'd just start by saying, as was emphasized in our comments earlier today, we emphasize understanding these drugs, especially from a safety as well as from an efficacy point of view. And so that -- those will be our guiding principles as we carry out the study of 3001.

We're excited with what we think the drug can do. *I'll remind you that in the preclinical data, we've established that we're able in nonhuman primates to reach normal levels as seen in human beings*. We think that's fundamental to the regulatory strategy. Our hope is that we'll show that in Phase I studies and assuming that we see that, we will progress as quickly as we can, working with the Food and Drug Administration and other related agencies to establish what is the shortest, most efficient way to regulatory approval. So that lies ahead, and we'll give you updates as we proceed.

156.    The statements identified in ¶155 above were materially false and misleading when made because "the preclinical data" of NTLA-3001 had not "established that we're able in nonhuman primates to reach normal levels as seen in human beings," and because the statements created the materially false impression that Intellia was proceeding with its development of NTLA-3001 as planned, concealing that the program was already being quietly wound down, and materially misrepresenting Intellia's near-term growth prospects driven by targeted gene insertion.

48

As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

157.    Moreover, once Defendant Leonard chose to speak about purported positive preclinical data supporting the clinical development of NTLA-3001, he had a duty to disclose the negative information that cut against the positive information. As corroborated by CW6, preclinical activities conducted in 2023 showed no indication of efficacy for NTLA-3001 in mice or nonhuman primates, significantly diminishing the likelihood of clinic success, resulting in Intellia effectively abandoning all research and development of the AATD program by the start of 2024.

*July 30, 2024*

158.    On July 30, 2024, Intellia issued a press release *via* GlobeNewswire, and published on the Company's website, Intelliatx.com, announcing receipt of authorization of its Clinical Trial Application (CTA) by the U.K.'s Medicine and Healthcare products Regulatory Agency (MHRA) to initiate a Phase 1/2 study evaluating NTLA-3001 for the treatment of AATD-associated lung disease ("July 30 Report").

159.    The July 30 Report went on to detail the study design providing, in relevant part:

The Phase 1/2 study will be an international, multicenter, single-arm, open-label study of NTLA-3001 in adults with AATD-associated lung disease. The study will

enroll up to 30 patients and consist of a dose-escalation phase, followed by a dose-expansion phase to confirm the recommended dose. The study will evaluate the safety, tolerability, pharmacokinetics and pharmacodynamics of NTLA-3001. More information about the study may be found on clinicaltrials.gov when available.

***Beyond its first application in the United Kingdom, Intellia is submitting additional regulatory applications in other countries as part of its ongoing, multi-national development strategy for NTLA-3001***.

160.    Defendant Leonard is quoted in the July 30 Report as stating, in pertinent part:

'NTLA-3001 is a groundbreaking *in vivo* CRISPR-based gene insertion candidate designed to durably produce functional AAT protein at normal levels after a one-time treatment. ***We are excited to receive regulatory authorization to begin this important first-in-human study of NTLA-3001 for people living with AATD***[.]' [ ] 'In addition, this study serves to validate our modular gene insertion platform, which we plan to leverage to address numerous diseases caused by a missing or defective protein.'

161.    The statements identified in ¶¶159-60 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

*August 8, 2024*

162.    On August 8, 2024, Intellia filed with the SEC the financial results for the quarterly period ended June 30, 2024 on Form 10-Q signed by Defendants Leonard and Dulac (the "2Q24 10-Q").

163.    Under "Our Pipeline," the 2Q24 10-Q highlighted the Company's "Alpha-1 Antitrypsin Deficiency ('AATD') Program" providing, in relevant part:

> In July 2024, we announced the authorization of our Clinical Trial Application by the United Kingdom's Medicines and Healthcare products Regulatory Agency ("MHRA") to initiate a first-in-human study of NTLA-3001. ***We expect to dose the first patient in the Phase 1/2 study of NTLA-3001 in the second half of 2024.*** The Phase 1/2 study will be a two-part, open-label, multi-center study with up to 30 patients to evaluate the safety, tolerability, pharmacokinetics and pharmacodynamics of NTLA-3001.

164.    The statements identified in ¶163 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

165.    That day, Intellia published a press release *via* GlobeNewswire and the NASDAQ, published on the Company's website, Intelliatx.com, and filed as an exhibit to a current report filed with the SEC on Form 8-K, signed by Defendant Leonard (the "2Q24 Report").

166.    The 2Q24 Report announced Intellia's quarterly results and highlighted recent Company progress including an update on the AATD program providing, in relevant part: "[i]n July, Intellia announced the authorization of its Clinical Trial Application by the United Kingdom's Medicines and Healthcare products Regulatory Agency (MHRA) to initiate a first-in-human study of NTLA-3001. Intellia *expects to dose the first patient in the Phase 1/2 study of NTLA-3001 in the second half of 2024*."

167.    Defendant Leonard is quoted in the 2Q24 Report as saying, in relevant part, "[w]ith three pivotal Phase 3 trials and *our first gene insertion trial expected to be active by year-end*, Intellia is closer than ever to transforming the future of medicine with our one-time, *in vivo* gene editing therapies."

168.    The statements identified in ¶¶166-67 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on

drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

169.    On August 8, 2024, Intellia also held its second quarter 2024 financial results conference call (the "2Q24 Earnings Call").

170.    During Defendant Sepp-Lorenzino's prepared remarks, she provided an update on the Company's NTLA-3001 program stating, in pertinent part:

> ***At I[ntellia], we're deploying the industry's broadest toolbox of novel gene editing and delivery technologies for in vivo and ex vivo therapeutic applications.*** Let me begin with NTLA-3001. As we announced last week, we received regulatory approval from the United Kingdom's Medicine and Healthcare products, Regulatory Agency to initiate the first-in-human study in patients with alpha-1 antitrypsin deficiency associated lung disease.
>
> Following the IND clearance of Regeneron factor IX program, this marks the second program leveraging our modular gene insertion platform set to enter the clinic, another accomplishment from our industry leading research engine. Unlike traditional gene therapy, we expect our approach will permanently restore and releasing of the effected protein without a waning effect over time.
>
> As a reminder, NTLA-3001 is designed to precisely insert the wild-type *SERPINA1* gene to permanently restore production and secretion of fully functional alpha-1 protein. Our goal is to replicate what we demonstrated in nonhuman primates to restore patients to normal alpha-1 levels after a single dose.
>
> The Phase I/II study will be a 2-part open-label multicenter study to evaluate the safety, tolerability, PK and PD of NTLA-3001, up to 30 patients will be enrolled. Phase I will be a single ascending dose design with up to 3 cohorts. Patients will receive a single infusion of NTLA-3001, which consists of a sequential dose of AAV and LNP. The AAV delivers a *SERPINA1* DNA template and the LNP delivers a CRISPR machinery. Based on our learnings from NTLA-2001 and NTLA-2002, we will be evaluating a 6 LNP dose of 50 milligrams. The only variable component from cohort to cohort in the dose escalation will be the dose of AAV. We will begin with doses of AAV that we expect will show some level of activity even in the first cohort.
>
> Once we've identified the optimal dose, we plan to move into the Phase II, which will be a single dose expansion cohort to further characterize the activity of NTLA-3001. ***We are on track to dose the first patient in the second half of this year.*** Assuming success, NTLA-3001 could redefine how alpha-1 is treated and unlock a whole new category of diseases we can pursue with our in vivo gene insertion platform.

171.    Defendant Leonard closed out the prepared remarks by corporate participants stating, in pertinent part, "Intellia continues to deliver on the promise of gene editing, and we are looking forward to several important clinical milestones in the second half of this year."

172.    The statements identified in ¶¶170-71 above were materially false and misleading when made because Intellia was not then "on track" to dose the first NTLA-3001 patient in 2024 as the program was already being quietly wound down, and the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by gene insertion. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

173.    During the Question-and-Answer portion of the call, analyst Luca Issi of RBC Capital Markets asked about Intellia's approach to treating AATD-associated lung disease:

> Obviously, the competitive landscape continues to evolve, obviously, Vertex giving up on their approach. But we are seeing a lot of other innovations coming down the pipe, including, I think we're going to see clinical data for the first time for ADAR and RNA editing toward the end of the year. Wondering if you can just kind of compare and contrast that approach versus your approach and why you think your approach is better. Any thoughts there?

174.    To which Defendant Sepp-Lorenzino responded:

> Look, **based on the preclinical data that we have seen, right, we believe that with 3001, we have demonstrated in nonhuman primates, the ability to achieve not just**

*in the micromolar, right, but the full normal dose.* And I think that if we can translate that in humans, that's going to be differentiated. And because of the mechanism of action, right, this is going to be potentially one and done, right? So you are looking for a single solution that will achieve normal levels. Of course, there is other modalities that are being advanced. *At the end of the day, the proof of the pooling will be in the clinic. So I'll await the clinical data*.

175.    The statements identified in ¶174 above were materially false and misleading when made because "the preclinical data" of NTLA-3001 had not "demonstrated in nonhuman primates, the ability to achieve not just in the micromolar, right, but the full normal dose" in humans, and because the statements created the materially false impression that Intellia was proceeding with its development of NTLA-3001 as planned and materially misrepresenting the Company's near-term growth prospects driven by gene insertion. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

176.    Moreover, once Defendant Sepp-Lorenzino chose to speak about purported positive preclinical data supporting the clinical development of NTLA-3001, she had a duty to disclose the negative information that cut against the positive information. As corroborated by CW6, preclinical activities conducted in 2023 showed no indication of efficacy for NTLA-3001 in mice or nonhuman primates, significantly diminishing the likelihood of clinic success, resulting in Intellia effectively abandoning all research and development of the AATD program by the beginning of 2024.

177.    During the same call, an analyst at BMO Capital Markets asked about the NTLA-3001 program's "competition for patient enrollment, given that Beam and also other editing companies [were] also recruiting in the United Kingdom," to which Defendant Leonard responded: "We work with investigators who know the patients they have, and *we're quite confident that certainly in a Phase I setting, not only in the U.K. but other countries where we will have sites, including New Zealand and Ireland that we'll be in a position to recruit the study expeditiously and look for the results that tell us how the drug is performing.* We don't see this being a competitive situation."

178.    The statements identified in ¶177 above were materially false and misleading when made because they created the materially false impression that Intellia was proceeding with its development of NTLA-3001 as planned and concealed that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

179.    Analyst Mary Kate Davis of BofA Securities asked about Intellia's "AATD program" and "how impactful the wholly owned insertional program could be for the current market, given an unmet need in the space?" To which Defendant Leonard responded:

> Well, our assessment of alpha-1 antitrypsin deficiency therapies as they currently exist is that it's almost a complete absence of effective therapy. So our view is that

it's essentially wide open in terms of resetting the bar. Remember what we're trying to do. We're trying to have the production of a fully normal protein that is the wild-type alpha antitrypsin deficiency -- sorry, alpha-1 antitrypsin protein that has normal activity that doesn't exist yet today. And so we view this a very large market as one that is -- one that we can be very, very successful in, and we're very excited about beginning the clinical program with 3001.

180. The statements identified in ¶179 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001, diverting resources and personnel from the AATD program, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

181. Relatedly, Defendant Leonard created a materially false and/or misleading impression concerning the potential market demand for the Company's targeted gene insertion platform using a hybrid delivery system. As corroborated by CW1, CW2, and CW4, the hybrid delivery system utilized for NTLA-3001, combining LNPs and AAV vectors, made it prohibitively expensive and difficult to produce. CW4 and CW5 each corroborate an adverse shift in the landscape surrounding the use of AAV vectors in 2024.

### *November 7, 2024*

182. On November 7, 2024, Intellia filed with the SEC the financial results for the quarterly period ended September 30, 2024 on Form 10-Q signed by Defendants Leonard and Dulac (the "3Q24 10-Q").

183.    Under "Our Pipeline," the 3Q24 10-Q highlighted the Company's "Alpha-1 Antitrypsin Deficiency ('AATD') Program" providing, in relevant part:

> In July 2024, we announced the authorization of our Clinical Trial Application by the United Kingdom's Medicines and Healthcare products Regulatory Agency ("MHRA") to initiate a first-in-human study of NTLA-3001. ***We expect to dose the first patient in the Phase 1/2 study of NTLA-3001 by year-end.*** The Phase 1/2 study will be a two-part, open-label, multi-center study with up to 30 patients to evaluate the safety, tolerability, pharmacokinetics and pharmacodynamics of NTLA-3001.

184.    The statements identified in ¶183 above were materially false and misleading when made because the target dose of the first NTLA-3001 patient by year-end contradicted and concealed that the program was already being quietly wound down, and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

185.    That same day, Intellia published a press release *via* GlobeNewswire and the NASDAQ, published on the Company's website, Intelliatx.com, and filed with the SEC as Exhibit 99.1 to a current report on Form 8-K signed by Defendant Leonard (the "3Q24 Report").

186.    The 3Q24 Report announced Intellia's quarterly results and highlighted recent Company progress including being "***[o]n track to dose the first patient by year-end in the Phase***

*1/2 study of NTLA-3001*, an *in vivo* gene insertion candidate for the treatment of alpha-1 antitrypsin deficiency (AATD)."

187.    The 3Q24 Report went on to list Intellia's "Third Quarter 2024 and Recent Operational Highlights" including an update on the AATD program providing, in relevant part:

> NTLA-3001 is a first-in-class CRISPR-mediated *in vivo* targeted gene insertion development candidate for the treatment of AATD-associated lung disease. It is designed to precisely insert the wild-type *SERPINA1* gene, which encodes the alpha-1 antitrypsin (AAT) protein, with the potential to restore permanent expression of fully functional AAT protein to normal levels after a single dose. This is Intellia's first wholly owned gene insertion program.
>
> **Intellia expects to dose the first patient in the Phase 1/2 study of NTLA-3001 by year-end.**

188.    The statements identified in ¶¶186-87 above were materially false and misleading when made because Intellia was not then "on track" to dose the first NTLA-3001 patient by year-end as the program was already being quietly wound down, and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

189.    On November 7, 2024, Intellia also hosted its third quarter 2024 financial results conference call (the "3Q24 Earnings Call").

190.    In her prepared remarks, Defendant Sepp-Lorenzino spoke about the AATD program providing, in pertinent part:

> *We're advancing our science beyond in vivo knockout therapies and into our first in vivo gene insertion programs in the clinic*. NTLA-3001 is our first wholly owned *in vivo* gene insertion program for alpha-1 antitrypsin deficiency associated lung disease. It is designed to precisely insert the wild-type *SERPINA1* gene, which encodes the alpha-1 antitrypsin protein*. In previously presented nonhuman primate data, we've demonstrated the ability to produce fully functional alpha-1 protein at normal levels after a single dose.* Notably, these normal levels of alpha-1 protein were durable through 2 years of follow-up in the completed study. *We're on track to dose the first patient in the Phase I/II study of 3001 by year-end.* If we're able to translate what we have seen in nonhuman primates to humans, we believe this will be a major step forward for alpha-1 patients and the field of gene editing. Assuming success, it would unlock a whole new category of diseases which require a gain of function that we could pursue with our modular insertion platform.

191.    The statements identified in ¶190 above were materially false and misleading when made because Intellia had not "demonstrated the ability to produce fully functional alpha-1 protein at normal levels after a single dose" and was not then "on track" to dose the first NTLA-3001 patient by year-end as the program was already being quietly wound down, and because the statements created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's growth strategy and its near-term prospects driven by targeted gene insertion. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted

services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

192.    Moreover, once Defendant Sepp-Lorenzino chose to speak about purported positive preclinical data supporting the clinical development of NTLA-3001, she had a duty to disclose the negative information that cut against the positive information. As corroborated by CW6, preclinical activities conducted in 2023 showed no indication of efficacy for NTLA-3001 in mice or nonhuman primates, significantly diminishing the likelihood of clinic success, resulting in Intellia effectively abandoning all research and development of the AATD program by the beginning of 2024.

193.    During the Question-and-Answer portion of the call, analyst William Pickering of Sanford C. Bernstein & Co., LLC. inquired, "[f]or the AATD program, do you have any plans to expand the study beyond the New Zealand site? And is it a reasonable base case that we would see data in 2025?"

194.    Defendant Lebwohl responded: "Yes. We will be having other sites, and we'll put them on [ clinicaltrials.gov ] as they come up. I should say ***it is possible that we'll have data, reasonable to think we have data in 2025***."

195.    The statements identified in ¶194 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the near-term prospects for NTLA-3001 and concealing that the program was already being quietly wound down. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known problems with

efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

196.    During the same call, referring to Intellia's extension "into later-stage clinical trials," analyst Alec of BofA Securities, LLC asked about its "capital allocation priorities given you have a lot going on in the pipeline and sort of how you're thinking about *in vivo* versus *ex vivo* going forward?"

197.    To which Defendant Dulac responded:

I mean we exited the third quarter with about $945 million in cash and -- as we look at our 2- or 3-year plan, I think we've laid out at JPMorgan earlier this year, 3-year priorities, strategic priorities through 2026. And so as I look at the company today, we clearly have a focus on the 3 Phase III studies, which will be up and running before the end of the year, and that's clearly a focus. ***We do have some exciting programs related to 3001, our first gene insertion program, which is an important proof of concept for us*** as well as sort of burgeoning *ex vivo* opportunities as well. And then we've been very prominent in just investing across the platform. So I look at our existing cash burn at roughly $100 million over the last couple of quarters as a reasonable estimate, that should go up. ***But I feel like we have a very conservative plan in place, one that takes our existing cash balance and gets us well into fourth quarter of 2026***.

198.    The statements identified in ¶197 above were materially false and misleading when made because they created the materially false impression that Intellia remained committed to the AATD program and was proceeding with its development as planned, materially misrepresenting the Company's execution of its stated growth strategy and its near-term prospects driven by targeted gene insertion. As detailed above, the corroborating accounts of multiple former employees and sequential decline in program-related R&D expenses confirm that, at the time these statements were made, Intellia had already begun to de-prioritize NTLA-3001 due to known

problems with efficacy and increased risks associated with the program's dual delivery system utilizing AAV vectors, ceasing all research and related animal testing, diverting resources and personnel to other designated high priority programs, reducing the amount of money spent on drug components and related contracted services and allowing critical DEA licenses to expire, all necessary for the clinical development of NTLA-3001.

## VII.  ADDITIONAL SCIENTER ALLEGATIONS

199.    Numerous facts alleged above, viewed collectively and holistically, raise a strong inference that the Individual Defendants knew or, at minimum, were reckless in disregarding adverse facts regarding Intellia's AATD program, the development of NTLA-3001, and its target dosage of patients in the Phase 1/2 trial, and that each of the statements alleged herein were materially false and misleading and/or omitted material facts when made. In addition to the allegations set forth above, the following facts further support a strong inference of scienter.

### A.  Corroborating Former Employee Accounts Confirm Individual Defendants' Knowledge of and/or Access to Material Adverse Information.

200.    According to CW2, CW3, and CW4, Intellia held quarterly all-hands (or town hall) meetings with all employees at the Company in attendance. CW3 recalled that, during their tenure with Company (April 2023 – January 2025), Defendant Leonard was always in attendance and often led the meetings. CW2 recalled that, during their tenure with the Company (January 2023 – January 2025), either Defendant Leonard or Defendant Sepp-Lorenzino typically announced the program updates at the town hall meetings. CW3 recalled Defendant Leonard gave regular updates on NTLA-3001's progress during the Company's all-hands meetings, accompanied by slide show presentations. CW4 corroborated this information providing that, during their tenure with the Company (January 2021 to July 2024), NTLA-3001 was regularly discussed during town hall meetings and in internal company presentations.

201.    Additionally, CW3 said Company executives consistently shared information about Intellia's cash runway during these all-hands meetings. CW1 recalled the cash runway discussed during their tenure with the Company (April 2023 – January 2025), saying executives would say Intellia has a cash runway into the end of 2025, then Q2 of 2026, then Q1 or Q2 of 2027.

202.    CW4 explained that risk and competition of each program were reviewed all the time at Intellia. According to CW4, the Company had routine assessments of risk and competition. CW4 said Intellia executives were very systematic about assessing the risk profile of its assets. During their tenure at the Company, CW4 said there were senior leadership portfolio reviews; there were program specific reviews; and then there were program-engaging-with-the-senior-leadership reviews. As such, a program was under continuous evaluation, and no decisions were ever made without the utmost assessment and critical review, said CW4. CW4 added that there were a set of internal rules the Company had to follow when assessing a program's viability. There were guiding principles that were always stated internally about keeping a certain amount of runway and continuously having to assess difficult decisions about how the resources would be allocated, said CW4. CW2 corroborated the Company-wide practice of viability reviews, adding that leadership at Intellia also regularly reviewed program timelines.

203.    According to CW6, all pre-clinical activities conducted at Intellia were logged in an electronically stored laboratory notebook. In particular, CW6 said this type of recording was a requirement for anyone doing any work that involved animal testing. CW6 said that these logs would have shown that the 2023 pre-clinical studies of NTLA-3001 did not produce any indications of efficacy. CW6 said that Company leadership also tracked the allocation of time and resources via Intellia's research and development (R&D) tracking system. According to CW6, employees had to log what percentage of their time was spent on each program, like NTLA-3001.

B.      **The Individual Defendants Held Themselves Out as Knowledgeable.**

204.    The Individual Defendants knew investors and analysts were acutely interested in the Company's commitment to the AATD program and its first-in-human Phase 1/2 trial of NTLA-3001 for treatment of AATD-associated lung disease, its regulatory approval pathway and the necessary data to support such approval, and the execution of its near-term target of first patient dosed in 2024 because they were repeatedly asked about such key operations throughout the Class Period. The Individual Defendants consistently spoke to these subjects with authority, indicating that they either had actual knowledge of the relevant subject matters discussed (and thus the material adverse information omitted) or were reckless to the likelihood of misleading investors by speaking with authority as to subjects about which they were uninformed.

205.    For example, during the J.P. Morgan presentation held on January 9, 2024, analyst Lut Ming Cheng asked "the registration path" of NTLA-3001: "How different is the path for AATD lung compared to what you have done so far?" To which Defendant Lebwohl responded:

> So there's been much fewer approvals in AATD lung. There's not a real -- well, way forward, the way that has been for TTR and HAE. What we think the FDA is looking for is to -- if we could achieve normal levels of alpha-1, probably also, of course, show good safety, maybe show some early effects on lung markers like FEV1, that a single-arm trial would be a way to get approved. It may require a randomized trial and follow-up to that. I don't think they really know at this point in this disease. But that's what we expect. The most important thing being to achieve normal levels of alpha-1 antitrypsin.

206.    During the Company's 4Q23 Earnings Call, analyst Timur Ivannikov of Raymond James & Associates, Inc., asked about Intellia's approach to achieving regulatory approval of NTLA-3001 noting, "[h]istorically, it's been difficult to show improvement in lung function with augmentation therapies and other therapies on endpoints such as FEV1 or pulmonary exacerbations and even more advanced augmentation therapies haven't attempted to show this

improvement. So how do you think about improvement in lung function, do you expect regulators to require you to show an improvement?" In response, Defendant Lebwohl explained:

> Yes. The regulatory standard hasn't been set here. There have been some reports publicly that the FDA may accept having normal levels of alpha-1 antitrypsin, could be a way to move forward, of course, with some associated clinical findings, but not necessarily a definitive improvement. And we do think because our program can get to normal levels, really the only gene editing program that's shown this so far that this may be something that the regulators will work with us on and give us a way forward to an approval, mostly based on the high levels that we'll be achieving.

207.    During the Company's 2Q24 Earnings Call, Mr. Ivannikov again asked about Intellia's approach to demonstrating the therapeutic impact of NTLA-3001 and its regulatory approval pathway noting, "[f]or AATD lung disease, historically, it's been difficult to show improvements in FEV1 and pulmonary exacerbations. So do you think the FDA will require showing improvements on those end points besides just showing the reduction in neutrophil elastase activity?" Defendant Leonard answered:

> It's an evolving space. And as far as we can determine in our interactions, as well as talking to experts in the space, is that the FDA is likely to approach this as a function of the degree of normality that's achieved. If patients achieve normal levels of the protein, the requirements we expect for functional aspects of that may be different from those instances in which either an abnormal protein or less than a complete normalization of effect is achieved because in those cases, you're going to need supplementary information to indicate that less than a complete response is actually beneficial to the patient. That's why we want to normalize patients. We think that the best we can do is put them in a position as if they never had the disease in the first place, and that's the objective for the program.

208.    During the Question-and-Answer portion of the 1Q24 Earnings Call, Analyst Rick Stephen Bienkowski of Leerink Partners LLC inquired about the AATD program and the design for the Phase 1 trial: "[s]ince there's 2 moving parts here, the LNP and the AAV, I was hoping if you could just comment on how you're thinking about the dose escalation. Would you be able to escalate those components in tandem? Or would you have to maybe do an extended dose escalation to control for those 2 different delivery vehicles?"

209.     Defendant Leonard responded:

I'll turn to David [Lebwohl], but just to set the table, we do a lot of preclinical work to try to address as many of the variables as possible before ever entering into the clinic. So I don't want anybody to think that we go in with a complete unknown. Just as our work with 2001 and 20[0]2, where our modeling was essentially dead on in terms of what we saw in the clinic, we expect that many of the insights we've learned from the preclinical work will apply very, very directly to the 3001 as well. So David, maybe you could just say a word or 2 about some of the contraction of what would be a standard sort of checkerboard study of 3001.

210.     And Defendant Lebwohl followed, adding:

So with these 2 parts, the LNP and the AAV, we've learned a lot already about LNP, the ability to go to a particular site and target that site. And what we've learned from both the 2002 and 2001 program is that we can achieve essentially every allele being targeted with this so that we can open that up for the contribution that the AAV will make. So we think this more as -- we have a good idea of the LNP dose and the variation will be more in terms of how much AAV is needed to optimally get expression of alpha-1 antitrypsin.

Again, our goal is to get normal levels. That's what we've achieved preclinically, and that's our goal clinically as well.

211.     Analyst Troy Frederick Langford of TD Cowen also inquired about the AATD program raising the following questions: "[s]o for NTLA-3001, how quickly do you think you can move through development with this asset? So do you think you would try to take this asset into a pivotal study shortly after the Phase I dose work like with NTLA-2001 or do you think we'll have more traditional placebo-controlled Phase II to further refine the dose for a pivotal study like with NTLA-2002." To which Defendant Leonard responded, in pertinent part:

I'd just start by saying, as was emphasized in our comments earlier today, we emphasize understanding these drugs, especially from a safety as well as from an efficacy point of view. And so that -- those will be our guiding principles as we carry out the study of 3001.

212.     During the same call, analyst Silvan Can Tuerkcan of JMP Securities LLC asked about the Company's process for selecting and prioritizing new programs:

Maybe you can give us like a 10,000 foot view on your strategy in the new tissues. I know you touched before on bone marrow and today, a little bit on cystic fibrosis.

67

But within all of these tissues that you've mentioned, which ones are closer to IND-enabling studies, which ones are further along? And how should we think about those programs coming to fruition over the next couple of years towards moving towards and IND.

213.    Defendant Leonard responded:

Thanks for the question. It's an important one. But I don't want you to think it's a horse race, and we give updates on the individual laps that these relay races run. All of these tissues are very, very important. It really goes back to the philosophy and the strategic intent that has been the basis of the company since we first set out. It's a very deliberate approach that thinks about delivery and editing technologies.

So as is apparent, we started out with knockouts in the liver, which you see with the 3001 program as a gene insertion into the liver. We have technology to add to that in the form of gene writing in the liver. And the goal has been to take these various editing technologies, apply them to diseases that reside outside the liver.

And as Laura [Sepp-Lorenzino] has mentioned earlier, we do that with collaborators, where people have technologies that can supplement our own and take us to places that we may not be able to get there by ourselves. We're excited about the work with ReCode. We're doing work with SparingVision. We have collaboration, as you know, with Regeneron. Each of these tissues, 5 of them that were delineated earlier have very important diseases with large populations with unmet medical need. Some of those opportunities surpass what we see in the liver at the current time. And so all of them benefit from the common approach from an editing point of view, and all of them are being resourced very, very aggressively to get to those preclinical development candidates.

214.    During the same call, analyst William Pickering of Sanford C. Bernstein & Co.,

LLC asked about the progress of the AATD program: "I believe you said that you filed the AATD

CTA application in December. Could you share if you have received any response or feedback to

that application? And once the trial is underway, what duration of follow-up would you want to

include in any initial data presentation?" To which Defendant Lebwohl responded:

Yes. So with the CTA, we've gotten some straightforward questions that we've addressed. We're expecting to hear any day back about the status of that.

In terms of follow-up, we will follow the principle we always have that when we have a significant body of data to report on that -- we will be bringing the data forward. As a reminder, Regeneron has gained approvals of both in Europe and the IND cleared. So that in terms of the application itself, the platform, we have high confidence in its ability to do -- go forward around the world.

215.    During the 2Q24 Earnings Call, analyst Myles Robert Minter of William Blair & Company L.L.C. asked:

> Just on alpha-1, just curious what your definition of normal AAT levels are because there's a wide range, I think, 20 to 50 micromolar. And if that range will be achievable with your initial 50 mg dose that you're going with? And final question is just on the risk of albumin reduction. Just with the fact that you're uncertainty into the albumin locus and if that's going to be material or not?

216.    To which Defendant Leonard responded: "We'll turn to Laura [Sepp-Lorenzino], who can speak to what we're shooting for in terms of albumin. But just one thing you said you referred to the 50-milligram dose. We will be holding the LNP dose constant in our Phase I study in varying the AAV dose, which, again, is at levels that are significantly below what's typical for gene therapy, at least in recent examples."

217.    And Defendant Sepp-Lorenzino followed, adding:

> Right. So normal levels, right? And what you quoted is right, right? So they vary from 20 to 50. And that's the goal that we want to achieve, right, in this case, we were in the 20s. So that's what we expect we're going to be able to achieve in humans.

> With regards to albumin that was obviously externally evaluated in our GLP toxicology studies. And we do not see a decrease in albumin expression that in any way could put patients in danger. So, we believe that, again, the doses that we're going to [be] investigating, even [at] the first dose, we expect we designed the trial for even the first dose to have led to alpha-1 levels that will be therapeutically relevant. And then we expect that the safety of the approach to 3001 will be pristine.

218.    During the 3Q24 Earnings Call, analyst Konstantinos Biliouris of BMO Capital Markets Equity Research asked about the AATD program and the Company's plans for clinically validating NTLA-3001: "[g]iven that the gene that you inserted isn't under the control of the natural promoter and under infection, patients need about 2 to 3x more AAT protein. Can you remind us how do you ensure that this additional AAT protein is there during infections?"

219.    Defendant Leonard responded:

We base our excitement over the alpha-1 program on the preclinical where as you point out, the natural transgene is driven by the albumin promoter. And with that in nonhuman primates, we've achieved normal levels of the protein. I would not expect that to be the module -- the typical response to infection because it will be driven by the albumin promoter. But what we prioritized is normalizing the protein because it's primary – it's the primary defect in patients with the disease. And we think that, that's going to be the primary determinant of the success of the product.

220.    During the same call, analyst Sean of J.P. Morgan asked about the differentiation between Intellia's AATD program and "the RNA editing data from [its] peers," to which Leonard responded:

As we've said elsewhere, we think the key determinant of success for the pulmonary pathology of the disease will be achieving high essentially normal levels of wild-type protein. Thus far, we are the only company that we're aware of that's presented that in the setting of a nonhuman primate. That is what we're looking for in our Phase I study to determine whether or not we achieve those same similar proteins in humans. Obviously, we'll watch the space. There are competitive programs playing out, but it's very, very early. We'll see how successful people are at even delivering their technologies and then the performance of production of the normal protein over time.

221.    Analyst Dae Gon Ha Stifel of Nicolaus & Company, Incorporated, also raised a question about the Company's AATD program and the patients to be enrolled in the trial:

Just thinking about the Phase I that's going to embark by the end of the year. If you can comment on any flexibility in that trial protocol to include any liver disease patients. I know that was supposed to be more of a 2003 purview, but given the biology and the potential, say, facilitation of polymer excretion from the cells once you have more M protein. Just wondering if you can add in a little bit of that sentinel cohort, if you will, just to see the benefit there.

222.    Defendant Lebwohl provided an initial response, stating: "these patients will not be having a major -- any kind of major liver disease. Those patients with liver disease really are best addressed by reducing the mutant protein as well as, of course, giving the increased alpha-1 antitrypsin would be valuable to them as well. But without our ability to reduce the Z protein, we don't think we're doing them full justice."

70

223.    And Defendant Leonard followed, adding: "[w]ell, just to add, we're taking an extended approach to going after alpha-1. And in addition to 3001, which we think will teach us a lot about the insertion approach for alpha-1 disease and reads to a multiplicity of other diseases for which insertion may be the path forward, we're also bringing forward a gene writing program that would address not only the lung but also the liver."

224.    Such statements of authority were intended to (and did) indicate to investors and analysts that the Individual Defendants were plugged into the details of these topics related to the research and development of NTLA-3001, its regulatory approval pathway and related risks, and the Company's promotion and continued prioritization of the AATD program.  Either they were knowledgeable of such subject matters and should have disclosed the adverse information concealed, or they were reckless in holding themselves out as knowledgeable without having reasonably investigated.

### C.    The NTLA-3001 Program was Integral to Intellia's Access to Capital.

225.    Intellia's need for working capital and, in turn, the need to maintain a successful image with investors provided Defendants with motive and opportunity to commit the fraud alleged herein. Given Intellia's precarious financial position as a clinical-stage biotechnology company with no approved products, this motive surpassed any ordinary or generic corporate motive to raise funds.

### VIII.    LOSS CAUSATION

226.    The market for Intellia common stock was open, well-developed, and efficient at all relevant times. Relying upon the integrity of the market and market information related to the Company, Plaintiffs and other members of the Class purchased Intellia stock during the Class Period and were damaged thereby.

227.    As detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Intellia's common stock and operated as a fraud or deceit on Class Period purchasers of Intellia's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Intellia's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Intellia's common stock during the Class Period, Plaintiffs and other members of the Class suffered losses compensable under federal securities laws.

228.    On January 9, 2025, Defendants announced a complete discontinuation of all research and development of NTLA-3001 and a major reorganization of the Company resources, which included a 27% reduction in force to be effective in 2025.

229.    The January 2025 Announcement disclosed material information that was directly related to Defendants' prior misrepresentations and omissions concerning Intellia's research and development of NTLA-3001, including the prioritization of the AATD program and initiation of the first-in-human Phase 1/2 trial for NTLA-3001 with first patient dosage in 2024.

230.    The market reacted immediately to Intellia's revelation. The price of Intellia securities declined dramatically. From a closing market price of $12.02 per share on January 8, 2025, Intellia's stock price fell to $10.20 per share on January 10, 2025 (which was the next trading session due to markets being closed on January 9, 2025 in observance of the passing of former President Jimmy Carter), representing a roughly 15% decline in the span of a single trading day. The decline was statistically significant at the 99.9% confidence level.

231.    Analysts at William Blair issued a report following the Company's January 2025 Announcement noting, "[d]iscontinuation of NTLA-3001 has generated several investor inbound

calls as to the reasons for this and if this decision has any readthrough to the company's gene insertion approach using a dual LNP/AAV delivery system." The report went on to share the analyst's "stock thoughts" for Intellia including "an updated probability-adjusted fair value of $46 per share (down from $55 per share)" providing, in pertinent part:

> Intellia shares traded down about 15% in market hours in response to both workforce reduction and discontinuation of NTLA-3001 in A1ATD, which had been an investor focus despite the early stage of the asset. Removing NTLA-3001 from our model does not significantly alter our net present valuation for shares, of which the lion's share was already placed on nex-z and NTLA-2002.

232.    The timing and magnitude of the decline in Intellia's stock price following the January 2025 Announcement negate any inference that the loss suffered by Plaintiffs and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent or deceptive conduct.

## IX.    CLASS ACTION ALLEGATIONS

233.    Plaintiffs bring this action as a class action, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of a class consisting of all individuals and entities who purchased Intellia common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Intellia, its current and former directors and officers, and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the foregoing individuals and/or entities have or had a controlling interest.

234.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intellia securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Intellia or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 1, 2024, there were 101.8 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

235.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws complained of herein.

236.    Plaintiffs have and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

237.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, operations, and prospects of Intellia;

(c)    whether Defendants acted knowingly or with deliberate recklessness;

(d)    whether the price of Intellia securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein;

(e)     whether the Individual Defendants acted as control persons of Intellia; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

238.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

239.    At all relevant times, the market for Intellia's common stock was an efficient market for the following reasons, among others:

(a)     Intellia's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Intellia communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Intellia was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Intellia was reflected in and incorporated into the Company's stock price during the Class Period.

240.    As a result of the foregoing, the market for Intellia's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Intellia's stock price. Under these circumstances, all purchasers of Intellia's common stock during the Class Period suffered similar injury through their purchase of Intellia's securities at artificially inflated prices, and a presumption of reliance applies.

241.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## COUNT I

### *For Violations of § 10(b) and Rule 10b-5*
(Against All Defendants)

242.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

243.    During the Class Period, Defendants knowingly or recklessly made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Such statements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain

the market price of Intellia securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Intellia securities at artificially inflated prices. In furtherance of this unlawful course of conduct, Defendants, and each of them, took the actions set forth herein.

244.    Pursuant to the above course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Intellia's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

245.    By virtue of their day-to-day responsibilities, participation in the senior management of Intellia, and positions held at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to each Defendant. At all relevant times, Defendants had access to information contradicting their public statements to investors. Their misrepresentations and omissions were committed willfully or with reckless disregard for the truth.

246.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within each Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Intellia's internal affairs.

247.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Intellia's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Intellia's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Intellia common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants and were damaged thereby.

248.    During the Class Period, Intellia securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased Intellia common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Intellia securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Intellia securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

249.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of Intellia securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

250.    By reason of the conduct alleged herein, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. This action was filed within two years of discovery of fraud or deceit and within five years of each Plaintiff's purchases or acquisitions of Intellia securities giving rise to the cause of action.

## COUNT II

### *For Violations of Section 20(a) of the Exchange Act*
(Against the Individual Defendants)

251.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

252.    This Count is asserted against each Individual Defendant and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

253.    During the Class Period, the Individual Defendants controlled the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the material adverse non-public information misrepresented and/or omitted from Intellia's statements and had access to truthful information contradicting their public statements to investors.

254.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control over the general operations of the Company and possessed the power to control the contents of the various reports, press releases and public filings which Intellia disseminated in the marketplace during the Class Period, including those containing

the misrepresentations and/or omissions alleged herein. Throughout the Class Period, the Individual Defendants had the power to direct the actions of Intellia and exercised their said power and authority to cause Intellia to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Intellia securities.

255.    By reason of the conduct alleged herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Intellia. This action was filed within two years of discovery of fraud or deceit and within five years of each Plaintiff's purchases or acquisitions of Intellia securities giving rise to the cause of action.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as class counsel;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## XI.    DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 23, 2025                    Respectfully submitted,

                                        LEVI & KORSINSKY, LLP

                                        */s/ Shannon L. Hopkins*
                                        Shannon L. Hopkins (BBO# 657485)
                                        1111 Summer Street, Suite 403
                                        Stamford, Connecticut 06905
                                        Tel. (203) 992-4523
                                        Fax: (212) 363-7500
                                        E-mail: shopkins@zlk.com

                                            -and-

                                        Adam M. Apton (admitted *pro hac vice*)
                                        33 Whitehall Street, 27th Floor
                                        New York, NY 10004
                                        Tel: (212) 363-7500
                                        Fax: (212) 363-7171
                                        Email: aapton@zlk.com

                                        *Attorneys for Plaintiffs and Co-Lead Counsel
                                        for the Class*

                                        POMERANTZ LLP
                                        Joshua B. Silverman
                                        (*pro hac vice* application forthcoming)
                                        10 South LaSalle Street, Suite 3505
                                        Chicago, IL 60603
                                        Tel: (312) 881-4847
                                        jbsilverman@pomlaw.com

                                            -and-

                                        Emily C. Finestone (BBO # 693684)
                                        Jeremy A. Lieberman
                                        (*pro hac vice* application forthcoming)
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (917) 463-1044
                                        efinestone@pomlaw.com
                                        jalieberman@pomlaw.com

                                        *Attorneys for Plaintiffs and Co-Lead Counsel
                                        for the Class*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Plaintiff Yiu Chung Lee*