**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARCOS GONZALEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>INTELLIA THERAPEUTICS, INC., JOHN LEONARD, LAURA SEPP-LORENZINO, DAVID LEBWOHL, and EDWARD J. DULAC,<br><br>        Defendants. | Case No. 1:25-cv-10353-DJC<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**
**<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Caroline H. Bullerjahn
John A. Barker
Brendan Blake
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

*Counsel for Defendants Intellia*
*Therapeutics, Inc., John Leonard, Laura*
*Sepp-Lorenzino, David Lebwohl, and*
*Edward J. Dulac*

**TABLE OF CONTENTS**

<u>**Page**</u>

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT..............................................................................................................1

I.  The AC Fails To Plead A Strong Inference Of Scienter....................................1

    A.  The AC Contains No Contemporaneous Allegations Of Knowledge Or Recklessness By The Individual Defendants..........................................1

    B.  The Absence Of Any Plausible Motive Undercuts Scienter. ...............5

    C.  There Is No "Strong Inference" Of Scienter As Cogent Or Compelling As The Nonfraudulent Alternative..................................................6

II.  The AC Fails To Allege Any Actionable Misstatement.....................................7

    A.  The AC Fails To Allege With Particularity That Any Statement Was False Or Misleading When Made. ......................................................7

    B.  The Alleged Misstatements Are Nonactionable Because They Are Forward-Looking Statements, Opinions, And/Or Puffery...................9

III.  The AC Does Not Allege Loss Causation. ....................................................10

CONCLUSION........................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bos. Sci. Corp. Sec. Litig.*,
    646 F. Supp. 3d 249 (D. Mass. 2022) .......................................................................5

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)......................................................................................2

*City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*,
    2025 WL 2457758 (2d Cir. Aug. 27, 2025) .............................................................7

*City of Miami Fire Fighters' v. CVS Health Corp.*,
    519 F. Supp. 3d 80 (D.R.I. 2021)............................................................................2

*Collier v. ModusLink Glob. Sols., Inc.*,
    9 F. Supp. 3d 61 (D. Mass. 2014) ...........................................................................2

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
    22 F.4th 1 (1st Cir. 2021) ........................................................................................5

*Corban v. Sarepta Therapeutics, Inc.*,
    868 F.3d 31 (1st Cir. 2017).................................................................................5, 6

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) ..........................................................................5

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ....................................................................................2

*In re Ibis Tech. Sec. Litig.*,
    422 F. Supp. 2d 294 (D. Mass. 2006)......................................................................6

*In re iRobot Corp. Sec. Litig.*,
    527 F. Supp. 3d 124 (D. Mass. 2021).......................................................................4

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
    552 F. Supp. 3d 77 (D. Mass. 2021) ......................................................................10

*Leung v. bluebird bio, Inc.*,
    599 F. Supp. 3d 49 (D. Mass. 2022) ............................................................. 4, 6, 10

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019)....................................................................................3

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ...................................................................................................2

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021)....................................................................8, 9

*Pizzuto v. Homology Meds., Inc.*,
  2024 WL 1436025 (D. Mass. Mar. 31, 2024).........................................................................9

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .................................................................................................5

*Ret. Sys. v. Talbots, Inc.*,
  2013 WL 5348569 (D. Mass. Sept. 23, 2013) ........................................................................2

*Sanders v. AVEO Pharms., Inc.*,
  2015 WL 1276824 (D. Mass. Mar. 20, 2015)..........................................................................6

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .................................................................................................8

*SEC v. Liberty*,
  2021 WL 664834 (D. Me. Feb. 19, 2021) ..............................................................................4

*In re Sepracor, Inc. Sec. Litig.*,
  308 F. Supp. 2d 20 (D. Mass. 2004) ......................................................................................8

*Shash v. Biogen, Inc.*,
  84 F.4th 1 (1st Cir. 2023) .......................................................................................................8

*Shih v. Amylyx Pharms., Inc.*,
  2025 WL 2807756 (D. Mass. Sept. 30, 2025) ........................................................................2

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
  604 F. Supp. 2d 332 (D. Mass. 2009).....................................................................................2

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
  775 F. Supp. 2d 227 (D. Mass. 2011)..................................................................................4, 7

*State Tchrs. Ret. Sys. of Ohio v. Charles River Lab'ys Int'l, Inc.*,
  152 F.4th 1 (1st Cir. 2025).....................................................................................................4

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005)...................................................................................................9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ...............................................................................................................7

iii

*Thant v. Karyopharm Therapeutics Inc.*,
   43 F.4th 214 (1st Cir. 2022)..................................................................................................8, 10

*Washtenaw Cnty. Emps.' Ret. Sys. v. Talbots, Inc.*,
   2013 WL 5348569 (D. Mass. Sept. 23, 2013) ......................................................................2

**PRELIMINARY STATEMENT**

Plaintiffs' opposition brief (ECF No. 54, the "Opposition" or "Opp.") confirms that the claims in this case are based on little more than speculation and surmise.[1] The Opposition advances the AC's unsupported theory that Defendants either abandoned or de-prioritized NTLA-3001 prior to the Class Period but concealed this decision for over a year. Tellingly, Plaintiffs cannot say which it is—abandonment or de-prioritization—because there is no well-pled allegation in the AC that Defendants made any such decision (or when), so they shift between the two as it suits their arguments. Either way, Plaintiffs' theory is fundamentally undermined by the fact that Intellia spent more than $8 million in external costs alone on NTLA-3001 and obtained regulatory clearance to initiate Phase 1 trials during the Class Period. Further, Plaintiffs do not identify any plausible motive for Defendants to have delayed the disclosure. Instead, Plaintiffs try to piece together a viable securities fraud claim from the uncorroborated opinions of confidential witnesses and circumstantial evidence that is contradicted by the AC's own allegations. These efforts must fail. ***First***, the allegations in the AC do not give rise to a strong inference of scienter. ***Second***, the AC does not identify any actionable misstatements or omissions—both because no statements are plausibly alleged to be false or misleading and because they are all inactionable as a matter of law. ***Third***, the AC fails to plead loss causation. Nothing in the Opposition dictates a different outcome.

**ARGUMENT**

**I.    The AC Fails To Plead A Strong Inference Of Scienter.**

    **A.    The AC Contains No Contemporaneous Allegations Of Knowledge Or Recklessness By The Individual Defendants.**

Plaintiffs assert that NTLA-3001 "had essentially been abandoned" (Opp. at 1) and

---

[1] Capitalized terms used but not defined in this reply have the meanings as in Defendants' opening brief, ECF No. 47 (the "MTD"). As in the MTD, quotation marks, internal citations, and alterations in the original have been omitted in citations, and emphasis has been added, unless otherwise noted.

"Defendants *knew* [it] had been de-prioritized throughout the Class Period" (*id.* at 18). But the Opposition does not—because it cannot—point to a single well-pled fact supporting Defendants' knowledge, or reckless disregard of any facts, indicating that Intellia had de-prioritized, much less abandoned, development of NTLA-3001 prior to or during the Class Period. *See* MTD at 7-13. Plaintiffs acknowledge that their claims rest primarily on the allegations of confidential witnesses (Opp. at 19-20), but even crediting these allegations, they still do not add up to a strong, or even plausible, inference of scienter.[2]

The Opposition relies primarily on the allegations of CW6 regarding preclinical activities in 2023.[3] But CW6's claims, individually or collectively, do not support the conclusion that Intellia had decided to stop (or de-prioritize) development of NTLA-3001 prior to the Class Period. ***First***,

---

[2] Plaintiffs cite a number of cases regarding the foundational requirements for confidential-witness allegations. *See* Opp. at 19-20. Not only does this miss the point, but those cases are readily distinguishable. In several cases the court dismissed plaintiffs' claims despite finding that the confidential-witness allegations were sufficiently alleged. *See City of Miami Fire Fighters' v. CVS Health Corp.*, 519 F. Supp. 3d 80, 91-98 (D.R.I. 2021); *Washtenaw Cnty. Emps.' Ret. Sys. v. Talbots, Inc.,* 2013 WL 5348569, at \*22, \*31 (D. Mass. Sept. 23, 2013). In another case, the court found scienter pled with respect to forward-looking statements concerning the company's future growth, which were allegedly contradicted by internal data that was discussed by defendants during quarterly earnings calls. *See Shih v. Amylyx Pharms., Inc.*, 2025 WL 2807756, at \*3-4 (D. Mass. Sept. 30, 2025). And, in the remaining cases, the confidential-witness allegations were far more detailed and probative of defendants' scienter than the allegations here. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 24 (1st Cir. 2002) (confidential witnesses alleged defendants "book[ed] entirely fictitious sales," "ma[de] shipments late in one quarter . . . while knowing that the goods would be returned during the next quarter," and "set[] aside newly received raw materials and book[ed] them in a later quarter so that they would not appear as liabilities"); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 71 (D. Mass. 2014) (confidential witness alleged, among other things, that "she received directions concerning rebates, financials and margins directly from [defendants]" and "[defendants] were solely responsible for decisions regarding if and when rebates were passed along to . . . clients"); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 604 F. Supp. 2d 332, 344 (D. Mass. 2009) ("The complaint indicates that each of [the confidential sources] had interactions with the executives at sales meetings and other situations where, they allege, it was clear that the executives knew demand was decreasing in Winter/Spring 2007."); *see also E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 938-39 (9th Cir. 2023) (confidential witnesses alleged, among other things, "NVIDIA Vice Presidents presented sales data reflecting GeForce sales to miners at the quarterly meetings with [CEO defendant] in 2017" and "[CEO defendant] reviewed everybody's sales data in detail at these meetings"); *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 (5th Cir. 2023) (confidential witness prepared weekly presentations "containing details about the lack of infrastructure, lack of construction workers onsite, and lack of progress over 'x number of days' in specific sectors of the parks" that were relayed to defendants).

[3] *See* Opp. at 18 ("the Company ran several studies in 2023 using the FlexiVent machine, and none of them demonstrated efficacy"); *id.* at 18-19 ("the Company let [an unspecified] critical DEA license to test NTLA-3001 lapse"); *id.* at 19 ("the Company's outsourced non-human primate studies in 2023 also failed"); *id.* ("Defendants had discontinued their use of the FlexiVent machine, essentially ending the mice study").

CW6's assertion that certain animal studies conducted in 2023 "did not show efficacy" (AC ¶¶ 64-67, 68) says nothing about the earlier preclinical data showing NTLA-3001's ability to restore normal A1AT levels in nonhuman primates or whether Intellia would ultimately be able to obtain approval for NTLA-3001. MTD at 8-9. Nor does it follow that because certain 2023 preclinical studies did not have the desired outcomes the Company chose to abandon NTLA-3001 altogether, particularly when Intellia continued to spend *millions* of dollars on developing NTLA-3001 and sought—*and obtained* (based on its preclinical data)—regulatory clearance to conduct clinical trials during the Class Period. *Id.* **Second**, the allegation that the Company curtailed certain preclinical work in 2024 is entirely consistent with the fact that it was preparing to transition to clinical trials. *Id.* at 9. **Third**, CW6 does not claim to have any actual knowledge of a decision by Defendants to discontinue development of NTLA-3001 at any point in time. *Id.*

The AC also fails to give rise to a strong inference of scienter because neither CW6 nor any of the other confidential witnesses say anything whatsoever about what data was communicated to the Individual Defendants, when any such data was communicated, or why that data was inconsistent with Defendants' statements at the time they were made. *Id.* at 9-12. Plaintiffs instead point to the Individual Defendants' alleged general monitoring of the Company's research and development efforts and their access to information about NTLA-3001 and suggest they *must have known* about certain supposedly negative preclinical data described by CW6. *See* Opp. at 19. But access alone does not equate to knowledge and nothing in the AC indicates that any allegedly negative data was communicated to the Individual Defendants, that they understood it to contradict their statements, or that they believed those statements were inaccurate when made. *See Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 162 (1st Cir. 2019) ("monitor[ing] . . . reporting metrics does not in and of itself suffice" for scienter because "one would need to know

3

what [defendant] learned from such monitoring, and whether what he learned was at odds with any of his 'plausibly misleading' statements").[4] Indeed, Plaintiffs plead no facts suggesting Defendants knew or believed there was any inconsistency between the data and their disclosures such that the Court could infer they were consciously reckless—let alone that they acted with intent to mislead investors—particularly since the 2023 preclinical studies did not render any statements misleading. *See* MTD at 18-20; *infra* pp. 7-9.

For similar reasons, the Opposition's remaining arguments concerning Defendants' supposed knowledge are also unavailing. The general assertion that "Defendants held themselves out as knowledgeable about the development, prioritization, and preclinical testing of NTLA-3001" (Opp. at 21), is precisely the type of generalized argument that courts routinely find does not support an inference of scienter. *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 140 (D. Mass. 2021); *see also* MTD at 12-13.[5] The "core operations" doctrine (*see* Opp. at 22) is inapplicable "absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 66 (D. Mass. 2022) (quoting *Metzler Asset Mgmt.*, 928 F.3d at 165). There is no

---

[4] The AC's allegations are also a far cry from those in *State Teachers Retirement System of Ohio v. Charles River Laboratories International, Inc.*, 152 F.4th 1 (1st Cir. 2025) (cited in Opposition at 20-21). There, the First Circuit found that the complaint adequately alleged scienter because "Charles River told its investors that its suppliers were not implicated in the federal proceeding *when it knew* that its supply [of long-tailed macaques] was coming from the entities subject to investigation, seizure, and indictment." *Id.* at 13. The court inferred that defendants *knew* their statements were false and misleading because at least one of the company's suppliers "had already *publicly declared* that its own 'principal supplier' was a target of the indictment, meaning Charles River was almost certainly importing macaques from that supplier, albeit through an intermediary, despite assuring investors it was not." *Id.* at 11. There are no comparable allegations here. Rather, the AC's entire theory of falsity rests on the opinions of CW6—a low-level, former animal-care technician—and there is no allegation that CW6's opinions or the preclinical data on which they were supposedly based were ever shared with the Individual Defendants.

[5] Plaintiffs cite *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227 (D. Mass. 2011), for stock language concerning recklessness (Opp. at 22), but there, unlike here, the complaint alleged the "Defendants' personal participation" in the conduct that allegedly made their statements false and misleading. 775 F. Supp. 2d at 243. Plaintiffs' reliance on *SEC v. Liberty*, 2021 WL 664834 (D. Me. Feb. 19, 2021) (Opp. at 21), is also misplaced given that it is a government enforcement action not subject to the heightened pleading requirements of the PSLRA. 2021 WL 664834, at *6.

such allegation here. *See* MTD at 7-13; *supra* pp. 3-4.[6] And Plaintiffs' contention that the "temporal proximity" between, on the one hand, November 7, 2024 statements regarding Intellia's plans to continue developing NTLA-3001 and, on the other, the January 9, 2025 announcement of the discontinuation decision somehow "bolsters" the inference of scienter is legally insufficient. Opp. at 22-23. Unlike in the cases relied upon by the Opposition, there is no allegation in the AC that Defendants knew of any information that contradicted their statements in November 2024.[7]

**B.      The Absence Of Any Plausible Motive Undercuts Scienter.**

Plaintiffs double down on the theory that "Intellia exploited the artificial inflation caused by Class Period misrepresentations and omissions to sell over 7 million shares of common stock." Opp. at 23. This argument, however, is foreclosed by binding caselaw. In *Corban v. Sarepta Therapeutics, Inc.*, the First Circuit held that $125 million in at-the-market sales did not supply a plausible motive where "[the company] had $156.2 million in cash and cash equivalents on its balance sheet," "$80 million in working capital, when it launched the . . . at-the-market offering,"

---

[6] The cases cited in the Opposition are of no help to Plaintiffs. In *Construction Industry and Laborers Joint Pension Trust v. Carbonite, Inc.*, the complaint alleged multiple "red flags" that put defendants on notice of the falsity of their statements, including internal reports that the at-issue product "was not ready for market" and "had allegedly produced not one successful backup." 22 F.4th 1, 10 (1st Cir. 2021). Similarly, in *Crowell v. Ionics, Inc.*, the complaint detailed "systematically fraudulent sales practices" that had been "ordered" by a company executive as well as a "clear motive to inflate [the company's] stock price" to facilitate a sale transaction. 343 F. Supp. 2d 1, 19 (D. Mass. 2004). Yet the only purported "red flag" identified in the AC is the rank speculation by CW6 that Intellia chose to de-prioritize or abandon the development of NTLA-3001 at some unspecified time in late 2023 or early 2024. *See* MTD at 8-10; *supra* pp. 2-3. While there is not a single well-pleaded allegation concerning Defendants' supposed motive to mislead investors or inflate Intellia's stock price. *See* MTD at 14-16; *infra* pp. 5-6.

[7] In *In re Boston Scientific Corp. Securities Litigation*, the court found the complaint adequately alleged scienter with respect to two statements made by the CEO touting a medical device platform, just weeks before the company announced its decision to recall the device and discontinue the device platform. 646 F. Supp. 3d 249, 288-89 (D. Mass. 2022). As part of the announcement, defendants acknowledged that the decision was the result of "much analysis and careful consideration" and that the decision had been made around the same time as the CEO's statements. *Id.* at 289. And, in *Reese v. Malone*, the court found scienter for statements concerning corrosion data relating to an oil pipeline that were made six months prior to an oil spill, where the statements were directly contradicted by contemporaneous internal documents concerning the same data. 747 F.3d 557, 559-72 (9th Cir. 2014). By contrast, here, there is no well-pled allegation that the decision to discontinue NTLA-3001 had been made as of the November 2024 statements or that there was any contrary information concerning the Company's plans for NTLA-3001 at the time. Indeed, the only concrete allegation concerning when Intellia decided to discontinue development of NTLA-3001 comes from CW2, who claims that the Company supposedly announced the decision during its year-end town hall meeting held on December 12, 2024—*i.e.*, more than a month after the November statements. *See* AC ¶ 75.

and there was no allegation "that such capital was insufficient for continued operations, much less that [the company] would shutter its doors unless it padded earnings by deceiving investors." 868 F.3d 31, 41-42 (1st Cir. 2017). The same reasoning dooms Plaintiffs' argument here. It is undisputed that at the beginning of the Class Period Intellia had $921.6 million in cash, cash equivalents, and marketable securities. Ex. 8 (2/22/2024 FY 2023 Form 10-K) at 100. And, far from alleging the Company was at risk of "shutter[ing] its doors," the AC concedes that the Company's available cash amounted to a two-and-a-half-year "cash runway" through at least the middle of 2026. *See* AC ¶ 5. The best Plaintiffs can do is allege that "Intellia raised enough cash to sustain its touted cash runway into late 2026." *Id.* ¶ 101. But this is precisely the type of allegation that the First Circuit deemed insufficient in *Corban*. 868 F.3d at 41-42 (allegations that "defendants needed the offering to provide . . . essential funding" and that "[the company] depended heavily on financing activities for capital" not enough to plead motive).[8]

### C.    There Is No "Strong Inference" Of Scienter As Cogent Or Compelling As The Nonfraudulent Alternative.

Last, as the MTD explained, any inference of scienter pales in comparison to the nonfraudulent inference: that Defendants truthfully disclosed throughout the Class Period that Intellia was planning to proceed with a Phase 1/2 trial of NTLA-3001 and expected to dose the first patient by the end of 2024, but ultimately decided to discontinue development of NTLA-3001 and focus its resources on later-stage, higher-value product candidates. This inference is fully

---

[8] *See also Leung*, 599 F. Supp. 3d at 65 (allegations that company "sorely needed capital" because it "ha[d] incurred losses since inception and to date ha[d] financed its operations primarily through the sale of shares" insufficient to plead motive); *Sanders v. AVEO Pharms., Inc.*, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (similar). The vast majority of the cases cited in the Opposition concerning capital raises are older, out-of-circuit decisions and are plainly distinguishable on their facts. *See* Opp. at 23. The sole in-circuit decision, *In re Ibis Technology Securities Litigation*, is of no help to Plaintiffs. In *Ibis*, the court found that a public offering supported scienter where defendants delayed disclosing an accounting write-down until shortly after the completion of the offering, which was necessary to ease "severe cash flow constraints" that already had caused the company to "reduce its workforce and increase the numbers of days off for remaining employees." 422 F. Supp. 2d 294, 303, 317 (D. Mass. 2006).

consistent with the allegations in the AC that Intellia submitted a CTA seeking approval to begin a Phase 1/2 trial of NTLA-3001 at the end of 2023 (AC ¶¶ 5, 79); the Company received MHRA authorization for the CTA in July 2024 (*id.* ¶ 158); Intellia spent more than $8 million on developing NTLA-3001 in 2024 in external costs alone (*id.* ¶ 77); and the Company allegedly announced the decision to discontinue development of NTLA-3001 internally in December 2024, shortly before disclosing the same to the market (*id.* ¶ 75). Plaintiffs' contrary inference—that Defendants decided to stop development of NTLA-3001 sometime before the Class Period but concealed that decision for over a year for no apparent reason—is both weak and not "cogent" or "compelling." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The Opposition does not provide any reason why the Court should weigh these inferences differently.

## II.     The AC Fails To Allege Any Actionable Misstatement.

### A.     The AC Fails To Allege With Particularity That Any Statement Was False Or Misleading When Made.

Plaintiffs advance shifting theories of falsity. They alternately contend that Intellia had "effectively abandoned" and "essentially stopped" developing NTLA-3001 (Opp. at 10), and "had already made a decision to unwind and begun unwinding the NTLA-3001 program" (*id.* at 12 n.7); or, more vaguely, that it was merely "de-prioritized" (*e.g.*, *id.* at 14, 15, 18, 21). The inconsistency is telling—and in any event, a de-prioritization (had it occurred) would not contradict any statements. Either way, the AC falls far short of pleading that Intellia stopped or even deprioritized NTLA-3001 any earlier than the end of the Class Period. *See* MTD 9-13, 18-19; *supra* pp. 2-3.[9]

Nor does the AC adequately allege falsity with respect to statements about NTLA-3001's

---

[9] The cases cited in the Opposition do not save Plaintiffs' claims. *See City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 2025 WL 2457758, at *8 (2d Cir. Aug. 27, 2025) (hypothetical risk-factor disclosure false and misleading based on confidential-witness allegation that warned-of risk had in fact materialized); *Special Situations Fund*, 775 F. Supp. 2d at 241-42 (affirmative statements that nothing had changed with company's relationship with counterparty false and misleading based on numerous alleged undisclosed changes).

potential to restore normal A1AT levels in humans based on preclinical data showing NTLA-3001 was capable of that in nonhuman primates. *See* AC ¶¶ 133, 137, 151, 155, 174, 190. To support falsity for these statements, Plaintiffs can only point to CW6's claim of their understanding that certain later preclinical studies allegedly did not demonstrate "efficacy" with respect to "chang[ing] lung function." *Id.* ¶ 65. Normalizing A1AT levels and improved lung function, however, are completely different endpoints for NTLA-3001. *See id.* ¶¶ 205-07. And making positive, accurate statements about results of one study concerning a drug candidate does not create an obligation to disclose all information—positive or negative—about *other* studies concerning the same drug. *See Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 226 (1st Cir. 2022).

This case is thus unlike those cited in the Opposition where courts found broad statements about the body of research supporting a drug and/or likelihood of FDA approval to be misleading based on failures to disclose certain contrary, negative data. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 701-02, 708 (9th Cir. 2016) (statements expressing confidence in FDA approval based on "Phase II data, the Phase I data, the preclinical studies that was [sic] done, [and] *all* the animal studies that have been completed" were misleading due to non-disclosure of negative results of a rat study, which the FDA had specifically flagged as an issue); *Shash v. Biogen, Inc.*, 84 F.4th 1, 12-13 (1st Cir. 2023) (statement that "our data are *all* consistent" with conclusion was misleading where company failed to disclose certain inconsistent, negative data); *see also In re Sepracor, Inc. Sec. Litig.*, 308 F. Supp. 2d 20, 34 (D. Mass. 2004) (statements expressing confidence in likelihood of FDA approval misleading based on non-disclosure of animal study data results inconsistent with FDA guidance). In fact, despite Plaintiffs' arguments to the contrary, this case closely resembles *In re Philip Morris International Inc. Securities Litigation*, where the court found that the alleged failure to disclose the results of four particular studies did not

8

contradict or render misleading other, factually accurate statements concerning other specific trials. 2021 WL 4135059, at \*11 (S.D.N.Y. Sept. 10, 2021) ("Because the undisclosed studies did not purport to measure the type of data that the Company presented in its statements concerning the clinical studies, the omitted information was not plausibly contradictory.").[10]

### B.    The Alleged Misstatements Are Nonactionable Because They Are Forward-Looking Statements, Opinions, And/Or Puffery.

The Opposition does next to nothing to refute the independent argument that the allegedly false and misleading statements are inactionable forward-looking statements, opinion statements, and/or puffery. ***First***, contrary to the Opposition's arguments, many of the statements are protected by the statutory safe harbor for forward-looking statements. MTD at 20-22. For the safe harbor not to apply, Plaintiffs must plead that (i) the statements were not accompanied by sufficient cautionary language, *and* (ii) Defendants had actual knowledge of their falsity. *See In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005). The AC fails on both fronts. In fact, all of the challenged forward-looking statements were accompanied by robust risk-factor disclosures. *See* MTD at 21-22; *see also* Ex. 2 (Risk Disclosure Chart). While Plaintiffs complain that certain risk factors were too "vague" and "boilerplate" (Opp. at 14-15), this argument is difficult to square with either the language of the disclosures or the caselaw finding similar disclosures to be effective. *See, e.g.*, *Pizzuto v. Homology Meds., Inc.*, 2024 WL 1436025, at \*14 (D. Mass. Mar. 31, 2024). Likewise, the Opposition's argument that Defendants possessed "actual knowledge" of the falsity of their statements fails for the reasons set forth above and in the MTD. *See* MTD at 7-13, 22; *supra* pp. 1-5. ***Second***, many of the alleged misstatements are inactionable

---

[10] Plaintiffs attempt to distinguish *Philip Morris* on the grounds that "FDA approval of the product undercut any argument that omission of four undisclosed studies misled investors." Opp. at 12 n.6. But that is a point of similarity, not distinction. Here, similar to *Philip Morris*, the MHRA approved the CTA for NTLA-3001 that Intellia submitted at the end of 2023 on the basis of the Company's preclinical data (*see* AC ¶¶ 79, 87, 158-59).

opinions. MTD at 22-24. While the Opposition asserts that Defendants' opinion statements "contain embedded factual assertions" which the AC "plausibly alleges . . . were objectively and subjectively false" (Opp. at 16), this too is wrong. *See* MTD at 7-13, 18-20, 22-24; *supra* pp. 1-5.[11] ***Third***, many of the alleged misstatements are immaterial corporate puffery. MTD at 24-25. The Opposition quibbles over which portions of Defendants' statements are puffery but does not deny puffing statements are inactionable. Opp. at 17-18. Further, Plaintiffs are wrong (*id.*) that the stock drop following Intellia's January 2025 announcement somehow rendered material every prior statement concerning NTLA-3001. *See Thant*, 43 F.4th at 223 ("vague optimism about a product's future . . . *cannot* constitute a material misstatement").

### III.    The AC Does Not Allege Loss Causation.

Plaintiffs protest that loss causation is subject to a less demanding pleading standard than the other elements of their claims (*see* Opp. at 24-25), but this cannot save their claims. As the AC alleges, Intellia's stock price dropped in January 2025 following its announcement of "the discontinuation of ***all*** NTLA-3001 related research and development, including the abandonment of the first-in-human Phase 1/2 trial . . . and a related reduction in workforce" (AC ¶¶ 10-11 (emphasis in original))—not any supposedly corrective disclosure of some previous untruth about NTLA-3001. This mismatch defeats loss causation. *See Leung*, 599 F. Supp. 3d at 70.

### CONCLUSION

Defendants respectfully request that the Court dismiss the AC with prejudice.[12]

---

[11] The Opposition's reliance on *In re Karyopharm Therapeutics Inc., Securities Litigation*, 552 F. Supp. 3d 77 (D. Mass. 2021), is misplaced. Opp. at 16. The court there found "arguably" misleading the inconsistency between statements about a drug trial being a success and "an important milestone" with respect to obtaining FDA approval, while failing to disclose certain toxicity data from the same trial that the FDA had specifically identified as a potential obstacle to approval (but nevertheless dismissed the complaint). *Karyopharm*, 552 F. Supp. 3d at 88-89. And this discussion did not involve opinion statements.

[12] Because the AC fails to plead a primary Section 10(b) claim or that any of the Individual Defendants are control persons, the Section 20(a) claim should also be dismissed. *See* MTD at 25.

Dated:  November 24, 2025

Respectfully submitted,

INTELLIA THERAPEUTICS, INC., JOHN LEONARD, LAURA SEPP-LORENZINO, DAVID LEBWOHL, and EDWARD J. DULAC

By their attorneys,

/s/ *Caroline H. Bullerjahn*
Caroline H. Bullerjahn (BBO No. 657241)
John A. Barker (BBO No. 708032)
Brendan Blake (BBO No. 710755)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617-570-1000
Fax: 617-523-1231
cbullerjahn@goodwinlaw.com
jbarker@goodwinlaw.com
bblake@goodwinlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 24, 2025.

/s/ *Caroline H. Bullerjahn*

12