UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
MARCOS GONZALEZ, Individually
and on Behalf of All Others
Similarly Situated,

               Plaintiffs,      Civil Action
                             No. 1:25-cv-10353-DJC

V.

                             January 14, 2026
INTELLIA THERAPEUTICS, INC.,  2:31 p.m.
JOHN LEONARD, LAURA
SEPP-LORENZINO, DAVID LEBWOHL,
and EDWARD J. DULAC,
               Defendants.
_____

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DENISE J. CASPER
UNITED STATES DISTRICT COURT
JOHN J. MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
BOSTON, MA  02210

JESSICA L. BISAILLON, RRP, CRI, CSR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5200
Boston, MA  02210
jsteno99@gmail.com

APPEARANCES:

FOR THE PLAINTIFF:

POMERANTZ LLP
By:  Brian P. O'Connell, Esquire
By:  Emily C. Finestone, Esquire
By:  Jianan Jiang, Esquire
By:  Juting Zheng, Esquire
10 South LaSalle Street, Suite 305
Chicago, Illinois  60603
312.377.1181
boconnell@pomlaw.com
efinestone@pomlaw.com
jjiang@pomlaw.com
jzheng@pomlaw.com

FOR THE DEFENDANTS:

GOODWIN PROCTER LLP
By:  Caroline H. Bullerjan, Esquire
By:  John A. Barker, Esquire
By:  Brendan Blake, Esquire
100 Northern Avenue
Boston, Massachusetts 02210
617.570.1000
cbullerjahn@goonwinlaw.com
jbarker@goodwinlaw.com
bblake@goodwinlaw.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on January 14, 2026.)

THE CLERK:  All rise.

(The Court entered the courtroom.)

THE CLERK:  Court is in session.  Please be seated.

Civil Action 25-10353, Gonzalez v. Intellia Therapeutics, Inc., et al.

Would counsel please state your name for the record?

MR. O'CONNELL:  Good afternoon, Your Honor. Brian P. O'Connell on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. JIANG:  Good afternoon, Your Honor.  Jianan Jiang on behalf of plaintiffs.

THE COURT:  Good afternoon.

MS. ZHENG:  Good afternoon, Your Honor.  Juting Zheng on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MS. FINESTONE:  Good afternoon, Your Honor.  Sorry. Emily Finestone from Pomerantz LLP on behalf of plaintiffs.

THE COURT:  Good afternoon.

Counsel?

MS. BULLERJAHN:  Good afternoon, Your Honor. Caroline Bullerjahn from Goodwin Procter on behalf of the defendants.

THE COURT:  Good afternoon.

MR. BARKER:  John Barker from Goodwin on behalf of the defendants.

THE COURT:  Good afternoon.

MR. BLAKE:  Good afternoon, Your Honor.  Brendan Blake, also Goodwin Procter.

THE COURT:  Good afternoon.

Counsel, I know we're here on the defendants' motion to dismiss.  I also know there's a pending motion to strike by the plaintiffs.  I've read the papers on either side.  I'm prepared to hear argument.

Counsel, given time constraints, I can basically give both sides about 15 minutes splitting the time.  I'd have you focus on the motion to dismiss.  But to the extent that you'd like to address the motion to strike in the course of your argument, feel free to do so.

Counsel?

MR. O'CONNELL:  That works for plaintiffs, Your Honor.

THE COURT:  Okay.

MS. BULLERJAHN:  Likewise, Your Honor.

THE COURT:  Thank you.  Then I'm prepared to hear argument.

MS. BULLERJAHN:  Thank you.

Your Honor, this case is about one of Intellia's early stage preclinical drug development programs known as NTLA-3001.

In January of 2025, after investing multiple years and tens of millions of dollars into the development of 3001, Intellia disclosed that it had made the difficult decision to discontinue the program in order to devote its resources to two of its other Phase 3 clinical programs that were much closer to FDA approval and commercialization.

Plaintiffs' core theory of this case is that defendants decided to abandon 3001 a year or more before January 2025 but concealed that decision from investors.

But there are no well-pled allegations to support this theory.  As we articulated in our motion to dismiss briefing, there are three independent grounds to dismiss the amended complaint.

First, it fails to allege particularized facts giving rise to the requisite strong inference of *scienter*.

Second, it fails to allege that any of the statements that the defendants made about 3001 during the class period were false and misleading when made.

And third, it fails to adequately plead loss causation.  Defendants' motion, thus, should be granted and plaintiffs' amended complaint should be dismissed.

By way of brief background, Your Honor, Intellia is a

Cambridge, Massachusetts-based biotech company that develops CRISPR-based medicines which uses a cutting-edge technology, gene editing technology, that precisely modifies DNA to treat disease at its genetic source.

At the beginning of the class period in January of 2024, Intellia had three product candidates in development: NTLA-2001, 2002, and 3001.

2001 and 2002 were in or approaching Phase 3 clinical trials, which are -- as Your Honor knows, those are the final stage of in-human clinical trials.

THE COURT:  And there was some approval for 3001 for Phase 1 at some point?

MS. BULLERJAHN:  Correct, Your Honor.

THE COURT:  During the class period?

MS. BULLERJAHN:  During the class period.

THE COURT:  And when was that?

MS. BULLERJAHN:  That was in July of 2024.

THE COURT:  Okay.

MS. BULLERJAHN:  So Intellia -- so 3001 was much earlier staged, as Your Honor pointed out.  It was preclinical, so it had been tested in animals, but not yet in humans.

The company applied for -- sought authorization from the U.K.'s -- effectively the equivalent of the FDA here in the U.S. to begin in-human clinical trials of 3001 at the end of December of 2023.  That authorization was granted on

December -- or, excuse me -- on July 30, 2024.

When Intellia applied or filed its CTA with the MHRA, which is, again, the U.K.'s version of the FDA, the company disclosed that to investors on January 4, 2024 and also disclosed to investors that they intended to initiate in-human clinical trials by the end of that year if they got the approval from the MHRA.  As I said, they got that approval. They announced --

THE COURT:  So that was in January of '24, and then the July 2024 was the approval?

MS. BULLERJAHN:  Correct.

So on July 30, 2024, the company announced the good news, that the MHRA had authorized its CTA to begin those in-human clinical trials so they could launch their Phase 1/2 clinical trial program in the U.K.

The company also in its July 30, 2024 disclosure disclosed its detailed clinical trial study design, and it also disclosed that it was submitting additional applications to other countries so that the company could potentially launch in-human clinical trials in countries outside of the U.K. as well as part of its, quote, multinational drug development strategy for 3001.

However, as Your Honor knows, drug development is risky and it's highly unpredictable.  And on January 9, 2025, the company announced that it was discontinuing the development

of 3001 and other early-stage clinical -- other early-stage programs as part of an overall reorganization of the company.

The company also disclosed that they were reducing their workforce by 27 percent. And as Your Honor likely knows, biotechnology companies and their boards of directors are often faced with difficult decisions as to how to allocate their resources, particularly in 2024 and 2025 when the capital markets were incredibly challenging, which made financing very difficult across the industry.

THE COURT: So, counsel, the plaintiffs make a number of allegations in regards to the class period, and I've been thinking about a number of those.

But what do you say to what I took to be the late November 2024 earnings call that talked about -- I believe talked about or it's alleged about expanding the clinical trials? I think -- which was for 3001. Isn't that close in time to the public statement of discontinuing that development?

MS. BULLERJAHN: It is close in time temporally, Your Honor, yes. However, in our view, that cuts the other way than what plaintiffs claim it cuts.

So -- so it is just not plausible, Your Honor, that the company would make disclosures to the market that the clinical trial was on track, that they still expected to initiate those in-human clinical trials in the U.K. by the end of the year, but then -- knowing that the end of the year was

only five weeks later, right, or six weeks later and that they eventually would have to provide an update to the market about the program.

So, in our view, the fact that the company, you know, provided an update to the market supports the inference that the trial was, in fact, on track and that, you know, they had -- as I said, they got the approval on July 30, 2024.  They had spent $9 million over the course of 2024 in preparation for those --

THE COURT:  I thought it was 8, but --

MS. BULLERJAHN:  It's like 8.7, Your Honor.  I'm rounding up.  I'm rounding up.

THE COURT:  Okay.

MS. BULLERJAHN:  So $8.7 million in 2024.  And the company disclosed that those dollars were spent on contracting services, which is entirely consistent with preparation for an in-human clinical trial.  Right?  So contracting with the CRO, contracting with sites, et cetera.

THE COURT:  Meaning that the suggestion that those statements were false or misleading is belied by the sequence?

MS. BULLERJAHN:  Correct.  In all of the -- all of the company's disclosures up to that point.

I will also point out, Your Honor, that even the CW allegations -- and I'm going to get into those in more detail.  But even according to plaintiffs' own allegations, the CWs all

say that they had these quarterly all-hands meetings within the company, and they all say that 3001 was discussed during those meetings throughout 2024.  Updates were given to employees about those -- about 3001 until, at least according to CW-2, the December meeting, which occurred in mid-December 2024.  There was an update that the company was discontinuing the program.  And so that, too, is also consistent with the November timing of the disclosure.  And then, ultimately, there's an internal disclosure about discontinuation.  And the very next time the company talked to the market, which was January 9th, 2025, it disclosed the reorganization and it explained that they were discontinuing 3001 because they wanted to put their valuable resources towards their two higher-value clinical trial programs, 2001 and 2002, which were much further along, years further along, in clinical development, and that much closer to generating revenue for the company.

THE COURT:  And so, counsel, just to turn to the CWs' information -- and I know there were six CWs referenced, but there's a lot of focus, I think, on both sides on CW-6.

MS. BULLERJAHN:  Yes.

THE COURT:  What do you say to the arguments about lack of efficacy from the 2023 mice study for the purposes of suggesting, I suppose, at least recklessness about the later statements?

MS. BULLERJAHN:  So CW-6, Your Honor, is -- as you

correctly point out, we both focus a lot on CW-6.  CW-6 is the only CW who has alleged to have even worked on 3001.  Right?  None of the other confidential witnesses are even alleged to have worked on the program.

CW-6 alleges that there was no excitement around the program, that there was no company swag or T-shirts that were given out for 3001.  And CW-6 also alleges that these early pilot studies of 3001 testing lung function in mice were halted by the beginning of 2024 and that the company let a DEA license expire at the end of 2023.  That led CW-6 to infer, him or herself, that the company had, quote, effectively abandoned trying to prove that 3001 was reaching the lungs in 2023.  And that's really important.  The language is really important there.

You know, first of all, we think that there are a lot of allegations in the amended complaint that, again, support the notion that the company was full steam ahead on this program, seeking authorization, obtaining authorization, preparing a clinical trial study design, you know, spending millions of dollars throughout the year on the program, et cetera.

But the fact that the mice studies that this one low-level employee worked on were halted at the end of 2023 or the beginning of 2024 actually makes sense, Your Honor, because the company had submitted its clinical trial application to the

MHRA in December of 2023, not based on the mice studies that CW-6 was working on, but, in fact, based on an entirely different set of clinical data.  And that data was from 2021 studies in nonhuman primates.  And those 2021 studies that formed the basis of the CTA, those showed that once the gene was inserted, there was normalized level of the A1AT protein in the nonhuman primates.  And that level of protein, which is exactly what this drug is meant to do, which is normalize A1AT protein that patients are deficient in, that level of protein was sustained in these nonhuman primates for a full year, 52 weeks.

So I know that the -- the amended complaint focuses on CW-6 and these other studies that were going on, these mice studies to measure lung function, but lung function is an entirely different endpoint.  That wasn't the point.  That wasn't the goal of 3001.  3001's goal was to insert a gene that encoded the A1AT protein and then hopefully creating a normalized level of A1A2 protein in the patient.  Lung function was irrelevant to the CTA.  And that's why the studies that were worked on by CW-6 in 2023, they were no longer relevant or needed to support the regulatory application to launch in-human trials.

THE COURT:  Okay.  I follow the argument.

And, counsel, just being mindful of time, if you'd like to reserve any rebuttal, I'd have you wrap up.

The other two things I would like you to address briefly are the sales on the market and the defendants' position that there's no loss causation.

MS. BULLERJAHN:  Yes, Your Honor.  I can absolutely do that.

So on the motive piece, so the -- you mean -- meaning the market offerings, Your Honor?  That's what you're referring to.

THE COURT:  Yes.

MS. BULLERJAHN:  Absolutely.  So the amended complaint alleges no motive whatsoever.

THE COURT:  No.  And I understand.  There are no allegations of stock sales and so forth.

MS. BULLERJAHN:  Stock sales.  We usually see the stock sales allegations.  We don't here.

THE COURT:  Right.

MS. BULLERJAHN:  No bonuses, no individual benefits.

So what they rely on is the fact that Intellia did these at-the-market offerings during 2024, sold shares pursuant to those offerings and -- you know, to generate revenue for the company.

But the First Circuit, Your Honor, in *Corban v. Sarepta,* addressed this very issue and said that at-the-market offerings are not probative or supportive of an inference of *scienter*, whereas, here, the company is not essentially in dire

financial straights.  Right?

THE COURT:  Because there's money on hand?

MS. BULLERJAHN:  There's money on hand.  I mean, even according to the company's own filings that are quoted in the amended complaint, the company had a two-and-a-half-year runway of cash.  They were -- their back was not against the wall.  They were not on the brink of insolvency, by any means.

And so, you know, here, it's just -- the fact that they sold shares in at-the-market offerings just does not support an inference of *scienter*.

THE COURT:  And, counsel, on the loss causation, I just want to understand what that argument is.

Am I to understand that it's the defense's position there's no loss causation because any dip in stock sales was not as a result of a corrective statement or the need for the corrective statement but the announcement of the discontinuation of 3001?

MS. BULLERJAHN:  That's exactly right, Your Honor.  I couldn't say it better myself.

The amended complaint really alleges the drop in Intellia stock price on the 10th of January followed the announcement of the discontinuation.  But that disclosure didn't correct any of the challenged statements, that is -- you know, or show that they were wrong or incorrect or misleading.  Rather, it disclosed new information in the form of the

discontinuation of 3001.

So we argue in our motion to dismiss briefing, Your Honor, that that is insufficient as a matter of law under the law of this Circuit to allege loss causation.

THE COURT:  Okay.  Thank you, counsel.

MS. BULLERJAHN:  Thank you.

THE COURT:  Counsel, I'll hear plaintiffs' response. Thank you.

MR. O'CONNELL:  Thank you, Your Honor.

Brian P. O'Connell, again, from Pomerantz LLP on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. O'CONNELL:  Good afternoon.  If it's okay with the Court, could it be -- could I address the Court from the podium?

THE COURT:  Sure.  Sure.

MR. O'CONNELL:  Thank you.  It helps with my posture.

THE COURT:  Sure.

MR. O'CONNELL:  Good afternoon and thank you.

This case is about false statements and misleading omissions about Intellia's lead development candidate for gene insertion, NTLA-3001, and the company's concealing highly adverse material information rendering their statements misleading.

Like scores of other biotech companies, Your Honor, in

recent years, Intellia sought to utilize the relatively novel CRISPR technology to develop drug candidates.  Intellia has never had a commercialized product or generated a new revenue from its product sales.  Its sources of cash are entirely, thus far, from raising money from investors.

Seeking to differentiate itself from legacy gene knockout treatments, key to Intellia's goal was moving beyond the relatively simple gene knockout program to a more complex gene insertion candidate.  NTLA-3001 was that gene insertion candidate, and it was designed for the treatment of Alpha-1 Antitrypsin Deficiency, AATD, associated lung disease.

During the class period, defendants referred to NTLA-3001 as a leading development candidate and it was the leading gene inversion candidate at all relevant times.  But simply put, Your Honor, the company had essentially abandoned the drug at the beginning of the class period.  As a result, defendants were misleading investors when they told them -- when they told them that NTLA-3001 was a strategic priority.

THE COURT:  And so, counsel, I guess -- and there were a number of allegations about misleading statements, but I just wasn't clear from the complaint, even considering the CWs' information, which of the statements were misleading, particularly given the sequence of events here.

So can you point me to what you're sort of -- what you're focused on in that regard?

MR. O'CONNELL:  So basically the -- the theory of the case, Your Honor, is that since the company -- we allege that the company had essentially given up on NTLA-3001 by the beginning of the class period.

THE COURT:  No.  And I understand that, but I guess what I'm saying is, if the -- here, I don't think it could be disputed that the Phase 1 trial was approved in 2024, which is after the mice study.  I guess I'm just not seeing what statements are misleading.

MR. O'CONNELL:  Sure.

So some of the statements I would -- I would direct the Court to are that -- are Sepp-Lorenzino's comments, the chief scientific officer, on August 8th, where she says, With NTLA-3001, we have demonstrated in nonhuman primates the ability to achieve not just in the micro more, but the full human dose.  And then in the --

THE COURT:  And that's -- I didn't take that you dispute the primate study.  I thought it was meaning that you weren't pointing to the results in the primates study as opposed to the mice study?

MR. O'CONNELL:  That's partially correct, Your Honor.

THE COURT:  Okay.

MR. O'CONNELL:  The -- the other wrinkle here, or not wrinkle, it's actually quite a material fact, is that we also allege that the company -- the company outsourced additional

nonhuman primates studies in 2023 and that the director of preclinical pharmacology at the company, Cindy Shaw, informed -- informed the staff that these showed no efficacy either.

So defendants are -- are essentially relying on these earlier 2021 studies, ignoring that there were multiple mice studies in 2023 as well as additional nonhuman primate studies that failed.  Now --

THE COURT:  But the statements in 2024 that you allege to be misleading are that they are moving forward with the Phase 1 trials and dosing.

So what is it about that occurring after the clinical study is approved to go forward that is misleading?

MR. O'CONNELL:  Sure.  Well, we allege, Your Honor, that -- that the -- the defendants weren't actually moving forward with the study.  The --

THE COURT:  And this is based on the change, the reduction in the funding?

MR. O'CONNELL:  That -- that's part of it.  The -- the -- the funding is -- the funding is relevant, Your Honor, because it -- if -- it, frankly, is inconsistent with ramping up for a clinical trial.

This -- we -- we allege in the complaint or, actually, it's a CW count that this type of treatment cost between 1 and 3 million per dose, and the defendants would also have had to

have taken all these steps to, you know, enroll, do screenings, and actually give the dosing, the -- set up sites.

The actual numbers are inconsistent with what defendants are saying is that they're -- they're getting ready for this clinical trial.

THE COURT:  Even at the $8.7 million level?

MR. O'CONNELL:  Well, the -- the 8.7 million is -- for one thing, it's -- it -- even that full year, it was cut in half relative to the previous year, where I think it was 17.3 million.

THE COURT:  Yes.

MR. O'CONNELL:  But a --

THE COURT:  From '23 to '24?

MR. O'CONNELL:  Correct, Your Honor.  But almost half of that was in the first quarter.  So as you -- as you go further on, when they're saying that they're going to dose this year, it actually -- the numbers continued to go down.  They never had a -- they were below 2 million each of the subsequent three quarters, which, as I mentioned, given the complexities of doing a trial like this and the rarity of the disease -- you know, only -- less than a million people have this worldwide -- it just isn't -- it's not -- it's not a viable counter-narrative to say that this was -- that this was a -- remained a strategic priority during the class period.

THE COURT:  Okay.  And so I guess -- and, counsel,

sorry to jump around with some of my questions.  But in terms of CW-6 in regards to the 2023 mice study, your sister and brothers make a lot of the fact that CW-6 -- I mean, I think, even as alleged, is very removed from the individual defendants' role in the company.

I guess what I'm not fully understanding is how any reliance on that in the absence of allegations about specific knowledge isn't essentially cut off by the approval of the clinical study.

MR. O'CONNELL:  Your Honor.

THE COURT:  Do you understand my point?

MR. O'CONNELL:  I do.  The -- the clinical study -- the clinical study application was filed in 2023, the CTA.  That, as you know, doesn't -- getting approval for a drug doesn't -- doesn't -- to test the drug doesn't demonstrate efficacy of it.  You know, it demonstrates that there weren't adverse safety effects.

THE COURT:  No.  I guess I was more pointing toward -- to the extent that the allegations are about misstatements or misleading statements about the intention to move forward, isn't it cut off that way?  I wasn't -- I wasn't suggesting that that resolves the efficacy allegation.

MR. O'CONNELL:  Okay.  I think this -- I think the -- I heard my sister say that that CW-6 was a really low-level employee, which cut against the allegations.

I would just say that CW-6 reported to the director of preclinical pharmacology, Cindy Shaw, and CW-6 was also the person in charge of running these tests on the flexiVent machine.  There's no -- there's no requirement that the -- that the CW -- you know, that the CWs were, you know, the highest-level employees at the company.  It's about whether they were in a position to know what they knew.

I would -- I would just say that given -- given as -- as we address -- we discuss in the briefs that how -- how often NTLA-3001 was discussed, both internally, as the CWs say, and externally, as it was tauted a strategic priority, I don't -- I don't think it's a -- it's a credible counter-narrative that -- that somehow this was still -- this was still an ongoing priority.

One other thing I would say about the CWs is that there's no requirement that they specifically warn a defendant.  The *Carbonite* case is an example of that, where, you know, it was widely known throughout the company that the tauted products didn't work.

There's also some -- there's also some examples that we have in the briefs about, for instance, in *Nvidia*, there was a credited CW who was five levels below the CEO.  And there's no requirement that you be a fly on every relevant wall.

THE COURT:  But what about the argument that, given the turn to the Phase 1 clinical -- the preclinical studies, it

wouldn't be unexpected that there would be a move away from the preclinical studies?

MR. O'CONNELL:  Well, there's a -- there's a little bit of a timing issue there.  Actually, it's quite a big timing issue that the -- the preclinical studies that CW-6 discusses were finished at the end of 2023.  They didn't have approval yet until July, and meanwhile, there was this other nonhuman primate study going on that was outsourced that was -- that the company -- not -- the director of preclinical pharmacology acknowledged was not effective in April 2024.

So I think this is one of those examples where there were a lot of -- there were a lot of misleading -- misleading half-truths, you know, other than -- about this -- citing this 2021 study while omitting multiple more recent studies.

And I think that -- I think that Your Honor's question may have -- may have got into knowledge of the individual defendants.  I would just say that defendants spoke extensively about -- about the design of the trials and -- and how -- how this was -- they had the only -- really only gene editing that has shown normal levels.

Defendant Leonard spoke multiple times about the technology and the interaction with the FDA.  This is very akin to the *Carbonite* case where the importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item.

Here, defendants emphasize the strategic importance as its leading gene insertion candidate, and that defendants sought to expand into gene insertion as a strategic priority and boasted about it in statements to investors supports an inference that -- that it was aware of the preclinical failures and deprioritization during the class period.

THE COURT:  Thank you.

And, counsel, if you could also address the issue in regards to the market sales and how I understand the plaintiffs are relying on that.

MR. O'CONNELL:  I -- absolutely, Your Honor.

The at-the-market sales, I would just say that these are part of the holistic *scienter* analysis.  You know, it's -- the allegations are considered collectively rather than through a divide-and-concur approach.

THE COURT:  Understood.

MR. O'CONNELL:  But to get to the ATM, specifically we allege that they -- that they sold approximately 175 million in stock during the class period and that -- given that the company had no sources of revenue other than -- or no sources of cash other than generating -- generating capital from investors, this supported -- supports an inference of *scienter*.

I know defendant -- my sister mentioned earlier that -- that this -- that this didn't support an inference of *scienter* because they had a significant amount of cash, which

defendants -- which -- but, then, at the earlier argument, my sister said that she -- that -- that one of the reasons why the company was restructuring was because it was a difficult time in capital markets.

So I think that given the relatively precarious condition of the company and its lack of any improved product, it supports an inference of *scienter*. But -- and just to be clear, Your Honor, we're not relying on it. We're not relying on it solely.

THE COURT: Understood. And then, counsel, you have about two more minutes.

MR. O'CONNELL: Oh, okay.

Yeah. I just -- maybe one thing I just want to highlight is the -- I think the temporal proximity here is -- is pretty significant where the -- the company said that -- that at -- on November -- in November 2024, We're advancing beyond knockout therapies into our first *in vivo* gene insertion programs in the clinic.

That was at the same time that they were spending less than 2 million in external costs that quarter, and they had already seen -- they had already seen multiple preclinical studies fail. And given that the -- given the complexity of this drug, the rarity of the disease, it just isn't -- it's not -- it's not plausible. It's not believable that they were actually ramping up at the time.

I will -- I'm going to rest on loss causation.

The other thing -- the other thing that I would just -- I would just add is that they also stressed that they were going to use multiple sites for this drug, and there's no -- there's nothing to support that this was -- that -- that anyone was enrolled at any of these sites.  It just wasn't -- it was -- it was -- throughout the class period, this drug was tauted as a strategic priority and it was commented on as such, that it was a -- it was a significant growth opportunity for the company.  But the fact is they didn't enroll a single patient during the class period, and they -- they didn't invest the resources that would -- that were consistent with their representation.  And we allege the reason they did this was because of all the preclinical studies that failed.

With that, unless the Court has any further questions, then I will -- I will rest.

THE COURT:  Thank you.

Counsel, I'll give you two minutes.

MS. BULLERJAHN:  Thank you, Your Honor.

I just want to address a few points.

So, first, I do want to go back to CW-6, and I just want to point out that neither CW-6 nor any of the other confidential witnesses is alleged to have worked on the CTA seeking authorization to move into in-human clinical trials that was filed in December of 2023.

They also didn't work on the 2020 -- excuse me -- 2021 nonhuman primate studies that formed the basis of that CTA or any other nonhuman primate studies.

THE COURT:  That is essentially the application for the clinical trial, the CTA?

MS. BULLERJAHN:  Correct.

THE COURT:  Yes.

MS. BULLERJAHN:  Correct.  So none of the CWs touched the study that actually was the basis of the CT or the CTA.

Counsel referenced the fact -- acknowledged the fact that there were 2023 nonhuman primate studies that were going on at the company.  But those were outsourced.

So CW-6 -- no Intellia employee was working on the outsourced nonhuman primate studies.  The only thing that CW-6 -- and CW-6 is the only person who comments on the 2023 nonhuman primates studies.

The only thing that CW-6 can say is that he or she was sitting in a meeting in April 2024 during which someone made a comment that the nonhuman primate studies were, quote, not finding what they were looking for.  And that's amended complaint 69.

Your Honor, that is just not sufficient to support an inference that the outsourced nonhuman primate studies that were supposedly going on in 2023 showed -- somehow showed efficacy problems with 3001 or in any way contradicted the

earlier 2021 nonhuman primate studies that actually formed the basis of the company's application to start in-human trials.

I do want to touch briefly on -- on the spend, because if Your Honor looks at the company's Form 10-K for 2024, it actually explains in detail what the spent -- like why the spend dropped between 2023 and 2024 and what the spend was during 2024.

So it explained that, quote, The 8.6 million decrease in external costs related to NTLA-3001, end quote, was primarily driven by a reduction in the, quote, initial manufacturing activities Intellia had conducted in 2023 in anticipation of clinical testing.

So a lot of work and spend occurred in 2023, 17 point -- I think it was -- 3 million in 2023 to manufacture the drug product to actually dose patients with once the in-human clinical trial started.  Right?

So a lot of that foundational work for the clinical trial happened in 2023.  In 2024 -- and then, of course, work performed in supporting the CTA that was filed at the end of the year in 2023.

In 2024, the spending shifted.  And this is in the 10-K.  It says that was offset in 2024.  So the decrease in the initial manufacturing expenses that I just referenced was offset by, quote, An increase in spend on contracted services. And, as I said, that's entirely consistent with starting

in-human clinical trial.

THE COURT:  Thank you.

MS. BULLERJAHN:  One last point.  So --

THE COURT:  Thirty seconds, counsel.

MS. BULLERJAHN:  Oh, okay.  I'll be quick.

So I do want to point out that there is some waffling or hedging by the plaintiffs in both the amended complaint, but particularly after reading our motion to dismiss and the opposition, between, you know, allegations that the company abandoned 3001 altogether or deprioritized the program.  I just want to point out, Your Honor, that, in our view, there are not well-pled allegations to support either abandonment or deprioritization and -- but just for the sake of argument, assuming, Your Honor, that a decision was made, you know, on January 1st, 2024, that the company was going to deprioritize 3001 in favor of its two other programs that were much further down the development pipeline, that does not render any of the alleged statements false or misleading.

So 3001 could have been hypothetically -- and, again, we don't believe this is pled in the amended complaint -- could have been deprioritized vis-à-vis the other programs and still be a strategic priority of the company.  The company was developing three drugs.  3001 was one of them.

And so, you know, it's really important, Your Honor, to just focus on the fact that even if there were some sort of

decision -- and there really is no allegation in the complaint as to what the decision was, abandonment or deprioritization, when the decision happened or who made the decision.

THE COURT:  Understood.

MS. BULLERJAHN:  But, even assuming it does, it doesn't render any of the statements false or misleading, let alone allege that the individual defendants even knew about such a decision.

Thank you, Your Honor.

THE COURT:  Thank you.

Counsel, I appreciate the arguments on either side. I, obviously, will take the motion to strike on the papers, and I want to give some further thought as well to the motion to dismiss.  But I appreciate the arguments.  Thank you.

THE CLERK:  All rise.

(Adjourned at 3:12 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Jessica L. Bisaillon            January 18, 2026
Jessica L. Bisaillon, RPR, CRI     Date
Official Court Reporter