**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **MARCOS GONZALEZ, Individually and on** | ) | |
| **Behalf of All Others Similarly Situated,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-cv-10353-DJC** |
| | ) | |
| **INTELLIA THERAPEUTICS, INC., JOHN** | ) | |
| **LEONARD, LAURA SEPP-LORENZINO,** | ) | |
| **DAVID LEBWOHL, and EDWARD J. DULAC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

**CASPER, C. J.**                                                                                    **June 18, 2026**

**I.      Introduction**

Plaintiffs, now represented by Lead Plaintiffs John D. Albaugh, James Scott Ewert, Yiu

Chung Lee and Ronnie Evans (collectively, "Plaintiffs"), D. 28, have filed this lawsuit individually

and on behalf of all others similarly situated against Defendants Intellia Therapeutics, Inc.

("Intellia"), John Leonard ("Leonard"), Laura Sepp-Lorenzino ("Sepp-Lorenzino"), David

Lebwohl ("Lebwohl") and Edward J. Dulac ("Dulac") (collectively, "Defendants") alleging

violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act") and Securities and Exchange Commission (the "SEC") Rule 10b-5.  D. 38.  Defendants now

have moved to dismiss Plaintiffs' Amended Complaint ("AC") under Fed. R. Civ. P. 12(b)(6).  D.

46.  Plaintiffs have also moved to strike the exhibits and declaration attached to Defendants'

1

motion to dismiss. D. 55. For the reasons discussed below, the Court ALLOWS Plaintiffs' motion to strike in part and DENIES it in part, id., and ALLOWS Defendants' motion to dismiss, D. 46.

## II.    Standard of Review

For allegations of securities fraud under Sections 10(b) and 20(a) of the Exchange Act, a plaintiff "must plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)," Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011), and, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), must also "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," id. (alteration in original) (citation and internal quotation marks omitted).

As part of the inquiry under Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23, (2007), courts engage in a particularized scrutiny of private securities complaints. See, e.g., Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009). As required by Tellabs, the Court considers the allegations collectively to determine whether they give rise to a strong inference of scienter. Id. at 991-92 (citing Tellabs, 551 U.S. at 323).

As with any Rule 12(b)(6) motion, the Court must "accept well-pleaded factual allegations in the complaint as true and view all reasonable inferences in the plaintiffs' favor." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).

## III.    Factual Background

### A.    Intellia's Clinical Research and Development of NTLA-3001

Intellia is a clinical-stage gene editing company focused on developing CRISP/Cas9-based technologies. D. 38 ¶ 36. On November 4, 2021, Intellia announced its first and wholly owned CRISPR/Cas9-mediated *in vivo* targeted gene insertion development candidate, NTLA-3001, for treatment of Alpha-1 Antitrypsin Deficiency ("AATD")-associated lung disease. Id. ¶ 48. AATD is a rare genetic disorder that can lead to lung and liver disease, occurring when the patient has

two mutated copies of the *SERPINA1* gene, causing the body to produce insufficient levels of the alpha-1 antitrypsin ("AAT") protein. Id. ¶ 49. NTLA-3001 is designed to precisely insert a healthy copy of the *SERPINA1* gene, which encodes the AAT protein, with the potential to permanently restore expression of functional AAT protein to therapeutic levels after a single dose. Id. ¶ 50. Two weeks prior to Intellia's NTLA-3001 candidacy announcement, Intellia presented preclinical data from a nonhuman primate study of NTLA-3001 at the 29th Annual Congress of the European Society of Gene & Cell Therapy, purportedly showing that insertion of a healthy form of the *SERPINA1* gene led to normal human AAT levels in nonhuman primates which were durable after 52 weeks. Id. ¶ 52.

In 2023, Intellia ran several preclinical FlexiVent machine studies of NTLA-3001 ("FlexiVent studies") designed to gauge the efficacy of NTLA-3001 in mice subjects. Id. ¶ 65. The FlexiVent machine measured whether NTLA-3001 "was properly targeting the lungs and having a therapeutic impact." Id. According to a former Intellia employee, CW6, none of the studies demonstrated the efficacy of NTLA-3001 in mice. Id. ¶¶ 64-66. Specifically, the studies allegedly "showed no changes in either the cell populations or the histology of the lungs." Id. ¶ 66. As alleged, this lack of efficacy was widely known among the Preclinical Pharmacology team at Intellia that NTLA-3001, including the former Director of Preclinical Pharmacology at Intellia, Cindy Shaw ("Director Shaw"). Id. ¶¶ 64-67, 69. By the end of 2023, Intellia allowed a Drug Enforcement Administration ("DEA") license to study NTLA-3001 to expire, and by the beginning of 2024, Intellia ceased FlexiVent studies with NTLA-3001. Id. ¶ 68. Intellia also outsourced nonhuman primate studies for NTLA-3001 in 2023 which also showed no indication of efficacy. Id. ¶ 69. As CW6 recalls, results of these nonhuman primate studies were discussed by the Preclinical Pharmacology team during a small group meeting in or around April 2024, at which

point Director Shaw told CW6 that these studies "showed there was no editing in the nonhuman primates and that they were not finding what they were looking for." Id.

### B.    Intellia's January 4, 2024 Press Release

On January 4, 2024, Intellia issued a press release, which it filed as part of its Form 8-K, id. ¶ 113; see D. 47-6, highlighting its "Three-Year Strategic Priorities and Anticipated 2024 Key Milestones" that "support the company's mission to transform the lives of patients and bring forth a new era in medicine." D. 38 ¶ 79. In the filing, Intellia provided "Recent Pipeline Advancement and Corporate Updates" including that it "[s]ubmitted a clinical trial application to initiate a first-in-human Phase 1 study of NTLA-3001 ahead of previous Q1 2024 expectation" in December 2023 supporting the Company's "[a]nticipated 2024 [m]ilestone[]," of "[d]ose first patient in Phase 1 study of NTLA-3001 in 2024." Id. ¶¶ 79, 114.

### C.    Leonard's January 9, 2024 Statements at the J.P. Morgan 42nd Annual Healthcare Conference

On January 9, 2024, Leonard, Intellia's President and Chief Executive Officer, and Lebwohl, Intellia's Executive Vice President ("EVP") and Chief Medical Officer, presented on behalf of Intellia at the J.P. Morgan 42nd Annual Healthcare Conference during which Leonard further discussed Intellia's "strategic priorities" in the near-term. Id. ¶ 83. This discussion included launching the next wave of *in vivo* clinical programs, claiming Intellia has "moved beyond knockouts to the liver to knock-ins of the liver," highlighting, inter alia, its recent CTA submission for NTLA-3001, its clinical program designed as a "proof-of-concept for [gene] insertion" to treat AATD-associated lung disease, utilizing Intellia's "DNA writing technology." Id. ¶¶ 83, 117-18. Leonard also detailed "key milestones for the upcoming year by program" providing, in relevant part, "we anticipate beginning dosing for the gene insertion program for AATD." Id. ¶¶ 83, 119.

**D.      Intellia's February 22, 2024 Form 10-K and Q4 2023 Report**

On February 22, 2024, Intellia released its fourth quarter and full-year 2023 financial results which it filed in its Form 10-K.  Id. ¶¶ 85, 121; see D. 47-10.  The announcement noted Intellia's CTA submission for NTLA-3001 as a "[r]ecent [o]perational [h]ighlight[]," reiterating its prioritization of the program and related 2024 milestone of first patient dosed before year-end. D. 38 ¶ 85.  The Form 10-K further provided that "In December 2023, [Intellia] submitted a clinical trial application ("CTA") to initiate a first-in-human, Phase 1 study of NTLA-3001 and plan to dose the first patient in 2024."  Id. ¶ 124.  The same day, Intellia issued a press release which was also filed as an exhibit to a current report on Form 8-K.  D. 38 ¶ 126; see D. 47-10.  The Q4 2023 Report announced Intellia's fourth quarter and full-year 2023 financial results and stated that Intellia was "[o]n track to dose the first patient in the Phase 1 study of NTLA-3001, an *in vivo* gene insertion candidate for the treatment of alpha-1 antitrypsin deficiency (AATD)-associated lung disease, in 2024."  D. 38 ¶ 127; see id. ¶ 128.

Intellia held its Q4 2023 conference call with investors later that day ("Q4 2023 Earnings Call").  Id. ¶ 130.  During Q4 2023 Earnings Call, Leonard stated that Intellia was "now bringing forth the next wave of innovation," noting that "[o]ur focus remains on both near-term clinical execution as well as value creating platform innovation . . . [w]ith this as a backdrop, we expect the following by the end of the year . . . 2 in vivo gene insertion programs in first-in-human studies."  Id. ¶ 131.  Sepp-Lorenzino, Intellia's EVP and Chief Scientific Officer, also provided an update on Intellia's "strategic priorities" stating, in pertinent part:

> We're continuing to advance novel gene editing and delivery technologies for both *in vivo* and *ex vivo* therapeutic applications . . . we're leading the development of CRISPR targeted gene insertion . . . [W]e [] expect to begin this year the Phase I study of our wholly owned program, [NT]LA-3[00]1 for alpha-1 antitrypsin efficiency. Based on our preclinical data, [NT]LA-30[0]1 could potentially achieve normal human levels of the alpha-1 protein after a single dose.

Id. ¶¶ 85, 133.  During the question-and-answer portion of the call, an analyst asked about the NTLA-3001 program: "[g]iven the rapid like clouding of the gene therapy, gene editing approaches in [A]ATD, what is the ideal product profile for NTLA-3001? And can you remind us again [whether] the SERPINA1 gene insertion, is it directional? And what are some supportive pieces of evidence or tools that are available to detect the correct insertion of the gene?" Id. ¶ 136. Leonard responded:

> our objective is to get to essentially normal human levels of wild-type protein. Once one does that, which we've accomplished preclinically in nonhuman primates, those patients should be essentially the same as patients without the mutation in the first place, at least with respect to their lung disease. So, whether or not we'll get to that in humans [i]s the basis of the Phase I trial that we're embarking on now as we speak.

Id. ¶ 137.

### E.    Intellia's May 9, 2024 Q1 2024 Form 10-Q and Q1 2024 Report

A few months later, on May 9, 2024, Intellia filed its Q1 2024 Form 10-Q.  Id. ¶ 140; see D. 47-12.  The Form 10-Q stated that Intellia "expect[s] to dose the first patient in a Phase 1 study of NTLA-3001 in 2024."  D. 38 ¶ 141.  The same day, Intellia issued a press release which it filed as an exhibit to a current report on Form 8-K ("Q1 2024 Report").  Id. ¶ 143; see D. 47-13.  The Q1 2024 Report highlighted recent progress including that, Intellia was "[o]n track to dose the first patient in the Phase 1 study of NTLA-3001, an *in vivo* gene insertion candidate for the treatment of alpha-1 antitrypsin deficiency (AATD), in 2024" and later reiterated that "Intellia expects to dose the first patient in a Phase 1 study of NTLA-3001 in 2024."  D. 38 ¶ 144; see id. ¶¶ 86, 146.

Later that day, Intellia held its Q1 2024 Earnings Call.  During the call, Leonard stated that "[w]e're now entering the next stage of growth, pushing the boundaries of what we can do and expanding where we can go with CRISPR from gene knockdown to gene insertion, from liver

targets to a broader set of tissues . . . NTLA-3001, is expected to enter human clinical development this year." Id. ¶ 149. Lebwohl noted that Intellia "expect[s] to begin this year a first in-human study of 3001," noting that "3001 is the only drug candidate to show AAT levels restored to normal levels after a single dose in nonhuman primates" and that Intellia's "clinical development of the *in vivo* pipeline is rapidly accelerating." Id. ¶ 151. Later, an analyst asked: "[s]o for NTLA-3001, how quickly do you think you can move through development with this asset? So do you think you would try to take this asset into a pivotal study shortly after the Phase I dose work like with NTLA-2001 or do you think we'll have more traditional placebo-controlled Phase II to further refine the dose for a pivotal study like with NTLA-2002." Id. ¶ 154. Leonard responded, stating, in part, that "I'll remind you that in the preclinical data, we've established that we're able in nonhuman primates to reach normal levels as seen in human beings." Id. ¶ 155.

### F.    Intellia's July 30, 2024 Press Release

On July 30, 2024, Intellia issued a press release announcing its receipt of authorization of the CTA for its first-in-human Phase 1/2 study of NTLA-3001 for the treatment of AATD-associated lung disease. Id. ¶¶ 87, 159. Intellia provided detailed information regarding the study design and declared that "[b]eyond its first application in the United Kingdom, Intellia is submitting additional regulatory applications in other countries as part of its ongoing, multi-national development strategy for NTLA-3001." Id. Leonard was quoted in the press release stating that NTLA-3001 is "a groundbreaking *in vivo* CRISPR-based gene insertion candidate" and that "[w]e are excited to receive regulatory authorization to begin this important first-in-human study of NTLA-3001 for people living with AATD." Id. ¶¶ 87, 160.

### G.    Intellia's August 8, 2024 Q2 2024 Form 10-Q and Q2 2024 Form 8-K

On August 8, 2024, Intellia filed its Q2 2024 Form 10-Q ("Q2 2024 Form 10-Q"). Id. ¶ 162; see D. 47-16. The Form 10-Q stated that Intellia "expect[s] to dose the first patient in the Phase 1/2 study of NTLA-3001 in the second half of 2024." D. 38 ¶ 163. Intellia also published a press release with its Form 8-K ("Q2 2024 Report") reiterating the same information. Id. ¶¶ 165-66; see D. 47-17. Leonard is also quoted in the Q2 2024 Report stating that "our first gene insertion trial [is] expected to be active by year-end." D. 38 ¶ 167. During Q2 2024 Earnings Call later that day, Sepp-Lorenzino stated that Intellia "[is] on track to dose the first patient [with NTLA-3001] in the second half of this year." Id. ¶ 170. Leonard closed his remarks stating that "Intellia continues to deliver on the promise of gene editing, and we are looking forward to several important clinical milestones in the second half of this year." Id. ¶ 171.

In response to an analyst question, Sepp-Lorenzino stated that "based on the preclinical data that we have seen, right, we believe that with 3001, we have demonstrated in nonhuman primates, the ability to achieve not just in the micromolar, right, but the full normal dose . . . At the end of the day, the proof of the pooling will be in the clinic. So I'll await the clinical data." Id. ¶ 174. During the same call, another analyst asked about the NTLA-3001 program's "competition for patient enrollment, given that Beam and also other editing companies [were] also recruiting in the United Kingdom," to which Leonard responded that Intellia is "quite confident that certainly in a Phase I setting, not only in the U.K. but other countries where we will have sites, including New Zealand and Ireland that we'll be in a position to recruit the study expeditiously and look for the results that tell us how the drug is performing." Id. ¶ 177. When asked "how impactful the wholly owned insertional program could be for the current market, given an unmet need in the space," Leonard responded:

8

Well, our assessment of alpha-1 antitrypsin deficiency therapies as they currently exist is that it's almost a complete absence of effective therapy. So our view is that it's essentially wide open in terms of resetting the bar. Remember what we're trying to do. We're trying to have the production of a fully normal protein that is the wildtype alpha antitrypsin deficiency -- sorry, alpha-1 antitrypsin protein that has normal activity that doesn't exist yet today. And so we view this a very large market as one that is -- one that we can be very, very successful in, and we're very excited about beginning the clinical program with 3001.

Id. ¶ 179.

### H.    Intellia's November 7, 2024 Q3 2024 Form 10-Q

On November 7, 2024, Intellia filed its Q3 2024 Form 10-Q. Id. ¶ 182; see D. 47-19. In the Form 10-Q, Intellia stated that "we expect to dose the first patient in the Phase 1/2 study of NTLA-3001 by year-end." D. 38 ¶ 183. In its accompanying Q3 2024 Form 8-K Report, see D. 47-20, Intellia announced that it was "[o]n track to dose the first patient by year-end in the Phase 1/2 study of NTLA-3001," D. 38 ¶¶ 92, 186, and that "Intellia expects to dose the first patient in the Phase ½ study of NTLA-3001 by year-end," id. ¶ 187. During the Q3 2024 Earnings Call, Sepp-Lorenzio noted that Intellia is "advancing our science beyond *in vivo* knockout therapies and into our first *in vivo* gene insertion programs in the clinic . . . In previously presented nonhuman primate data, we've demonstrated the ability to produce fully functional alpha-1 protein at normal levels after a single dose . . . We're on track to dose the first patient in the Phase I/II study of 3001 by year-end." Id. ¶ 190.

Later in the Q3 2024 Earnings Call, when asked "is it a reasonable base case that we would see data in 2025?," Lebwohl responded that "it is possible that we'll have data, reasonable to think we have data in 2025." Id. ¶¶ 193-94. When asked about Intellia's "capital allocation priorities given you have a lot going on in the pipeline and sort of how you're thinking about in vivo versus ex vivo going forward," Dulac, Intellia's EVP and Chief Financial Officer and Treasurer as of July 22, 2024, responded that "[w]e do have some exciting programs related to 3001, our first gene

9

insertion program, which is an important proof of concept for us . . . But I feel like we have a very conservative plan in place, one that takes our existing cash balance and gets us well into fourth quarter of 2026." Id. ¶¶ 196-97.

## I.    Intellia's January 9, 2025 Announcement of NTLA-3001's Discontinuation and Intellia Stock Drop

According to a former Intellia employee, CW2, approximately five weeks later, on December 12, 2024, Intellia informed employees that NTLA-3001 would be discontinued, noting that the drug "did not meet [its] goals." Id. ¶ 75.  On January 9, 2025 (while the markets were closed in observance of the passing of former President Jimmy Carter) Defendants issued a press release entitled, "Intellia Therapeutics Announces Anticipated 2025 Milestones and Strategic Reorganization to Prioritize the Advancement of its Late-Stage Programs, NTLA-2002 and Nexiguran Ziclumeran (nex-z)" (the "January 9, 2025 Announcement"), providing, in relevant part, that "Pipeline priorities result in NTLA-3001 discontinuation and select, research-focused investment." Id. ¶¶ 102-03.  In the announcement, Leonard stated:

> "We have made significant progress and built strong momentum in 2024 with three actively enrolling, Phase 3, pivotal studies. Our early clinical data for both NTLA2002 and nex-z support novel, highly differentiated product profiles that directly address the significant unmet needs of patients and prescribers in HAE and ATTR[.]' [ ] 'We understand the significant potential of our late-stage programs, and within a challenging market environment, have made a difficult decision to focus our resources predominantly on NTLA-2002 and nex-z where we have the greatest opportunity to create significant, near-term value."

Id. ¶ 104.

Following the January 9, 2025 Announcement, the price of Intellia securities dropped from a closing price of $12.02 per share on January 8, 2025, to a closing price of $10.20 per share on January 10, 2025, a decline of approximately 15%. Id. ¶ 106.

10

## IV.    Procedural History

On February 11, 2025, Plaintiffs filed this action individually and on behalf of all others similarly situated against Defendants.  D. 1.  Plaintiffs filed the operative AC on July 23, 2025.  D. 38.  Defendants now have moved to dismiss the AC.  D. 46.  Plaintiffs moved to strike the corresponding exhibits and declaration to Defendants' motion on October 23, 2025.  D. 55.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 65.

## V.    Discussion

### A.    Plaintiffs' Motion to Strike

As an initial matter, Plaintiffs move to strike Exhibits 1-4, 7 and 22 attached to Defendants' motion to dismiss.  D. 56 at 8-13.[1]  At the motion to dismiss stage, the Court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).[2]

---

[1] Defendants' argument that Plaintiffs' motion to strike is procedurally improper under Rule 12(f), D. 60 at 6, 8-9, misapprehends the nature of Plaintiffs' motion.  While motions to strike under Rule 12(f) are limited to pleadings, see Fed. R. Civ. P. 12(f); Minahan v. Town of E. Longmeadow, No. 12-cv-30203-MAP, 2014 WL 1652646, at *2 (D. Mass. Apr. 22, 2014), Plaintiffs move to strike on the basis that various exhibits are improper for consideration on a Rule 12(b)(6) motion, D. 55 at 2.  Courts in this district routinely entertain such motions on this basis.  See, e.g., Shash v. Biogen Inc., 627 F. Supp. 3d 84, 97 (D. Mass. 2022); Mahoney v. Found. Med., Inc., 342 F. Supp. 3d 206, 212 (D. Mass. 2018); Guerra v. Teradyne Inc., No. 1-cv-11789-NG, 2004 WL 1467069, at *1 (D. Mass. Jan. 16, 2004).

[2] To the extent that Plaintiffs argue that Defendants have waived their argument why consideration of the exhibits is proper, D. 56 at 2-3, the Court rejects this argument, particularly where the Court has full briefing by either side to consider now as to Plaintiffs' motion to strike.

11

Exhibit 1 is a chart cataloguing the various alleged misstatements and identifying the reasons Defendants argue they are not actionable as set forth in their memorandum of law. D. 47-2 at 2-21. As Defendants note, D. 60 at 11-12, other sessions of this Court have considered charts such as these that merely "catalogu[e] the misstatements and omissions alleged in the Amended Complaint and explain[] why [Defendants argue] they are not actionable under Rule 10b–5." Mahoney, 342 F. Supp. 3d at 212; see Kader v. Sarepta Therapeutics, Inc., No. 14-cv-14318-ADB, 2016 WL 1337256, at *10 (D. Mass. Apr. 5, 2016) (same). Exhibit 1 does not, as Plaintiffs contend, D. 56 at 8-11, provide any additional facts not alleged in the AC, nor does it supplement any legal arguments. Thus, the chart "does not introduce any new arguments" and Court finds it "useful," Kader, 2016 WL 1337256, at *10, particularly given the length of the AC and numerous allegations contained therein and the Court will not strike Exhibit 1.

Plaintiffs also argue that Exhibits 3, 4 and 22, three SEC filings, should not be considered because they are neither incorporated by reference in the AC nor relevant. D. 56 at 11-13. As explained above, a court may consider public records, including SEC filings. See In re Stone & Webster, Inc., Sec. Litig., 253 F. Supp. 2d 102, 128 n.11 (D. Mass. 2003) (explaining that a district court may "consider documents required to be filed, and actually filed, with the SEC on a motion to dismiss"). Plaintiffs do not dispute this, D. 56 at 13, but instead argue that these documents are "irrelevant . . . because these filings were issued outside the Class Period," id. In support of their argument, Plaintiffs cite cases where courts have declined to consider post-class period materials at the motion to dismiss stage. Id.; see, e.g., Pizzuto v. Homology Medicines, Inc., No. 23-cv-10858-AK, 2024 WL 1436025, at *2 (D. Mass. Mar. 31, 2024) (declining to take judicial notice of SEC filing filed four months after end of class period because it is "irrelevant"); Shash, 627 F.

Supp. 3d at 99 (declining to take judicial notice, finding "no basis" to consider new information that fell outside the presumptive class period).

Exhibit 22 is a SEC filing for fiscal year ended December 31, 2024. D. 47-23. This filing details Intellia's financial information during fiscal year 2024, information which falls within the presumptive Class Period of January 4, 2024 and January 8, 2025, D. 38 ¶ 1, even though it was filed thereafter. See id. at 2-5. Moreover, as Defendants note, D. 60 at 17, the AC includes allegations regarding "Intellia's reported research and development ('R&D')" during "the fiscal year ended December 31, 2024," D. 38 ¶ 76, "Intellia's reported external costs" in 2024, id. ¶ 77, and reproduced figures comprising "Intellia's external R&D expenses" from fiscal year ended December 31, 2024 that are included in Exhibit 22, id. ¶ 78; D. 47-23 at 5. Although Plaintiffs do not specify the source of this reported information, it appears that these facts and figures "are presumably taken directly from the Company's 2024 Form 10-K filed with the SEC—*i.e.*, Exhibit 22." D. 60 at 17; see D. 47-23 at 5; see Guerra, 2004 WL 1467069, at *2 (rejecting plaintiffs' argument that SEC filing must be stricken because "it encompasses information outside the Class Period"). Accordingly, the Court will not strike Exhibit 22.

By contrast, Exhibit 3 is a SEC filing for the fiscal year ended December 31, 2022, D. 47-4, and Exhibit 4 is a SEC filing for fiscal year ended fiscal quarter ended September 30, 2023, D, 47-5. These exhibits report on information preceding the Class Period and Defendants fail to articulate how they are relevant to the allegations in the AC. D. 60 at 16-17; see Kader, 2016 WL 1337256, at *10 (noting that "[a]lthough these exhibits may have provided helpful [background] context, they are not properly before the Court, nor are they essential to evaluating the sufficiency of the [c]omplaint"). These exhibits are also not, as Defendants contend, D. 60 at 17, incorporated by reference as they are not "integral to or explicitly relied upon in the complaint," see Clorox Co.

13

P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000) (citation omitted), and even though public records, not relevant to allegations in the AC. The Court will not consider Exhibits 3 and 4 at this stage.

Exhibit 7 is Intellia's PowerPoint presentation for the 42nd Annual J.P. Morgan Healthcare Conference. D. 47-8. Defendants' general contention that this presentation "is publicly available," D. 60 at 19, is insufficient to establish that it is a matter of public record, see Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013) (rejecting "expansive view that any document held in a public repository falls within the category of extrinsic materials that may be considered"). Additionally, while the AC references Intellia's presentation at the J.P. Morgan conference, D. 38 ¶¶ 83-84, 117, 205, it neither referenced nor "explicitly relied upon" the PowerPoint presentation purportedly accompanying the presentation, see Clorox Co. P. R., 228 F.3d at 32; Pizzuto, 2024 WL 1436025, at *1-2. Accordingly, the Court will not consider Exhibit 7.

Finally, Plaintiffs challenge Exhibit 2, a chart of purported "Risk Disclosures," which reproduces several excerpted statements from Exhibits 5, 6, 7, 8 and 10 and characterizes them as "disclosure[s] of risks," D. 47-3 at 2-15, and cites several of the remaining exhibits for their purportedly "substantially similar (though not always exactly identical) language," id. at 2 n.3. While Defendants contend that "Exhibit 2 is a compilation exhibit for the Court's convenience that simply collects quotations from other Exhibits properly before the Court," D. 60 at 13, the Court agrees with Plaintiffs that this exhibit goes beyond compiling statements offered by Defendants as risk disclosures in their brief. See 56 at 9-10. Exhibit 2 relies upon several exhibits not cited in Defendants' brief, including exhibits which, as explained above, the Court may not consider at this stage. See D. 47-3 at 2-15 (citing Exhibits 3 and 4); id. at 14-15 (citing and discussing Exhibit 7); cf. Guerra, 2004 WL 1467069, at *2 (considering summary of cautionary disclosures where exhibit

14

contained only excerpt of exhibits not challenged by plaintiffs).  Further, Exhibit 2 includes not only excerpts from these exhibits, but also legal arguments that are not included in Defendants' memorandum of law.  D. 47-3 at 2-15; see D. 47 at 27-28.  In sum, Exhibit 2 impermissibly offers new legal arguments, see Kelly v. Waters Corp., No. 17-cv-12193-LTS, 2023 WL 2404040, at *3 (D. Mass. Feb. 9, 2023).  Accordingly, the Court will not consider Exhibit 2.

For the aforementioned reasons, Plaintiffs' motion to strike is ALLOWED in part as to Exhibits 2, 3, 4 and 7 but otherwise denied.[3]

### B.    Section 10(b) and Rule 10b-5 Claim (Count I)

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss and (6) loss causation.  Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460-61 (2013).  Defendants challenge the adequacy of the AC's allegations regarding scienter, actionable misrepresentations and loss causation.  D. 47 at 13-31.

#### 1.    Actionable Misstatement

Defendants argue that Plaintiffs failed to allege an actionable misstatement on the grounds that:  (1) Plaintiffs failed to allege with particularity that any statement was false or misleading when made; (2) Plaintiffs challenge forward-looking statements immunized by the safe harbor rule; and (3) Plaintiffs challenge statements of opinion and puffery.  D. 47 at 24-31.  The AC challenges three categories of statements:  (1) statements about the timeline for the Phase 1/2 and Phase 1 clinical studies of NTLA-3001 in human subjects, D. 38 ¶¶ 114-15, 118-19, 124, 127-28,

---

[3] Although Plaintiffs' also move to strike the declaration of Bullerjahn accompanying Defendants' exhibits, D. 55 at 2; see D. 47-1, Plaintiffs advance no arguments as to why this declaration should be stricken, see D. 56 at 8-16.  As this declaration is provided for the purpose of identifying Defendants' exhibits, Plaintiffs' motion to strike is also denied as to this declaration.

133, 141, 144, 146, 149, 151, 159-60, 163, 166-67, 170-71, 177, 183, 186-87, 190, 194, (2) statements about Intellia's development and prioritization of NTLA-3001, id. ¶¶ 114, 118, 122, 131, 133, 179, 197, and (3) statements about NTLA-3001's preclinical nonhuman primate data, id. ¶¶ 133, 137, 141, 151, 155, 174, 190.

> a) <u>Plaintiffs have not pled actionable statements regarding the timeline for NTLA-3001 clinical studies and Intellia's development and prioritization of NTLA-3001</u>
>
> (1)    Opinion and Puffery

As to Defendants' statements that Intellia anticipated dosing or was on track to dose the first patient in the Phase 1 and/or Phase 1/2 study of NTLA-3001 in 2024 and that NTLA-3001 was a priority for Intellia in 2024, Defendants argue that certain of these statements are inactionable statements of opinion and/or puffery. D. 47 at 28-31. "Courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation . . . numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Shaw, 82 F.3d at 1217. Such statements include those "about both a company's current state of affairs and its future prospects." In re Boston Sci. Corp. Sec. Litig., No. 10-cv-10593-DPW, 2011 WL 4381889, at *11 (D. Mass. Sept. 19, 2011) (internal citation and quotation marks omitted), aff'd, 686 F.3d 21 (1st Cir. 2012). Here, Plaintiffs' challenges to Defendants' alleged statements that NTLA-3001 was a priority, D. 38 ¶ 114; see id. ¶ 197, Intellia was "bringing forth the next wave of innovation," for gene editing technology, id. ¶ 131; see id. ¶¶ 119, 122, 144, 149, 159, 170, 190, and that Intellia was "mak[ing] progress . . . with DNA witting technology," id. ¶ 118; see id. ¶¶ 133, 151, fall within this bar. See In re Cytyc Corp. Sec. Litig., No. 2-cv-12399-NMG, 2005 WL 3801468, at *22 (D. Mass. Mar. 2, 2005) (concluding that statements about "momentum" and "consistent"

16

growth are inactionable "puffery and sales talk"); In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d 5, 42 (D. Mass. 2016) (claiming that company sold a "terrific product that is going to perform very well in the market" was not actionable).

Defendants' argument, however, that their alleged statements that Intellia "planned to dose," "anticipated dosing" and was "on track to dose" patients in the Phase 1 and/or Phase 1/2 study of NTLA-3001 in 2024, D. 38 ¶¶ 115, 119, 124, 127-28, 131, 133, 137, 141, 144, 149, 151, 163, 166-67, 170, 183, 186-87, 190, are also mere corporate opinion or puffery, D. 47 at 28-31, fails. Defendants argue that certain of these statements are inactionable opinion statements because they are paired with words such as "we're confident" and "we expect." Id. at 29. While "[w]ords like 'I think' or 'I believe' can play a role in demonstrating a lack of certainty . . . their use does not preclude the possibility that the statement as a whole may still mislead as to some fact." Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 7 (1st Cir. 2021) (citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 187 (2015)). Here, Defendants allegedly made repeated statements of their expectations to dose patients in the NTLA-3001 clinical trials in 2024 on several occasions, up-to-and-including statements made on November 7, 2024 that they "expect[ed] to dose the first patient in the Phase 1/2 study of NTLA-3001 by year-end [2024]," D. 38 ¶ 183; see id. ¶ 187, and that "it is possible" and "reasonable to think" that "we'll have data [from these clinical trials] . . . in 2025," id. ¶ 194. These repeated statements of Defendants' expectations for 2024, particularly those made on November 7, 2024, are sufficient to demonstrate that a reasonable investor would understand them to be factual statements. See Shaw, 82 F.3d at 1217; see also In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (concluding that "[w]hile some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when (as here alleged) the statements were

made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company"); In re Sepracor, Inc. Sec. Litig., 308 F. Supp. 2d 20, 33-34 (D. Mass. 2004) (rejecting puffery argument where "Defendants' predictions regarding [company]'s future contain 'at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a rational basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement'") (quoting Helwig v. Vencor, Inc., 251 F.3d 540, 557 (6th Cir. 2001)).

Additionally, several of these alleged statements go beyond predictions of Intellia's timeline for dosing clinical patients and convey information about Intellia's current status. As alleged, Defendants stated that Intellia was "on track" to dose patients in these clinical trials by the end of 2024, D. 38 ¶¶ 127, 144, 170, including less than two months before the end of the year, id. ¶¶ 186, 190. Further, on February 22, 2024, Defendants claimed that Intellia was "embarking on [the Phase 1 trials] now as we speak." Id. ¶ 137. These present-tense statements regarding when Intellia would begin dosing patients in the clinical trials more so resemble statements of fact than mere opinion or puffery, see Constr. Indus. & Laborers Joint Pension Tr., 22 F.4th at 7 (citing Omnicare, Inc., 575 U.S. at 183), as exemplified by analysts' alleged reactions to these statements, see D. 38 ¶¶ 88-89, 91. Defendants' statements that they were "on track" to dose patients in the clinical testing of NTLA-3001 are thus not puffery.

(2)    Materially False or Misleading

Plaintiffs have not, however, sufficiently alleged that any of these statements are materially false or misleading. "To establish a material misrepresentation or omission, [a plaintiff] must show 'that defendants made a materially false or misleading statement or omitted to state a material fact

18

necessary to make a statement not misleading.'" Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (quoting Geffon v. Micrion Corp., 249 F.3d 29, 34 (1st Cir. 2001). "Information is material if a reasonable investor would have viewed it as having significantly altered the total mix of information made available." Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008) (citations and internal quotation marks omitted). The allegations in the complaint also must meet the standard under Fed. R. Civ. P. 9(b) and the "heightened pleading requirements" imposed by the PSLRA. Id. Although "[i]n most circumstances, disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact," Shaw, 82 F.3d at 1217, dismissal is appropriate where "[t]he Court finds that, even taking all facts alleged as true, most of the challenged statements were not material misrepresentations or omissions," Wasson v. LogMeIn, Inc., 496 F. Supp. 3d 612, 639 (D. Mass. 2020). The Court also must dismiss a securities fraud complaint "predicated on the concealment of information if that information was, in fact, disclosed." In re First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 155 & n.73 (D. Mass. 2009) (citations omitted).

Plaintiffs have not sufficiently alleged that Defendants' statements regarding Intellia's anticipated timeline for Phase 1 and/or Phase 1/2 clinical trials of NTLA-3001 were materially false or misleading. Plaintiffs first argue that these statements are false because, according to CW6, NTLA-3001 did not show efficacy in the 2023 preclinical FlexiVent studies or the nonhuman primate studies, D. 38 ¶¶ 64-67, 69, and, according to CW4 and CW5, "many companies in the gene editing and delivery space" were moving away from the AAV vectors used in NTLA-3001 in 2024 because of financial and efficiency constraints, id. ¶ 71. See id. ¶ 116. Even assuming, as discussed fully below, that Plaintiffs may properly rely upon CW6's information regarding NTLA-3001's efficacy in the 2023 preclinical mice studies, see In re

19

Cabletron Sys., Inc., 311 F.3d 11, 29 (1st Cir. 2002) (internal citation omitted), this information does not establish that Intellia did not anticipate beginning clinical trials in 2024. Likewise, the generalized allegation provided by CW4 and CW5 that "many companies" moved away from AAV vectors in 2024 does not support falsity, as it does not specifically allege that Intellia moved away from AAV vectors. See Hill, 638 F.3d at 55.

Plaintiffs next argue that these statements are false because by the beginning of 2024, Intellia ceased FlexiVent studies with mice and Intellia "did not have all the proper certifications to comprehensively conduct testing of NTLA-3001," specifically a DEA license that expired at the end of 2023. D. 38 ¶ 68; see D. 54 at 17. That Intellia ceased its preclinical FlexiVent studies in mice studies in 2023 does not establish that Intellia did not anticipate beginning its clinical Phase 1 studies in 2024. See D. 38 ¶¶ 61-62. Further, Plaintiffs' allegation that Intellia let an unspecified DEA license expire is insufficient to establish falsity. Likewise, CW6's speculative statement that Intellia "effectively abandoned trying to prove that NTLA-3001 was reaching the lungs in 2023," id. ¶ 68, is afforded no weight at this stage, Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (taking only a "complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true in consideration of a Rule 12(b)(6) motion). Plaintiffs also argue that these statements are false and misleading because Intellia's external costs related to NTLA-3001 decreased from $17.3 million in 2023 to $8.7 million in 2024. D. 54 at 17; see D. 38 ¶¶ 77-78; see id. ¶ 76. Without any allegations regarding the particular costs associated with Phase 1 and Phase 1/2 trials, this decrease in funding does not establish falsity. Likewise, Plaintiffs' allegation that Intellia was considering potential layoffs in July 2024, D. 38 ¶¶ 73-74, and that the Company's Disease Biology department was moved to "high-priority projects" then, id. ¶ 74, does not establish falsity, not only because the majority of Plaintiffs' challenged statements preceded any layoffs,

20

see id. ¶¶ 113-57, but also because the AC fails to allege any specific facts to support an inference that these layoffs demonstrated that Defendants did not anticipate beginning Phase 1 trials in 2024 such as who was laid off, the personnel needed for Phase 1 and Phase 1/2 trials, whether NTLA-3001 was a "high priority project" or whether the Company's Disease Biology department was moved off NTLA-3001 development, see Hill, 638 F.3d at 55; Premca Extra Income Fund LP v. Angle, No. 25-1192, 2026 WL 1622808, at *15 (1st Cir. June 5, 2026) (concluding that allegations that merger-integration meetings ended before statements predicting success of merger did not establish falsity as complaint "provides no well-pleaded allegations for why they ended" and inference that meetings ended because merger would fail regulatory review was "unsupported by particularized allegations").

Accordingly, Plaintiffs have failed to sufficiently allege that Defendants' statements about the timeline for NTLA-3001's Phase 1 and Phase 1/2 trials were materially false or misleading. Plaintiffs' falsity arguments as to Defendants' statements regarding Intellia's prioritization and development of NTLA-3001, predicated on these same allegations, D. 54 at 17, also fail for the reasons discussed above.

(3)    Safe Harbor

Moreover, the PSLRA's "safe harbor" provisions further immunize several of Plaintiffs' challenged statements. These provisions "sharply limit liability of companies and their management for certain 'forward-looking statements,' . . . when such statements are accompanied by appropriate cautionary language." In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 71 n.3 (1st Cir. 2012) (citing 15 U.S.C. § 78u-5).   Forward-looking statements include statements "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." Meyer v. Biopure Corp., 221 F. Supp.

21

2d 195, 203 (D. Mass. 2002) (quoting 15 U.S.C. § 78u-5(i)(1)(B)).  "[T]o be meaningful, cautionary statements must be 'substantive and tailored to the specific future projections, estimates or opinions . . . which plaintiffs challenge.'"  Isham v. Perini Corp., 665 F. Supp. 2d 28, 39 (D. Mass. 2009) (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 340 (D. Mass. 2009)).  Further, "if a forward-looking statement is accompanied by meaningful cautionary language the defendant's state of mind is wholly irrelevant."  Leavitt v. Alnylam Pharms., Inc., 451 F. Supp. 3d 176, 186 (D. Mass. 2020) (citing In re Stone & Webster, Inc., Sec. Litig., 414 F.3d at 212).

Plaintiffs challenge several forward-looking statements regarding Defendants' anticipated timeline for dosing patients in clinical trials and prioritization of NTLA-3001 in 2024.  D. 38 ¶¶ 114-15, 119, 124, 128, 131, 133, 141, 144, 149, 151, 163, 166-67, 183, 187.  As Defendants note, D. 47 at 27, 27 n.16, certain of these statements were accompanied by sufficient cautionary language such that they fell into the safe harbor rule.  For example, Intellia's February 22, 2024 Form 10-K statements that it planned to dose patients in clinical trials for NTLA-3001 in 2024, D. 38 ¶ 124; D. 47-9 at 12, are accompanied by cautionary language such as "developing, manufacturing and commercializing our product candidates may subject us to a number of challenges or delays in completing our preclinical studies and initiating or completing clinical trials," D. 47-9 at 14, "we may elect to, or regulators, IRBs or ethics committees may require that we or our investigators, suspend or terminate clinical research or trials for various reasons," id. at 15, "[w]e cannot provide any assurance that we will be able to successfully advance any of our product candidates, including . . . NTLA-3001 . . . through the entire research and development process," id. at 19; see id. 21, and that Intellia "may have to significantly delay, scale back or

22

discontinue the development, manufacture or commercialization of our product candidates" depending on the availability of funding, id. at 22.

Although "[g]eneralized risk disclosures" about a company's inability to assurance timely or ultimate regulatory approval "do not give a company a 'free pass to deceive investors about a specific risk,'" Premca Extra Income Fund LP, 2026 WL 1622808, at *13 (internal citation omitted), here, as explained above, Plaintiffs have not adequately identified a "specific risk" regarding the NRLA-3001 timeline that would make these statements false or misleading. Cf. id. (concluding that statements about company's inability to assurance timely or ultimate regulatory approval did not immunize company's prediction of regulatory success where plaintiff adequately alleged that company knew that merger faced regulatory difficulty). Here, in the absence of contrary evidence, these risk disclosures, paired with Defendants' forward-looking statements regarding the timeline NTLA-3001 clinical studies, immunize these statements from securities challenges under the safe harbor rule. See Pizzuto, 2024 WL 1436025, at *14 (concluding that risk disclosures that "successful development . . . may never occur if [drug] . . . were found to not be efficacious" and factors "could cause clinical trials to be delayed or terminated" were sufficient cautionary statements).

For the aforementioned reasons, Plaintiffs have not sufficiently plead actionable statements regarding Intellia's timeline for clinical trials and prioritization of NTLA-3001.

> b)    Plaintiffs have pled actionable statements regarding NTLA-3001's preclinical nonhuman primate data

As to Defendants' alleged statements regarding NTLA-3001's preclinical nonhuman primate data, D. 38 ¶¶ 133, 137, 151, 155, 170, 174, 190, Plaintiffs argue that these statements were materially misleading because, according to CW6, preclinical activities had not shown any efficacy for NTLA-3001 in mice or nonhuman primates, id. ¶¶ 64-67, 69. While, Defendants'

23

alleged statements regarding what they "believe[d]" NTLA-3001 could achieve in human subjects "[b]ased on [Intellia's] preclinical data," id. ¶ 133; see id. ¶ 174, are inactionable, see Shaw, 82 F.3d at 1217, certain of Defendants' alleged statements regarding NTLA-3001's preclinical data for its nonhuman primate studies are actionable.  Plaintiffs challenge Defendants' February 22, 2024, May 9, 2024, August 8, 2024 and November 7, 2024 statements that Intellia had successfully employed NTLA-3001 to accomplish "essentially normal human levels of wild-type protein . . . which we've accomplished preclinically in nonhuman primates," D. 38 ¶ 137; see id. ¶¶ 151, 155, 170, 174, 190.  According to CW6, Intellia's 2023 outsourced nonhuman primate studies "showed no indication of efficacy" and, when discussing the results of these studies with their small group in April 2024, Director Shaw "definitively told CW6 . . . that these studies showed there was no editing in the nonhuman primates and that they were not finding what they were looking for," id. ¶ 69.  As the AC does not allege that the results of these 2023 outsourced studies were discussed until "around April 2024," id., Plaintiffs have not plausibly alleged that Defendants' February 22, 2024 statements were false.

As for the remaining statements, although a close call, the Court concludes that Plaintiffs have alleged with particularity that these statements are misleading based on the alleged results from the 2023 nonhuman primate studies showed no gene editing and no indication of efficacy. Id. ¶ 69.  Even though, as Defendants contend, see D. 47 at 25-26, the AC includes allegations suggesting positive results in nonhuman primates in 2021, D. 38 ¶ 52; see id. ¶ 87, the allegations of inefficacy in April 2024 are sufficient to allege that Defendants' post-April 2024 statements are misleading for failure to include information regarding these negative preclinical trials, see In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 27 (1st Cir. 2012) (explaining that Section 10(b) creates an affirmative duty to disclose material information "where affirmative statements are made and

24

the speaker fails to 'reveal [] those facts that are needed so that what was revealed would not be so incomplete as to mislead'") (quoting Hill, 638 F.3d at 57); Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 706 (9th Cir. 2016) (noting that "'[o]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information'") (citation omitted; alteration in original); Premca Extra Income Fund LP, 2026 WL 1622808, at *11 (concluding that statement predicting success of merger was misleading as it "failed to contemporaneously disclose [merger-company's] ongoing refusal to provide [regulatory agency] with information").  These 2023 study results are also material because they "altered the total mix of information made available," namely Intellia's communications regarding the success of its preclinical nonhuman primate studies.  See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted).  As these statements neither included risk disclosures regarding the nonhuman primate preclinical data nor amount to opinion or puffery, they are actionable.

Accordingly, Plaintiffs have sufficiently alleged that Defendants' statements regarding the success of Intellia's preclinical nonhuman primate studies are materially misleading.

### 2.   Scienter

Still, however, Plaintiffs have failed to plead a strong inference of scienter as to the challenged statements.  "Scienter is defined as either the 'intentional or willful conduct designed to deceive or defraud investors' or 'a high degree of recklessness.'"  Metzler Asset Mgmt. GmbH v. Kingsley, 928 F.3d 151, 158 (1st Cir. 2019) (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)). Recklessness in this context refers to "a highly unreasonable omission" involving "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor

must have been aware of it." Brennan v. Zafgen, Inc., 853 F.3d 606, 613 (1st Cir. 2017) (citation and internal quotation marks omitted). This "definition of recklessness does not encompass ordinary negligence and is closer to a lesser form of intent." Greebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999). Defendants must have had the requisite scienter at the time of the allegedly fraudulent statements. In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d 744, 751-52 (1st Cir. 2016).

The PSLRA's requirement to plead facts giving rise to a "strong inference" of scienter means that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Thus, in evaluating securities class action complaints, courts "must take into account plausible opposing inferences." Id. at 323-24 (instructing courts to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff"). This is necessarily a fact-specific inquiry. See Greebel, 194 F.3d at 195, 202. Courts conducting such an inquiry must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23 (emphasis omitted).

### a)    Intentional or Reckless Disregard

The crux of Plaintiffs' allegation of a strong inference of scienter rests on the statements of six confidential witnesses ("CW"), D. 38 ¶¶ 30-35, 200-03, but particularly CW6, who served as an *in vivo* Study Support Technician at Intellia and worked on the preclinical testing of NTLA-3001, id. ¶ 35. Plaintiffs may rely on confidential witnesses without specifically naming them "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information

26

alleged." In re Cabletron Sys., Inc., 311 F.3d at 29 (internal citation omitted). Some courts have looked askance upon confidential sources that "were simply not positioned to know the information alleged, . . . report only [multi-layer] hearsay and . . . allege conclusory assertions of scienter." Zucco, 552 F.3d at 996-98 and cases cited.

Plaintiffs first allege that Defendants knew or should have known that their statements were false because, according to CW6, Intellia ran several FlexiVent studies in 2023, none of which demonstrated efficacy, D. 38 ¶ 65, Intellia let a DEA license to test NTLA-3001 lapse at the end of 2023, id. ¶ 68, and that Intellia discontinued its use of the FlexiVent machine by the beginning of January 2024, id. As alleged, CW6 was employed by Intellia between March 2022 and January 2025, during which time CW6 served as an *in vivo* Study Support Technician. Id. ¶ 35. In this role, CW6 focused primarily on the preclinical testing of NTLA-3001 and was responsible for administering Lipid Nanoparticles to the lungs of mice and measuring lung mechanics using the FlexiVent machine. Id. These allegations regarding CW6 are sufficient to support the probability that CW6 would possess the information alleged as to the FlexiVent studies in 2023.

CW6's allegations do not, however, satisfy PSLRA's scienter requirement. None of these allegations speak to the mindset of any of the Defendants. Nor does CW6 specifically allege that Defendants had knowledge of any of this alleged information at the time they made any given statement. See Cody v. Conformis, Inc., 199 F. Supp. 3d 409, 421 (D. Mass. 2016) (finding no inference of scienter where complaint does not specifically allege what defendants knew or thought). While, according to CW6, "it was widely understood within the Preclinical Pharmacology team at Intellia that NTLA-3001 did not show efficacy in the animal studies conducted in 2023," D. 38 ¶ 64; see id. ¶¶ 65-67, 69, Plaintiffs do not allege that any Defendant was a member of the Preclinical Pharmacology team at Intellia. Likewise, although CW6 alleges

27

that Director Shaw knew about the negative preclinical study results in 2023, id. ¶¶ 67, 69, and that the adverse nonhuman primate study results were discussed "amongst CW6 and their team during small group meetings (held on Fridays) around April 2024," id. ¶ 69, Plaintiffs fail to allege that any Defendant was present at this meeting or that Director Shaw, CW6 or any other member of the Preclinical Pharmacology at Intellia ever relayed this information to any Defendant.  See In re Vertex Pharms. Inc., Sec. Litig., 357 F. Supp. 2d 343, 354 (D. Mass. 2005) (noting that confidential witness allegations concerning knowledge of "some scientists at Vertex" and "those privy to the analysis of the data" as well as "common feeling among co-workers" not sufficient for scienter); Metzler Asset Mgmt., 928 F.3d at 162 (rejecting scienter allegations where "plaintiffs [did] not allege that any of the confidential witnesses who made these statements spoke with [the executive-defendant] before he made his [alleged misstatements]").

Plaintiffs' allegations that, according to CW6, all preclinical activities conducted at Intellia were logged in a digital lab book which "would have shown that the 2023 preclinical studies of NTLA-3001 did not produce any indications of efficacy," D. 38 ¶ 203, fares no better.  Not only does this allegation rest upon conjecture of what this lab book "would have shown" regarding the 2023 preclinical studies, but, contrary to Plaintiffs' representations in their opposition to motion to dismiss, D. 54 at 25-26, the AC does not specify whether Defendants had access to this data, either contemporaneously with any particular statement or otherwise, nor whether Defendants actually accessed data that showed negative nonhuman primate study results.  Absent any allegations that Defendants were aware of these negative results, Plaintiffs' allegations based on CW6's information cannot support scienter.

Plaintiffs also allege that Defendants knew or should have known that their statements were false because, according to CW3 and CW4, NTLA-3001 was regularly discussed during town hall

28

meetings and in internal company presentations, including by Lenoard.  D. 38 ¶ 200.  Plaintiffs fail to specify, however, what about NTLA-3001 was discussed at these alleged meetings beyond "NTLA-3001's progress."  Id.  Further, these CWs place only Leonard and Sepp-Lorenzino at these meetings between January 2023-Janaury 2025 and fail to allege that any other Defendant was present at these meetings.  Cf. Premca Extra Income Fund LP, 2026 WL 1622808, at *12 (concluding plaintiff adequately alleged company was aware statements regarding merger success were false as the company held two senior leadership meetings where the chief legal officer "warned that [merger-company] was refusing to provide [regulator] with 'information'" necessary to approve merger).  These allegations do not raise an inference of scienter, much less allege scienter with particularity.

Plaintiffs' allegations that, according to CW1, CW2 and CW4, the hybrid delivery system utilized for NTLA-3001 "made the program more complicated, costly and uncertain," id. ¶ 70, that the AAV vector component used in NTLA-3001 also made the program "more expensive, id. ¶ 71, and CW4 and CW5's generalized allegations about these costs and what "many companies" did in response to them, id., also fail to establish scienter.  Plaintiffs have not alleged that any of these CWs, none of whom appear to have worked with Intellia's financial department or in an upper-level position, see id. ¶¶ 30-31, 33-34, would have information about the costs associated with the NTLA-3001 program.  Plaintiffs' allegations that, according to CW4 and CW2, "Intellia executives" systematically reviewed program viability, id. ¶ 202, likewise fails.  Plaintiffs have not sufficiently alleged that these CWs had a basis to know this information, see id. ¶¶ 31, 33, but even if they had, these allegations are devoid of particularity, such as which executives assessed programs' viability, whether NTLA-3001's viability was accessed and the results of any such assessment.  These allegations do not support scienter.

b)        Motive and Opportunity

A "plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter," including allegations "that the defendants had the motive ('concrete benefits that could be realized by . . . the false statements and wrongful nondisclosures') and opportunity ('the means and likely prospect of achieving concrete benefits by the means alleged') to commit the fraud." Aldridge, 284 F.3d at 82 (alteration in original) (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)) (further citation omitted). "[W]hile mere allegations of motive and opportunity alone may be insufficient, together with additional factual support, evidence of motive and opportunity may establish a strong inference of scienter." Id.

Plaintiffs contend that Defendants mislead investors to achieve "aggressive capital raises" by exploiting an artificially inflated stock price, without which "Intellia would not have been able to sustain itself." D. 54 at 30. As alleged, "Intellia has funded its operations through proceeds from the Company's initial public offering ("IPO") and additional capital raises including private placements, follow-on public offerings, at-the-market offerings and the sale of convertible preferred stock." D. 38 ¶ 93. According to CW5, clinical-stage biotechnology companies "typically need to show they have at least two years of cash on hand . . . mean[ing] companies must constantly raise new money." Id. ¶ 94. Plaintiffs, therefore, argue that Intellia's 2024 statements regarding the development and prioritization of NTLA-3001 in its 2024 milestones and 2024-2026 strategic priorities, during which time Intellia raised aggregate net proceeds of $174.9 million, id. ¶ 99, were necessary to sustain the company, D. 54 at 30. Plaintiffs have failed to allege that CW5, the former Director of Protein Production and Assay Group at Intellia from August 2022 to January 2025, D. 38 ¶ 34, had a basis of knowledge to report on the financial standing of Intellia, and CW5's generalized statements about what clinical biotechnology

30

companies "typically need to show," is insufficient to establish Intellia's particular intent.  Zucco, 552 F.3d at 996-98.

Further, "'the usual concern by executives to improve financial results' does not support an inference of scienter"; instead courts "require something more than the ever-present desire to improve results, such as allegations that 'the very survival of the company w[as] on the line.'" Corban v. Sarepta Therapeutics, Inc., 868 F.3d 31, 41 (1st Cir. 2017) (quoting In re Cabletron Sys., Inc., 311 F. 3d at 39 (alteration omitted)).  Here, Plaintiffs' conclusory allegation that "Intellia would not have been able to sustain" without the 2024 capital raises, D. 38 ¶ 101, is not sufficient. See Schatz, 669 F.3d at 55.  Further, even as alleged, Intellia did indeed "ha[ve] a cash runway into the end of 2025, then Q2 of 2026, then Q1 or Q2 of 2027," D. 38 ¶ 201, and as Intellia's February 22, 2024 Form 10-K reveals, at the beginning of 2024, Intellia had $921.6 million in cash and cash equivalents, D. 47-9 at 27; see Corban, 868 F.3d at 41-42 (noting that $125 million in at-the-market sales did not supply a plausible motive where "[the company] had $156.2 million in cash and cash equivalents on its balance sheet," and "$80 million in working capital, when it launched the . . . at-the-market offering").  Absent "any allegations suggesting that such capital was insufficient for continued operations, much less that [Intellia] would shutter its doors unless it padded earnings by deceiving investors," Plaintiffs' motive argument fails.  See Corban, 868 F.3d at 42.

c)    <u>Core Operations Theory</u>

Plaintiffs also argues that a "core operations" theory supports a strong inference of scienter. D. 54 at 29.  Under such a theory, "facts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its officers."  Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (alteration and citation omitted).  Courts, however, "have

31

been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'" In re Biogen Inc. Sec. Litig., 193 F. Supp. 3d at 51 (quoting In re A123 Sys., Inc. Sec. Litig., 930 F. Supp. 2d 278, 285 (D. Mass. 2013)). "As a general matter, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." Metzler Asset Mgmt., 928 F.3d at 165 (quoting S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784-85 (9th Cir. 2008)) (internal quotation marks and further citation omitted).

Here, even if NTLA-3001's candidacy was critical to Intellia's business as one of three drug candidates Intellia was developing at that time, D. 38 ¶¶ 2, 36-42, the Court cannot impute to Defendants' knowledge of any alleged divergence in the prioritization or timeline for conducting clinical studies of NTLA-3001 or any negative 2023 study results "absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter." See Metzler Asset Mgmt., 928 F.3d at 165 (citation and internal quotation marks omitted); cf. Premca Extra Income Fund LP, 2026 WL 1622808, at *12 (concluding that plaintiff was entitled to inference that "individual defendants were 'paying close attention' to" details of merger where plaintiff adequately alleged that defendant-company was "a declining company that was counting on [] merger to improve its financial footing" and individual defendants made optimistic statements about merger when regulatory concerns were "publicly known"). As to the prioritization and timeline for conducting clinical studies of NTLA-3001, as explained above, Plaintiffs have not sufficiently alleged that Defendants' statements were false. Additionally, as to the 2023 nonhuman primate studies, Plaintiffs have failed to allege

32

particularized facts as to such plus factor supporting that Defendants knew or should have known these statements to be false. Plaintiffs' core operations theory thus fails to support a strong inference of scienter.

d)    <u>Weighing Opposing Inferences</u>

Considering the complaint as a whole, including "plausible opposing inferences," Tellabs, 551 U.S. at 323, the stronger inferences favor Defendants. As to Defendants' statements regarding the success of NTLA-3001 preclinically, even as alleged, on October 19, 2021, Defendants presented data "showing that insertion of a healthy form of the *SERPINA1* gene led to normal human AAT levels in non-human primates (NHPs) which were durable after 52 weeks." D. 38 ¶ 52. The inference that Defendants' statements regarding NTLA-3001's positive preclinical data for nonhuman primates refers to this 2021 data as opposed to the 2023 nonhuman primate studies is stronger than Plaintiffs' proposed inference, particularly as Defendants' statements on the subject refer specifically to the type of data discussed in the 2021 presentation. Id. ¶¶ 133 (stating that "[b]ased on our preclinical data, [NT]LA-30[0]1 could potentially achieve normal human levels of [AAT] after a single dose"), 137 (stating that "our objective is to get to essentially normal human levels of wild-type protein . . . which we've accomplished preclinically in nonhuman primates"), 151 (stating that "3001 is the only drug candidate to show AAT levels restored to normal levels after a single dose in nonhuman primates"), 190 (stating that "[i]n previously presented nonhuman primate data, we've demonstrated the ability to produce fully functional [AAT] at normal levels after a single dose"). In contrast, Plaintiffs have failed to specify the type of data captured in the 2023 nonhuman primate studies or allege that Defendants had knowledge of these studies or their results, and the AC alleges that negative results of these studies were not

33

discussed by CW6 and their team until April 2024, which came after certain of Defendants' challenged statements. Id. ¶ 69.

As to Defendants' statements regarding the timeline for conducting clinical trials of NTLA-3001 and Intellia's prioritization of NTLA-3001 in 2024, even assuming *arguendo*, Plaintiffs sufficiently plead that Defendants knew Intellia discontinued certain animal studies in 2023 due to lack of efficacy or that Intellia allowed a DEA license to study NTLA-3001 lapse by the end of 2023, these allegations do not defeat plausible opposing inferences, including, as Defendants argue, D. 47 at 15, that Intellia ramped down preclinical work in preparation for clinical trials. As alleged, Intellia announced plans to submit a CTA for NTLA-3001 in November 2023, D. 38 ¶ 57, and submitted its CTA in December 2023, id. ¶ 79. Defendants highlighted their CTA submission several times throughout 2024, id. ¶¶ 79, 81, 83, 85, and received authorization of the CTA for the Phase 1/2 study of NTLA-3001 on July 30, 2024, id. ¶ 87. Defendants also allegedly spent $8.7 million developing NTLA-3001 in 2024, id. ¶ 77, and "regular[ly]" discussed "NTLA-3001's progress" at town hall meetings "with all employees at the Company in attendance," id. ¶ 200. Defendants' CTA submission and approval to conduct clinical studies of NTLA-3001 in 2024 as well as their highlighting of the NTLA-3001 program in 2024 SEC filings and press releases, $8.7 million funding allocation to NTLA-3001's development and constant internal discussions about NTLA-3001's progress in 2024 support the inference that Defendants believed NTLA-3001 was on track to begin clinical studies in 2024 and that it was a priority in 2024. See Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 81 (1st Cir. 2016) (concluding that the fact that company "made the investment necessary to design and perform a study" meant it "must have thought that positive results were possible, even if not probable"). This competing, nonculpable inference is more compelling than Plaintiffs' proposed inference. Further, this nonculpable

34

inference is particularly strong given Defendants' disclaimers about the possibility of needing to discontinue NTLA-3001 testing and development, see Corban, 868 F.3d at 38-39, as well as Intellia's prompt disclosure of its decision to discontinue NTLA-3001 development, D. 38 ¶¶ 75 (discontinuation discussed at December 12, 2024 internal town meeting), 102-03 (public disclosure on January 9, 2025); see Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 243 (1st Cir. 2015) (stating that company's prompt disclosure of FDA warning letter did not represent "the actions of a company bent on deceiving investors as to their future earnings prospects").

Accordingly, Plaintiffs have failed to sufficiently allege scienter.

### 3.    Loss Causation

The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  Plaintiffs may establish loss causation by showing that a corrective disclosure was "a 'substantial' cause of their losses."  See Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 237-39 (1st Cir. 2013) (quoting FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1309 (11th Cir. 2011)).  A "corrective disclosure" occurs when a company "release[s] . . . information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud."  Id. at 237 (quoting FindWhat Inv. Grp., 658 F.3d at 1311-12); see Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 273 (D. Mass. 2013) (explaining that "the announcement must connect the current, present, negative information to the earlier false or misleading statement" (emphasis omitted)).

Plaintiffs allege that Defendants' January 9, 2025 Announcement to investors regarding the discontinuation of research and development into NTLA-3001 was a "corrective disclosure"

that resulted in a 15 % stock drop.  D. 38 ¶¶ 102-11, 226-32.  Although Plaintiffs have sufficiently alleged that the 15% stock drop from January 8, 2025 to January 10, 2025 was connected to Defendants' January 9, 2025 Announcement, D. 38 ¶¶ 105-10, 231, Plaintiffs cannot show loss causation because they have not alleged any corrective disclosure.  As Plaintiffs failed to allege a false or misleading statement with adequate scienter, Plaintiffs have not adequately alleged that the January 9, 2025 Announcement "reveal[ed] to the market [a] pertinent truth that was previously concealed or obscured by the company's fraud."  See Mass. Ret. Sys, 716 F.3d at 237; In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 350 (D. Mass. 2020) (concluding that a press release "was not a 'corrective disclosure' because [p]laintiffs have not adequately pleaded scienter, so there is no adequate allegation that the defendants 'concealed' or 'obscured' any information from the public").  Additionally, as Defendants previously disclosed the risk that NTLA-3001 might be discontinued, see D. 47-9 at 14-15, 19-22, Intellia's announcement that this risk materialized cannot support loss causation.  See Pizzuto, 2024 WL 1436025, at *19 (concluding no loss causation where "[d]efendants did not conceal the risk . . . but disclosed that risk several times throughout the Class Period") (internal citation omitted).  Intellia's January 9, 2025 Announcement that it was discontinuing NTLA-3001 thus did not correct some untruth about its timeline for clinical trials of NTLA-3001, its development and prioritization of NTLA-3001 or NTLA-3001's preclinical nonhuman primate data but instead announced the materialization of a previously disclosed risk and a change in priority for NTLA-3001 development.

Accordingly, Plaintiffs also fail to allege sufficient facts supporting loss causation.

### C.    Section 20(a) Claim (Count II)

Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation. 15 U.S.C. § 78t(a).  Thus, to

state a claim under Section 20(a), a plaintiff must allege a primary violation of the Exchange Act.

ACA Fin. Guar. Corp., 512 F.3d at 67 (stating that "[t]he plain terms of [S]ection 20(a) indicate

that it only creates liability derivative of an underlying securities violation").  Because Plaintiffs

fail to plead a primary securities law violation, Plaintiffs' claim under Section 20(a) against

Leonard, Sepp-Lorenzino, Lebwohl and Dulac also fails.

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS Plaintiffs' motion to strike in part and

DENIES it in part, D. 55, and ALLOWS Defendants' motion to dismiss, D. 46.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge